UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAIQUAN K. FALLS,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>(POLICE OFFICER) DETECTIVE MICHAEL PITT; (POLICE OFFICER) CARLOS CANARIO; (POLICE OFFICER) ANDRES ARESTIN; (POLICE OFFICER) JONATHAN SAINTICHE; (POLICE OFFICER) SERGEANT WILLIAM ANDERSON; (POLICE OFFICER) JOHN PEREZ; (POLICE OFFICER) CARLOS MENDEZ; (NURSE) BLANCA LEMOS; (NURSE PRACTITIONER) HILLARY DURBIN-FRENCH; (PHYSICIAN) ALAN MADELL,<br><br>                              Defendants. | 16-CV-8863 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances:</u>

Raiquan K. Falls
Brocton, NY
*Pro Se Plaintiff*

David L. Posner, Esq.
Kimberly H. Lee, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants Michael Pitt, Carlos Canario, Andres Arestin, Jonathan Saintiche, John Perez, Carlos Mendez, and William Anderson*

Milan P. Spisek, Esq.
Sean B. Maraynes, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY
*Counsel for Defendants Alan Madell, M.D., Hillary Durbin-French, N.P., and Blanca Lemos, R.N.*

KENNETH M. KARAS, District Judge:

Plaintiff Raiquan K. Falls ("Plaintiff") brought this Action against seven members of the Newburgh Police Department ("Police Defendants") and three members of the hospital staff at Saint Luke's Cornwall Hospital ("St. Luke's") in Newburgh, New York ("Medical Defendants").[1]  Plaintiff alleges various civil rights violations stemming from his arrest and subsequent treatment while in police custody.  (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 111).)  Before the Court are Police Defendants' Motion for Summary Judgment, (Dkt. No. 159), Medical Defendants' Motion for Summary Judgment, (Dkt. No. 173), and Plaintiff's Partial Motion for Summary Judgment, (Dkt. No. 183).  For the following reasons, Police Defendants' Motion is granted in part and denied in part, Medical Defendants' Motion is granted in part and denied in part, and Plaintiff's Motion is granted in part and denied in part.

## I.  Background

### A.  Factual History

The Court has described the allegations and procedural history of this case in two prior Opinions.  *See Falls v. Pitt*, No. 16-CV-8863, 2020 WL 2097626 (S.D.N.Y. May 1, 2020); *Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036 (S.D.N.Y. Aug. 8, 2018).  The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motions.

---

[1] Police Defendants are Detective Michael Pitt ("Pitt" or "Detective Pitt"), Police Officer Carlos Canario ("Canario" or "Officer Canario"), Police Officer Andres Arestin ("Arestin" or "Officer Arestin"), Police Officer Jonathan Saintiche ("Saintiche" or "Officer Saintiche"), Patrol Sergeant William Anderson ("Anderson" or "Sergeant Anderson"), Police Officer John Perez ("Perez" or "Officer Perez"), and Police Officer Carlos Mendez ("Mendez" or "Officer Mendez").  Medical Defendants are Doctor Alan Madell ("Madell" or "Dr. Madell"), Nurse Practitioner Hilary Durbin-French ("Durbin-French" or "Nurse Practitioner Durbin-French"), and Nurse Blanca Lemos ("Lemos" or "Nurse Lemos").

Unless otherwise noted, the following facts are taken from Plaintiff's Second Amended

Complaint, (*see generally* SAC), Defendants' statement pursuant to Local Civil Rule 56.1, (*see*

Defs.' Local Civil Rule 56.1 Statement in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 168)),

Plaintiff's Counter 56.1 Statement in Opposition to Defendants' 56.1, (*see* Pl.'s Counter 56.1

Statement in Opp'n to Defs.' 56.1 ("Pl.'s Counter 56.1") (Dkt. No. 204)), and Plaintiff's own

statement pursuant to Local Civil Rule 56.1, (*see* Pl.'s Local Civil Rule 56.1 Statement in Supp.

of Mot. ("Pl.'s 56.1") (Dkt. No. 183)).[2, 3]  Defendants have sent the required Local Civil Rule

---

[2] On July 6, 2020, the Court granted Medical Defendants' request to adopt the Local Civil
Rule 56.1 Statement submitted by Police Defendants.  (*See* Dkt. No. 182.)

[3] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise
statement, in numbered paragraphs, of the material facts as to which the moving party contends
there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party must then
submit "a correspondingly numbered paragraph responding to each numbered paragraph in the
statement of the moving party, and if necessary, additional paragraphs containing a separate,
short[,] and concise statement of additional material facts as to which it is contended that there
exists a genuine issue to be tried."  *Id.* at 56.1(b).  "If the opposing party . . . fails to controvert a
fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to
the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation
marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).
"A pro se litigant is not excused from this rule."  *Brandever v. Port Imperial Ferry Corp.*, No.
13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted).
Where the Parties identify disputed facts but with semantic objections only or by
asserting irrelevant facts, the Court will not consider these purported disputes, which do not
actually challenge the factual substance described in the relevant paragraphs, as creating disputes
of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a
number of his admissions—improperly interject arguments and/or immaterial facts in response to
facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without
specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported
denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance
asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-
CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's
56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial
facts in response to facts asserted by [the] [d]efendant, without specifically controverting those
facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead
responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002
WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does
not comply with the rule" because "it adds argumentative and often lengthy narrative in almost

56.2 Notice to Plaintiff.  (*See* Police Defs.' Local Civil Rule 56.2 Not. (Dkt. No. 169); Med. Defs.' Local Civil Rule 56.2 Not. (Dkt. No. 176).)

This case stems from a series of events that unfolded on the evening of May 8, 2015.  For conceptual clarity in resolving the instant Motions, the Court will group these events into roughly four distinct episodes: (1) Plaintiff's apprehension and arrest; (2) Plaintiff's body cavity search at the Newburgh police station; (3) Plaintiff's attempt to swallow recovered narcotics; and (4) Plaintiff's subsequent treatment and examination at St. Luke's.

### 1.  Plaintiff's Apprehension and Arrest

On May 8, 2015 at approximately 5:00 P.M., Plaintiff was arrested following a pursuit on foot near 15 Lutheran Street in the City of Newburgh, New York.  (SAC ¶¶ 20, 28; Pl.'s 56.1 ¶¶ 1, 6, 9.)[4]  City of Newburgh Police Department Officers Canario, Perez, and Mendez were dispatched to the area in response to a 911 call from a nearby resident who reported ongoing drug sales.  (SAC ¶ 20; Pl.'s Counter 56.1 ¶ 11.)[5]  By Plaintiff's own admission, the 911 caller "fully describ[ed] [him] as the suspect selling narcotics[,]" (SAC ¶ 20; *see also* Pl.'s Counter

---

every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)).  Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

[4] Plaintiff's Rule 56.1 Statement is located at ECF pages 5–7 of Dkt. No. 183.

[5] Plaintiff's Counter 56.1 Statement is located at ECF pages 223–52 of Dkt. No. 204.

56.1 ¶ 11), and accurately described what he was wearing, (Pl.'s Counter 56.1 ¶ 13).[6]  Plaintiff

testified that he was holding marijuana, which he was "just about to smoke," when officers

arrived on the scene.  (Aff. of David L. Posner, Esq., in Supp. of Police Defs.' Mot. ("Posner

Aff.") Ex. K ("Pl.'s Dep."), at 19:7–9 (Dkt. Nos. 160, 160-10).)

At some point after exiting the patrol car, Officer Canario began walking toward Plaintiff.

(See SAC ¶ 25; Pl.'s Counter 56.1 ¶ 15.)[7]  According to Plaintiff's account, Canario approached

him with his hand on his service weapon, yelling, "Falls, I'll shoot you right in your back if you

make me run!"  (SAC ¶¶ 25–26.)  Both sides agree that Plaintiff began to flee as soon as Canario

approached him.  (Id. ¶ 27; Pl.'s Counter 56.1 ¶ 15.)  Plaintiff avers that the chase "lasted for

about 20 seconds" before he was apprehended.  (SAC ¶ 28.)

What happened next is in dispute.  According to Police Defendants, Plaintiff "was

captured by Officer Mendez a few blocks away and arrested without incident."  (Defs.' 56.1

¶ 16.)  They maintain that "[n]o force was used by the arresting officers beyond restraining him

in handcuffs."  (Id. ¶ 17.)  Plaintiff, by contrast, alleges that he was "slammed . . . to the ground"

and handcuffed by Perez and Mendez, who held him there for several seconds until Canario, Pitt,

Saintiche, Arestin, and Anderson arrived.  (SAC ¶¶ 28–30.)[8]  Plaintiff alleges that the officers

---

[6] Quotations to Plaintiff's submissions occasionally reflect minor corrections in grammar, punctuation, and spelling.

[7] In both his Second Amended Complaint and at his deposition, Plaintiff stated that Canario first approached the residence at 15 Lutheran Street and spoke to a resident on the porch before eventually walking toward Plaintiff.  (See SAC ¶¶ 24–25; Pl.'s Dep. 33:13–16.)

[8] Besides disputing Plaintiff's general characterization of the arrest, Police Defendants assert that Anderson, Pitt, and Saintiche were "not present at the scene of the arrest."  (Defs.' 56.1 ¶ 27.)  Although Arestin eventually arrived at the scene of the arrest, he allegedly did so after Plaintiff was in custody.  (Id. ¶ 28.)  Similarly, while Plaintiff asserts that it was Perez and Mendez who captured and forced him to the ground, (see SAC ¶¶ 28–30), Police Defendants maintain that Plaintiff was initially apprehended by Mendez and Canario, (see Aff. of Carlos

then "dragged [him] into a nearby backyard" behind 12 Dubois Street.  (*Id.* ¶ 31.)  There, he

alleges, the officers "overtightened [his] handcuffs to the point where the metal was press[ing]

against and squeezing [his] wrist bones[,] causing substantial pain and bruising."  (*Id.* ¶ 32.)  He

claims the officers then took turns pummeling him with their "closed fists," striking Plaintiff in

his stomach, ribs, chest, and thighs.  (*Id.* ¶ 33.)  He also claims that the officers "reach[ed] down

inside of [his] pants from the front . . . all the way from [his] underwear to [his] socks."  (*Id.*)

Plaintiff was eventually placed in a patrol car and driven to the Newburgh police station.

(*See* Defs.' 56.1 ¶¶ 29–30; SAC ¶ 35.)  Although Plaintiff claims he was seated in the back seat

between two detectives who interrogated him on the ride to the police station, (*see* SAC ¶¶ 35–

36), video evidence shows there was no one else in the car besides Perez, the driver, and

Plaintiff, (Defs.' 56.1 ¶¶ 30–31; Posner Aff. Ex. C ("Secure Bay Video"), at 5:26:35–5:27:39).[9]

### 2.  Police Defendants' Cavity Search at the Newburgh Police Station

Video footage shows that after arriving at the police station, Plaintiff spent approximately

half an hour waiting in the booking room.  (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–

6:00:40.)  During this time, Plaintiff can be seen sitting, lying down, and occasionally interacting

with Canario and other officers.  (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–6:00:40.)

Eventually, Sergeant Anderson authorized a "visual body cavity search" of Plaintiff.  (Defs.' 56.1

---

Mendez in Supp. of Mot. ("Mendez Aff") ¶ 4 (Dkt. No. 163); Aff. of Carlos Canario in Supp. of
Mot. ("Canario Aff.") ¶ 5 (Dkt. No. 165)), and that Perez arrived a few moments thereafter, (*see*
Aff. of John Perez in Supp. of Mot. ("Perez Aff.") ¶¶ 3–4 (Dkt. No. 162)).

[9] All videos discussed in this Opinion were transmitted by DVD as Exhibit C to the
Posner Affidavit, and are on file with the Court.  In this Opinion, each video is identified by the
title of the camera angle as it appears on the DVD.

¶ 36.)[10]  He allegedly did so for two reasons: first, Plaintiff had been arrested in a part of

Newburgh "known to be rife with drug activity"; and second, "[s]treet dealers such as [Plaintiff]

are known to 'cheek' drugs," placing them "between the cheeks of their buttocks to avoid

detection."  (*Id.* ¶¶ 38–39; Anderson Aff. ¶¶ 3–4.)  Police Defendants maintain that "drugs are

often recovered at the police station during visual body cavity searches."  (Defs.' 56.1 ¶ 40.)  The

search authorized by Anderson was not without limit, however.  According to Police Defendants,

"there is no touching or digital penetration of a body orifice[]" during a "visual body cavity

search."  (*Id.* ¶ 41; Pl.'s Counter 56.1 ¶ 41.)  The Newburgh Police Department's internal strip-

search policy "requires a search warrant for digital penetration of a body orifice," and such an

examination must be performed by medical staff.  (Defs.' 56.1 ¶ 42; Pl.'s Counter 56.1 ¶ 42.)

At approximately 6:00 P.M., Officers Canario and Saintiche escorted Plaintiff into a

separate room—without video cameras—to perform the search.  (Defs.' 56.1 ¶ 43; *see also* SAC

¶¶ 44–45.)  In affidavits submitted in support of Police Defendants' Motion, Canario and

---

[10] The Court notes at the outset that the terminology used to describe different types of invasive body searches is often imprecise and inconsistent.  This observation applies to the relevant case law as well as to Defendants' various submissions.  For example, although Defendants' 56.1 statement refers to the authorized search as a "visual body cavity search," (*see* Defs.' 56.1 ¶¶ 36–37), Sergeant Anderson refers to the search alternatively as a "strip search," (*see* Aff. of William Anderson in Supp. of Mot. ("Anderson Aff") ¶¶ 2, 9 (Dkt. No. 161)), and as a "visual body cavity inspection," (*id.* ¶ 7), and the Newburgh Police Department's official strip search policy recognizes only two types of searches—a "strip search" and a "body cavity search," the latter of which must be performed "by a physician or . . . other medically trained personnel at the physician's direction," (Posner Aff. Ex. G ("Strip Search Policy"), at 1–2, 3 (Dkt. No. 160-6)).  Thus, although Defendants claim that Anderson authorized a "visual body cavity search," Plaintiff, relying on the Newburgh Strip Search Policy, maintains that Anderson authorized only a "strip search."  (*See* Pl.'s Counter 56.1 ¶ 36.)  Plaintiff has a valid point in this regard, for the department's strip search policy does not contain an explicit category labeled "visual body cavity search."  In truth, however, the Parties appear to be talking past one another.  Although Defendants refer to the search using different terms, it seems apparent that Anderson authorized a search that included an invasive look at Plaintiff's genitals and body cavity, but which did not include any touching.  (*See* Anderson Aff. ¶¶ 7–8; Pl.'s Counter 56.1 ¶¶ 41–42.)

Saintiche state that Plaintiff initially went along with the strip search protocol, removing one article of clothing at a time until he was completely naked.  (Canario Aff. ¶ 13; *see also* Aff. of Jonathan Saintiche in Supp. of Mot. ("Saintiche Aff.") ¶ 6 (Dkt. No. 167) (stating that Plaintiff was initially "cooperative with the process").)  But although Plaintiff agreed to "lift his genitals for visual inspection[,]" he "refused to turn around, bend over[,] and spread his buttocks." (Canario Aff. ¶ 13; *see also* Saintiche Aff. ¶ 6 (stating that Plaintiff "balked at turning around, squatting[,] and spreading the cheeks of his buttocks").)  In response, Canario and Saintiche gave Plaintiff "several loud verbal commands to comply[.]"  (Canario Aff. ¶ 13; *see also* Saintiche Aff. ¶ 6 ("[N]o amount of verbal instruction from us could gain [Plaintiff's] cooperation.").) Around this time, Pitt and Arestin entered the room "because they heard indications that [Plaintiff] was being uncooperative."  (Defs.' 56.1 ¶¶ 45–46.)

Each of the four officers in the room provides essentially the same account of what happened next.  In their telling, Pitt and Saintiche each took one of Plaintiff's arms and "held him facing the wall."  (Canario Aff. ¶ 15; Saintiche Aff. ¶ 7; *see also* Aff. of Michael Pitt in Supp. of Mot. ("Pitt Aff.") ¶ 7 (Dkt. No. 164); Aff. of Andres Arestin in Supp. of Mot. ("Arestin Aff.") ¶ 4 (Dkt. No. 166).)  At that point, according to the officers, Plaintiff voluntarily squatted, and "a small plastic bag drop[ped] from his rectal area."  (Canario Aff. ¶ 15; *see also* Saintiche Aff. ¶ 7; Pitt. Aff. ¶ 7; Arestin Aff. ¶ 4; Defs.' 56.1 ¶ 47 ("While naked and squatting a small plastic bag later determined to [be] cocaine, fell from [Plaintiff's] rectal area, observed by both Arestin and Canario.").)  They maintain that "[n]one of the four [D]efendants with [Plaintiff] in the strip search room digitally penetrated his rectum."  (Defs.' 56.1 ¶ 48.)  Accordingly, "[t]he only physical contact between [Plaintiff] and any of the four officers in the room was the contact [o]fficers Pitt and Saintiche had with [Plaintiff's] arms."  (Canario Aff. ¶ 16; *see also* Saintiche

Aff. ¶ 8; Arestin Aff. ¶ 5.)  In this version of events, "there was no physical struggle."  (Arestin Aff. ¶ 5; *see also* Saintiche Aff. ¶ 8 ("[Plaintiff] was not thrown to the ground or into the wall or punched by Detective Pitt.").)

Plaintiff has given a different account of what happened.  He alleges that Pitt and Saintiche "slammed [him] onto the floor face first," whereupon Pitt "punched [him] directly on the right side of [his] face between [his] right ear and right eye," that is, "on [his] temple."  (SAC ¶¶ 59–60.)  Plaintiff alleges that his "head bounced off the floor[,] and Pitt then immediately pinned [Plaintiff's] face against the floor with force."  (*Id.* ¶ 61.)  "While [his] head was pinned against the floor by Pitt," Plaintiff explains, "Saintiche, Canario[,] and Arestin then began punching and kneeing [him] in [his] ribs in a rapid motion."  (*Id.* ¶ 62.)  Plaintiff "[t]hen . . . felt one of these officers forcefully penetrate [his] anal cavity and snatch the plastic sandwich baggie containing the white-rock like substance [he] had hidden there."  (*Id.* ¶ 63.)  After the officers had recovered the contraband, they allegedly threw Plaintiff's clothes at him and left the strip search room.  (*Id.* ¶ 64.)

### 3.  Plaintiff's Attempt to Swallow Contraband and the Ensuing Scuffle

Security camera footage from the booking room shows what happened next.  A few moments after being brought back into the booking room and having one ankle shackled to a bench, Plaintiff leapt toward Officer Canario and snatched from his hands the contraband that had been recovered in the strip search room.  (*See* Pl.'s Counter 56.1 ¶¶ 54, 57; Booking 1 Video at 6:17:35.)  The ensuing scuffle is described in detail in Section II.B.2.c *infra*.  In brief, Plaintiff stuffed the contraband in his mouth in an attempt to "eat" the drugs and thereby destroy the evidence.  (*See* Pl.'s Counter 56.1 ¶ 57; Pl.'s Dep. 70:16–17 ("[M]y intent was to eat it, yes."); *id.* 70:18–20 (Q: "You thought by doing that you would destroy that evidence?  A: "Yes."); SAC

¶ 66 (stating that he placed the drugs in his mouth "intending to chew and destroy it").)  Officer Canario tackled Plaintiff, and Pitt, Sainticbe, and Arestin rushed to restrain Plaintiff on the ground and pry the contraband from his mouth.  (*See* Pl.'s Counter 56.1 ¶¶ 58–60; Booking 1 Video at 6:17:37–49.)  About 12 seconds later, as the officers continue struggling to subdue Plaintiff and recover the drugs, Canario uses pepper spray on Plaintiff.  (*See* Booking 1 Video at 6:17:49.)  The struggle continues for approximately 20 more seconds until Arestin uses his taser on Plaintiff, (*see id.* at 6:18:11), and the officers are finally able to restrain Plaintiff's hands in handcuffs and retrieve the contraband from his mouth, (*see id.* at 6:18:16).

The video footage of this episode substantially undermines Plaintiff's version of events outlined in the Second Amended Complaint.  Plaintiff, for example, alleges that he was pepper sprayed "[a]s soon as [he] hit the floor," (SAC ¶ 69), and was "punched and kneed in [his] ribs," (*id.* ¶ 71), both of which are belied by the footage.  He also alleges that he spit out the contraband within 20 seconds from when he first snatched it from Canario's hands.  (*Id.* ¶ 70.)  Again, the video proves otherwise.  And finally, he alleges that Arestin used the taser on him when he was lying face-down on the floor with "[his] hands on [his] head, not resisting at all."  (*Id.* ¶ 72.)  As with his other allegations from this incident, this statement is not true.

Finally, Canario avers that at some point before he and Saintiche took Plaintiff to St. Luke's, *see* Part I.A.4 *infra*, Plaintiff told him that "he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them."  (Canario Aff. ¶ 25.)  Canario advised Pitt and Sergeant Anderson about these remarks.  (*Id.*)  Plaintiff denies that he made such a comment.  (*See* Pl.'s Decl. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Decl.") ¶¶ 23, 25 (Dkt. No. 183).)[11]

---

[11] Plaintiff's Declaration is located at ECF pages 1–4 of Dkt. No. 183.

### 4.  Medical Treatment and Examination at St. Luke's

Shortly after the events just described, Canario and Saintiche drove Plaintiff to St. Luke's.  (SAC ¶ 75; Pl.'s Counter 56.1 ¶ 74.)  The Parties agree that at the hospital, Plaintiff received medical care to have the residual pepper spray washed from his eyes and to have the taser barbs removed from his lower back.  (*See* SAC ¶ 83; Posner Aff. Ex. D ("ER Records"), at 8 (Dkt. No. 160-3); Posner Aff. Ex. L ("Madell Aff'n") ¶¶ 15, 20 (Dkt. No. 160-11).)[12]  But at this point in the narrative, the Parties' respective accounts of the evening diverge significantly.  As discussed below, Defendants maintain there were two separate visits to the hospital—an initial visit in which medical staff rinsed Plaintiff's eyes and removed the taser barbs from his lower back, and a subsequent visit later in the evening in which medical staff performed a manual body cavity search and x-ray examination pursuant to a search warrant.  But according to Plaintiff, only the initial visit took place, and the cavity search and x-ray were performed without the search warrant, which was not obtained until later in the evening.

### a.  Defendants' Version of Events at St. Luke's

According to Defendants, Dr. Alan Madell treated Plaintiff during his first visit to St. Luke's, which took place between approximately 6:50 P.M. and 7:40 P.M.  (*See* Defs.' 56.1 ¶¶ 108, 113.)  During this visit, medical staff rinsed Plaintiff's eyes with water to remove any residual pepper spray, (*see* Madell Aff'n ¶¶ 11–12), and Dr. Madell removed the taser barbs, cleansed the area with antiseptic, and applied antibacterial ointment and a bandage, (*see id.* ¶ 20).  Dr. Madell also conducted a "head to toe" examination of Plaintiff and observed no signs "of trauma, such as bruising, contusions[,] or reflexes of pain."  (*Id.* ¶ 24.)  According to Dr. Madell, Plaintiff "denied any neck pain, back pain[,] or any other complaints except for eye pain."  (*Id.*

---

[12] Citations to Plaintiff's medical records refer to the ECF stamp at the top of the page.

¶ 13.)  The first visit ended sometime between around 7:25 P.M. and 7:40 P.M.  (*See* Defs.' 56.1 ¶¶ 81, 113.)

Meanwhile, Pitt prepared a search warrant application based on Plaintiff's alleged statement that he was secreting more drugs inside his body cavity or stomach.  (*See* Pitt. Aff. ¶ 14; Anderson Aff. ¶¶ 9–10.)  Obtaining a search warrant would allow the police to have Plaintiff's anal cavity manually examined by hospital personnel.  (*See* Pitt Aff. ¶ 14; Anderson Aff. ¶ 8.)  Pitt prepared an affidavit in support of the search warrant, noting in part that police had already recovered contraband from Plaintiff's "rectum area" during a "strip search," and that Plaintiff had "made a statement that he does have more narcotics in his rectum."  (Posner Aff. Ex. I ("Search Warrant & Supporting Aff."), at 4 (Dkt. No. 160-8).)[13]  Pitt's affidavit was presented to the Honorable Judge E.L. Williams of the Newburgh City Court ("Judge Williams"), who issued the requested search warrant.  (*See* Pitt Aff. ¶ 14; Search Warrant & Supporting Aff. 2.)  Pitt delivered the search warrant to St. Luke's and "gave it to its medical personnel."  (Pitt Aff. ¶ 14; Canario Aff. ¶ 27.)

Having obtained a search warrant, Canario and Saintiche took Plaintiff to St. Luke's once again, arriving around 11:00 P.M.  (Defs.' 56.1 ¶ 84.)  After a triage nurse took Plaintiff's vital signs, Nurse Blanca Lemos received Plaintiff in "Bay 5."  (Posner Aff. Ex. M ("Lemos Aff.") ¶¶ 7–8 (Dkt. No. 160-12).)  However, it was Nurse Practitioner Hillary Durbin-French who actually examined Plaintiff.  (*See* Defs.' 56.1 ¶¶ 119, 136–39.)  Durbin-French is "trained to do rectal exams" and has performed "countless" such searches over the course of her career.  (Posner Aff. Ex. N ("Durbin-French Aff.") ¶ 18 (Dkt. No. 160-13).)  Having been shown the

---

[13] Citations to Police Defendants' Exhibit I refer to the ECF stamp at the top of the page.

search warrant, Durbin-French asked Plaintiff to cooperate with the rectal examination.  (*Id.* ¶¶ 20, 23.)  Although he initially refused to consent to the search, Plaintiff eventually turned over on his side and voluntarily "pulled down his pants and agreed to the examination."  (*Id.* ¶ 23.)  Donning examination gloves and a "liberal amount of lubricant," Durbin-French quickly inserted her forefinger into Plaintiff's rectum and "palpate[d] for abnormalities."  (*Id.* ¶ 19.)  She identified no foreign body.  (*Id.* ¶ 21.)

After performing this search, Durbin-French ordered a "KUB" (kidney, ureter, and bladder) x-ray examination to ensure that there were no foreign objects "further in the rectal cavity."  (*Id.* ¶ 24.)  Durbin-French states that an x-ray was performed because "good medical practice requires" it, and "not because a police officer requested it."  (*Id.* ¶¶ 24–25.)  At 1:30 A.M., Durbin-French reviewed the x-rays, which indicated there was no foreign body inside Plaintiff.  (*Id.* ¶ 28.)  Plaintiff was discharged back into police custody at approximately 1:40 A.M. on May 9, 2015.  (Defs.' 56.1 ¶ 118.)

### b.  Plaintiff's Version of Events at St. Luke's

Plaintiff agrees that he initially arrived at St. Luke's at around 6:50 P.M.  (*See* SAC ¶ 75.)  Plaintiff states that his "emergency room doctors" were Dr. Madell *and* Nurse Practitioner Durbin-French.  (*Id.* ¶ 76.)  He alleges that he did complain about additional injuries he had sustained—including injuries to his wrists, (*see* Pl.'s Dep. 50:20–52:4), and face, (*id.* at 104:18–105:15)—but that Dr. Madell and Durbin-French "caused [his] complaints to go ignored," (SAC ¶ 77).  After Plaintiff changed into a hospital gown and was handcuffed to a gurney, Officers Canario and Saintiche left the room "to go find medical personnel."  (SAC ¶ 80.)  Plaintiff then "overheard Canario and Saintiche saying to someone out in the hallway" that they had a "search warrant for [Plaintiff's] rectum," that they had observed Plaintiff "swallowing drugs," and that

13

Plaintiff had told them he had more drugs hidden in his rectum.  (*Id.* ¶ 81.)  Plaintiff alleges that "[a]t about 6:52 P.M.," Nurse Lemos informed him that "she was given authorization to search [his] body cavity."  (*Id.* ¶ 84.)[14]  Plaintiff allegedly tried to show Lemos the "vis[i]ble bruises on [his] face and [his] wrists," told her that it felt as though his neck and back were broken, and explained that he was experiencing "sharp pains in [his] rectum" from having the police manually extract the contraband.  (*Id.* ¶ 86.)  But Lemos "ignored [him]" and told him that the police "ha[d] a search warrant and . . . [could] use deadly force" to ensure his compliance with the search.  (*Id.* ¶¶ 86, 88.)  Officers Canario and Saintiche reportedly told Plaintiff that the taser barbs and pepper spray would not be removed unless he complied with the search.  (*Id.* ¶ 90.)  Then, the officers allegedly forced him onto one side and pinned him to the hospital bed as Nurse Lemos "pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds."  (*Id.* ¶¶ 92–93.)

After Lemos announced that there were no drugs in Plaintiff's cavity, Canario and Saintiche allegedly "suggested" that Lemos should perform an x-ray examination.  (*Id.* ¶¶ 96–97.)  Plaintiff allegedly had his "stomach/abdomen" x-rayed at 7:00 P.M., after which Lemos removed the taser barbs from his back and washed the pepper spray from his eyes.  (*Id.* ¶¶ 98–100.)  At around 7:35 P.M., Lemos returned with the results of the x-ray and reported that there were no "unknown substances" inside Plaintiff's stomach, and said that Plaintiff was ready to be discharged.  (*Id.* ¶ 101.)

---

[14] As discussed in Section II.B.7.a *infra*, Nurse Lemos's timesheet for the evening of May 8, 2015 indicates that she did not clock in until 10:45 P.M., (*see* Lemos Aff. ¶ 5 & attached timesheet), posing something of a problem for Plaintiff's narrative that she performed his rectal examination during his first and only visit to the hospital.

Although there is a discharge release form in Plaintiff's medical records indicating that he was discharged at 1:35 A.M. on May 9 following the rectal examination and x-ray, (*see* ER Records 36), Plaintiff maintains that this form has been forged, (*see* SAC ¶ 102). Indeed, Plaintiff alleges that to the extent his medical records clearly indicate there were two visits to St. Luke's, thereby corroborating Defendants' version of events, these records have been forged or falsified. (*See id.* ¶¶ 112, 137.) Likewise, Plaintiff alleges that Pitt fabricated his statement that he was concealing additional drugs, and then used this fabricated evidence not only to obtain a search warrant, but also to "build[] a stronger case for the prosecution." (*Id.* ¶¶ 108–09.) According to Plaintiff's theory, the search warrant obtained from Judge Williams was "brought back to the hospital by Canario and Saintiche so that they could conspire with . . . Lemos and Durbin-French to . . . cover-up the fact that [Plaintiff] was illegally" subjected to a manual body cavity search and x-ray before the warrant was obtained. (*Id.* ¶ 111.) These Defendants allegedly conspired "to record[] these events as if they [had] happened" during a non-existent second visit later in the evening, around 11:00 P.M., and to doctor the records such that the first visit only documented treatment of Plaintiff's back and eyes. (*See id.*)

Based on the foregoing events, Plaintiff has brought claims against Police Defendants for false arrest (Count One), excessive force (Counts Two, Five, and Eight), sexual harassment and sexual abuse (Counts Three and Four), an unreasonable search (Count Six), deliberate indifference (Count Seven), and malicious abuse of process (Count 10).[15] Against Police Defendants *and* Medical Defendants, Plaintiff has brought claims for sexual harassment and sexual abuse (Counts 12 and 13), unreasonable searches (Counts 15 and 16), and conspiracy

---

[15] As discussed in Section II.B.6 *infra*, the Court has construed Plaintiff's malicious abuse of process claim as a claim for denial of his right to a fair trial.

(Counts 14 and 20).  Against Medical Defendants alone, Plaintiff has brought claims for violation of his right to privacy (Count 17) and deliberate indifference (Counts 18 and 19).

    B.  Procedural History

    Plaintiff filed his initial Complaint on November 15, 2016 against Arestin, Pitt, Canario, Saintiche, and "Registered Nurse Jane Doe."  (Compl. (Dkt. No. 2).)  On November 17, 2016, Plaintiff's application to proceed in forma pauperis was granted.  (*See* Dkt. No. 4.)  On November 18, 2016, the Court directed the County Attorney for the County of Orange to ascertain the identity of the Jane Doe nurse at St. Luke's involved in the events on May 8, 2015. (*See* Dkt. No. 6.)  On February 7, 2017, Plaintiff submitted the Amended Complaint, (*see* Am. Compl. (Dkt. No. 22)), along with a list of parties in the Amended Complaint, (*see* Dkt. No. 19). The Amended Complaint added Dr. Madell, Nurse Practitioner Durbin-French, Nurse Lemos, Sergeant Anderson, Officer Perez, and Officer Mendez as Defendants.  (*See* Am. Compl.)  On April 27, 2017, Plaintiff submitted an application asking the Court to appoint pro bono counsel to represent him.  (*See* Dkt. No. 26.)  On May 2, 2017, the Court denied the request without prejudice.  (*See* Dkt. No. 27.)

    On October 6, 2017, Madell and Durbin-French moved to dismiss all claims filed against them (the "Motion To Dismiss").  (*See* Dkt. Nos. 64–66.)  Plaintiff failed to file an opposition or otherwise respond, (*see* Dkt. No. 80), and on January 22, 2018, the Court deemed the Motion To Dismiss fully submitted, (*see* Dkt. No. 81).

    Meanwhile, discovery proceeded as to the other Defendants.  Following the completion of discovery, on July 9, 2018, Police Defendants sought leave to file a summary judgment motion.  (*See* Dkt. No. 101.)  The same day, Medical Defendants sought leave to file a summary judgment motion, but noted that the decision on Madell and Durbin-French's Motion To Dismiss

was still pending.  (*See* Dkt. No. 102.)  On July 18, 2018, the Court set a briefing schedule for all

Defendants to file summary judgment motions.  (*See* Dkt. No. 104.)

On August 8, 2018, the Court issued an Opinion & Order granting Madell and Durbin-

French's Motion To Dismiss.  (*See* Op. & Order ("Aug. 2018 Op.") (Dkt. No. 109).)  However,

the Court granted Plaintiff 30 days to amend his complaint and correct the deficiencies with

respect to the dismissed claims.  (*See* Aug. 2018 Op. 15.)  On September 6, 2018, Plaintiff

signed his Proposed Second Amended Complaint ("PSAC"), which was docketed on September

11, 2018.  (*See* Dkt. No. 111.)  On September 14, 2018, Police Defendants filed a letter objecting

to the PSAC on the grounds that it "purports to assert new matters and claims with regard to

them . . . without leave of the Court on the eve of summary judgment practice."  (*See* Dkt. No.

113.)  On November 7, 2018, the Court issued an Order construing Plaintiff's PSAC as a Motion

To Amend, and setting a schedule for Police Defendants' Response and Plaintiff's Reply.  (*See*

Order ("Nov. 2018 Order") (Dkt. No. 125).)  The Court simultaneously stayed the briefing of

Defendants' expected summary judgment motions pending resolution of Plaintiff's Motion To

Amend.  (*See id.* at 5.)  On December 4, 2018, Police Defendants filed their Response and

accompanying papers.  (*See* Dkt. Nos. 126–27.)  On February 26, 2019, Plaintiff filed his Reply.

(*See* Dkt. No. 133.)  On April 23, 2020, Plaintiff filed a "Declaration in Support of the Plaintiff's

Motion for Appointment of Counsel," (Dkt. No. 146), thereby renewing his earlier (previously

rejected) Application for appointment of pro bono counsel, (*see* Dkt. No. 26).

On May 1, 2020, the Court issued an Order granting in part and denying in part the

Motion To Amend and denying Plaintiff's renewed Application for appointment of pro bono

counsel.  (*See* Order ("May 2020 Order") (Dkt. No. 147).)  The Court found that two of the

claims raised in the PSAC—a First Amendment retaliation claim and a malicious prosecution

claim—were never raised in the Amended Complaint.  (*See id.* at 9 & n.2.)  The Court also concluded that neither claim satisfied the standard that governs motions to amend under Fed. R. Civ. P. 15(a).  (*See id.* at 10–14.)  Finally, the Court denied Plaintiff's renewed Application for appointment of pro bono counsel, observing in part that "Plaintiff has demonstrated his ability to present the case himself through his submissions in this Action that adequately express his arguments and desired forms of relief."  (*Id.* at 16–17.)  Having deemed the PSAC the new operative complaint (henceforth the Second Amended Complaint), the Court lifted the stay on Defendants' Motions for Summary Judgment and set a briefing schedule.  (*See id.* at 17.)

After the Court granted Defendants a 30-day adjournment in light of the Covid-19 pandemic, (*see* Dkt. No. 150), and granted their request for a page extension on their Memorandum of Law, (*see* Dkt. No. 155), Police Defendants and Medical Defendants filed their Motions for Summary Judgment and supporting papers on July 1, 2020, (*see* Police Defs.' Not. of Mot. (Dkt. No. 159); Med. Defs.' Not. of Mot. (Dkt. No. 173)).  Plaintiff filed a cross-Motion for Partial Summary Judgment on July 7, 2020.  (*See* Dkt. No. 183.)  Police Defendants filed their Opposition to Plaintiff's Motion on August 10, 2020.  (*See* Dkt. No. 193.)  After receiving multiple extensions from the Court, (*see* Dkt. Nos. 191, 200), Plaintiff filed his Opposition to Defendants' Motions on October 23, 2020, (*see* Dkt. No. 204).  Police Defendants submitted their Reply on November 19, 2020, (*see* Dkt. No. 207), and, after receiving an extension from the Court, (*see* Dkt. No. 210), Medical Defendants submitted their Reply on December 11, 2020, (*see* Dkt. No. 212).  Plaintiff failed to submit a Reply in further support of his Partial Motion for Summary Judgment.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest

arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir.

2006) (italics and citation omitted).  Moreover, "the failure to oppose a motion for summary

judgment alone does not justify the granting of summary judgment."  *Vt. Teddy Bear Co.*, 373

F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an

examination of the legal validity of an entry of summary judgment should . . . be[] made in light

of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does

not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se

party's bald assertions unsupported by evidence[] are insufficient to overcome a motion for

summary judgment."  *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation

Fringe Benefit Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, citation, and

quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL

3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

    B.  Analysis

       For reasons discussed in the May 2020 Order, the Court will not consider Plaintiff's First

Amendment retaliation claim (Count Nine) or his malicious prosecution claim (Count 11).  Of

the remaining claims, Police Defendants have moved for summary judgment on Counts 1–5, 7–

8, 10, 12–16, and 20.  (*See generally* Police Defs.' Mem. of Law in Supp. of Mot. for Summ. J.

("Police Defs.' Mem.") (Dkt. No. 170).)  Medical Defendants have moved for summary

judgment on Counts 12–20.  (*See generally* Med. Defs.' Mem. of Law in Supp. of Mot. for

Summ. J. ("Med. Defs.' Mem.") (Dkt. No. 177).)  Plaintiff has moved for summary judgment on

Count Six and cross-moved for summary judgment on Counts One, Seven, and 10.  (*See* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") 8 (Dkt. No. 183).)[16]

### 1.  False Arrest Claim (Count One)

In Count One, Plaintiff asserts a claim for false arrest against Police Defendants Canario, Perez, and Mendez based on the incidents leading to his arrest.  (SAC ¶¶ 20–29, 118.)  Both Plaintiff and Police Defendants have moved for summary judgment on this claim.  (*See* Pl.'s Mem. 8, 11–13; Police Defs.' Mem. 20–21, 32.)

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same).  "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439 F.3d at 151 (citation omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." (ellipsis in original) (citation omitted)).  Under New York law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him [or her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'" *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

---

[16] Plaintiff's Memorandum of Law in Support of his Motion for Partial Summary Judgment is located at ECF pages 8–17 of Dkt. No. 183.  Citations to his Memorandum of Law refer to the ECF stamp at the top of the page.

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson*, 702 F.3d at 19 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Deanda v. Hicks*, 137 F. Supp. 3d 543, 568 (S.D.N.Y. 2015) (same); *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). "Probable cause to arrest exists when the officers have . . . reasonably trustworthy information as to[] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been . . . committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *see also Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (same). To determine whether probable cause existed for an arrest, a court "assess[es] whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (citation and quotation marks omitted). Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Id.* at 20 (citation and quotation marks omitted). In other words, "[Police] Defendants prevail if there was probable cause to arrest Plaintiff for any single offense." *Id.* (alteration, citation, and quotation marks omitted). "Whether probable cause is established depends on the totality of the circumstances, . . . including the information possessed by the officer prior to making the arrest and [his or] her experience." *Daniels v. City of New York*, No. 15-CV-2251, 2016 WL 4368378, at *3 (S.D.N.Y. Aug. 14, 2016) (citation omitted). "The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (citations omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013

WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

"Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) (citation and quotation marks omitted); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same). Accordingly, "the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Escalera*, 361 F.3d at 742 (quotation marks omitted). "This forgiving standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To deny a motion for summary judgment on qualified immunity grounds, a court must find that the officer's judgment was "so flawed that no reasonable officer would have made a similar choice." *Provost*, 262 F.3d at 160 (citation omitted).

As relevant here, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubts as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations omitted); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (observing that "information gleaned from informants can be sufficient to justify the existence of probable cause," and recognizing the

"well-established" principle "that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity" (citations and quotation marks omitted)).  Moreover, the information furnished by "an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy," and the Second Circuit has "endorsed the proposition that an identified citizen informant is presumed to be reliable." *Panetta*, 460 F.3d at 395 (citation and quotation marks omitted).

Here, it is undisputed that the officers in question were responding to a 911 call in which the caller "fully describ[ed] [Plaintiff] as the suspect selling narcotics." (SAC ¶ 20; *see also* Defs.' 56.1 ¶ 11.)  The officers had no reason to question this informant's credibility; indeed, Plaintiff himself acknowledges that the information provided to the officers was accurate. (*See* SAC ¶ 20.)  Officer Canario, who first approached Plaintiff, recognized him as the individual who "matched the description given by the caller." (Canario Aff. ¶ 4.)  Joining the pursuit moments later, Officer Mendez also recognized that Plaintiff's clothing "matched" the "description [that had] come over the radio." (Mendez Aff. ¶ 4.)[17]  All of this occurred in an area where illegal drug activity was common, (*see* Anderson Aff. ¶ 3), and in which Plaintiff admits to having sold drugs shortly before the officers arrived, (Pl.'s Dep. 23:4–17).

Relying on credible, contemporaneous information from an eyewitness, the responding officers here undoubtedly had arguable probable cause to arrest Plaintiff.  Courts have found the existence of probable cause and arguable probable cause in similar circumstances where police officers make an arrest based on information from a 911 call. *See, e.g., Gatling v. West*, No. 18-

---

[17] By the time Officer Perez arrived on the scene, Plaintiff was already "in the custody of Officers Mendez and Canario." (Perez Aff. ¶ 4.)

CV-275, 2020 WL 564604, at *8 (N.D.N.Y. Feb. 5, 2020) (finding that a police officer had probable cause to arrest an erratic driver based in part on a "near-contemporaneous citizen complaint" that was "communicated to [the officer] through the 911 operator," and therefore dismissing the plaintiff's false arrest claim on summary judgment), *appeal docketed*, No. 20-827 (2d Cir. Mar. 6, 2020); *Pagan v. City of New York*, No. 15-CV-5825, 2019 WL 8128482, at *6–7 (E.D.N.Y. Mar. 28, 2019) (granting summary judgment based on conclusion that police officers had "arguable probable cause" where the officers were acting in response to a 911 caller who described the suspect as "disturbed, uncontrollable, and potentially carrying a weapon").[18] Likewise, courts have found the existence of arguable probable cause where, as here, officers make an arrest based on a contemporaneous, eyewitness description of the suspect's clothing.  In *Steinbergin v. City of New York*, No. 19-CV-1314, 2021 WL 396690 (S.D.N.Y. Feb. 4, 2021), for example, the officer "arrived at the scene" of a reported drug deal "only a few minutes" after the sale and "saw [the plaintiff] . . . wearing distinctive clothing matching [the undercover officer's] description of the suspect's clothing."  *Id.* at *4.  "Given the proximity in time and location to the crime and the fact that [the plaintiff's] distinctive attire matched the suspect's," the court

---

[18] In *Pagan*, the parties disputed whether, when officers arrived on the scene, the suspect "was still flailing about or was instead lying calmly on the floor."  2019 WL 8128482, at *6.  As the court explained, "[t]here [could] be no question that the information officers received before arriving at the apartment would have established probable cause to arrest [the suspect], had he continued acting as described on the 911 calls."  *Id.*  "[V]iewing the evidence in the light most favorable to [the] [p]laintiff," however, the court found "it [was] a closer call whether probable cause was subsequently dissipated upon officers' arrival on the scene."  *Id.*

Ultimately, the *Pagan* court found it unnecessary to resolve this question.  Because the court found that the officers had "arguable probable cause" to effectuate the arrest *even under the plaintiff's version of events*, it dismissed the false arrest claim on grounds of qualified immunity, without deciding whether there was *actual* probable cause for the arrest.

In this respect, *Pagan* is distinguishable.  Here, there is nothing in the record to suggest that Plaintiff's behavior minimized probable cause when the officers arrived on the scene.  Quite the opposite.  By deciding to run from police, Plaintiff's behavior further contributed to the existence of probable cause—a point discussed briefly *infra*.

concluded that "a reasonable officer in [the defendant's] position could have concluded that [the plaintiff] had sold cocaine to [the undercover officer] as soon as he saw him." *Id.* The court therefore found that the defendant officer was entitled to qualified immunity and dismissed the plaintiff's false arrest claim on a motion for summary judgment. *See id.* at *4–5. In *Falls v. Rude*, No. 17-CV-1339, 2019 WL 3715087 (S.D.N.Y. Aug. 7, 2019), another case involving Plaintiff, the court found that the defendant officers had arguable probable cause to arrest Plaintiff based on "a particularly distinctive feature of [his] clothing[,]" a description of which had been provided to the officers by a victim who called the police to report that Plaintiff had threatened her with a gun, *see id.* at *8. Accordingly, the court held that defendants were entitled to qualified immunity with respect to Plaintiff's false arrest claim on a motion for summary judgment. *See id.*

Finally, Plaintiff's decision to run from the responding officers is another factor that supports the existence of arguable probable cause. *See Greene v. Bryan*, No. 15-CV-249, 2018 WL 3539811, at *12 (E.D.N.Y. July 23, 2018) ("Unprovoked flight from the police is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances." (citation and quotation marks omitted)); *McClellan v. City of New York*, No. 15-CV-6759, 2017 WL 4217144, at *3 (S.D.N.Y. Sept. 20, 2017) (observing that courts may consider a suspect's "flight from the police, presence at the scene, and similarity . . . to witness descriptions" when deciding whether there was probable cause).

Based on the totality of circumstances, the Court concludes that "it was objectively reasonable for the [responding] officer[s] to believe that probable cause existed," or, at the very least, "officers of reasonable competence could disagree on whether the probable cause test was met." *See Walczyk*, 496 F.3d at 163. These officers therefore had "arguable probable cause" to

arrest Plaintiff, and they are entitled to qualified immunity with respect to Plaintiff's false arrest claim.  For these reasons, Police Defendants' Motion is granted, and Plaintiff's Motion is denied, with respect to Count One.  Count One is therefore dismissed.

### 2.  Excessive Force Claims (Counts Two, Five, and Eight)

Plaintiff has brought three excessive force claims, each based on a different episode on the night of May 8.  In Count Two, Plaintiff brings an excessive force claim against each of the seven Police Defendants based on their alleged treatment of Plaintiff in the yard behind 12 Dubois Street shortly after he was apprehended.  (*See* SAC ¶¶ 31–33, 119.)  In Count Five, Plaintiff brings an excessive force claim against Canario, Pitt, Saintiche, and Arestin based on their alleged treatment of Plaintiff during the cavity search at the Newburgh police station.  (*See id.* ¶¶ 59–63, 122.)  In Count Eight, Plaintiff brings an excessive force claim against these same four Police Defendants based on their efforts to restrain him after he tried to swallow the drugs that were recovered during the search.  (*See id.* ¶¶ 67–73, 125.)  Police Defendants have moved for summary judgment on each count.  (*See* Police Defs.' Mem. 13–19.)

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard."  *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted).  Thus, as noted in the Court's May 2020 Order, although Plaintiff labels his excessive force claims as arising under the Fourteenth Amendment, (*see* SAC ¶¶ 119, 122, 125), the Court will "construe[] these claims as arising under the Fourth Amendment as incorporated by the Fourteenth Amendment," (*see* May 2020 Order 7 n.1).  *See also Graham v. Connor*, 490 U.S. 386, 394–95 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional

protection against . . . physically intrusive governmental conduct [during an arrest or investigatory stop of a free citizen], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

"When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.'" *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (alteration in original) (quoting *Graham*, 490 U.S. at 397).  To evaluate the reasonableness of an officer's conduct, a court should "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999).  "Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable." *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (citation and quotation marks omitted).  "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, alterations, and italics omitted).

### a.  Use of Force During Plaintiff's Arrest (Count Two)

Within Count Two itself, Plaintiff alleges three distinct acts that could arguably constitute excessive force.  As discussed in Section I.A.1 *supra*, Plaintiff alleges that Police Defendants (1) overtightened his handcuffs (the "Handcuff Claim"), (2) repeatedly punched him in the stomach, ribs, chest, and thighs (the "Assault Claim"), and (3) "reach[ed] down inside of [his] pants from

the front . . . all the way from [his] underwear to [his] socks" (the "Search Claim").  (SAC ¶¶ 31–

33.)  The Court will address each of these specific claims in turn.  *See Dunkelberger v.*

*Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *14–17 (S.D.N.Y. Sept. 30, 2015)

(addressing separately the plaintiff's allegations of tight handcuffing, threats of arrest and

property destruction, brandishing weapons, and physical force); *Keeney v. City of New London*,

196 F. Supp. 2d 190, 198 (D. Conn. 2002) (addressing separately alleged force used before an

individual was handcuffed and restrained and after an individual was handcuffed and restrained).

### i.  Count Two: The Handcuff Claim

"Courts apply a separate standard to claims for excessive force in the use of handcuffs."

*Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012).  "While

handcuffs must be reasonably tight to be effective, handcuffs that are overly tight may constitute

an excessive use of force on the part of the officer using them." *Id.* (citing *Lynch ex rel. Lynch v.*

*City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)).  When evaluating a claim of

excessive force based on the defendants' use of handcuffs, courts are to consider three factors:

(1) whether the handcuffs were "unreasonably tight"; (2) whether the "defendants ignored the

plaintiff's pleas that the handcuffs were too tight"; and (3) the "degree of injury to the

[plaintiff's] wrists." *Id.* (citation, alteration, and emphasis omitted).  Of these three factors, the

third is "particularly important," for a plaintiff "must suffer some form of injury from the tight

handcuffs in order for such a claim to be actionable." *Id.* (quoting *Vogeler v. Colbath*, No. 04-

CV-6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)).  Indeed, there is agreement

throughout the Second Circuit that "tight handcuffing does not constitute excessive force unless

it causes some injury beyond temporary discomfort." *Id.* (quoting *Lynch*, 567 F. Supp. 2d at

468–69) (gathering authorities).

Here, Plaintiff alleges that after Police Defendants handcuffed him, they "overtightened [his] handcuffs to the point where the metal was pressed against and squeezing [his] wrist bones[,] causing substantial pain and bruising."  (SAC ¶ 32.)  Describing this injury in more detail during his deposition, Plaintiff said his wrists had "dents," "bruises," and broken skin.  (Pl.'s Dep. 51:4–21.)  Plaintiff has provided a similar description of his injury in other submissions as well.  (*See* Pl.'s Decl. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n Decl.") ¶ 14 (Dkt. No. 204) (stating that he "sustained intensive bruising on his wrists caused by the assaults while in overtightened handcuffs"); Pl.'s Mem. of Law in Opp'n to Defs.' Mot. ("Pl.'s Opp'n") 3 (Dkt. No. 204) (explaining that the "only injuries he claims to have sustained as a result of the assault were intensive pain, bruising, scrapes[,] and redness in/on his wrists").)[19]

Even if the Court accepted Plaintiff's allegations and supporting testimony as true, the alleged injury he has described—temporary pain, bruising, scrapes, and redness—"does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs." *Sachs*, 2012 WL 3822220, at *15 (concluding on summary judgment that a plaintiff's swelling in her wrists, which lasted 24 hours, did not constitute a sufficient injury to support an excessive force claim based on tight handcuffs); *see also Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 74–75 (E.D.N.Y. 2015) (granting summary judgment for the defendants where the plaintiff's injuries consisted of scabbing and abrasions); *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05-CV-6278, 2009 WL 804096, at *13–14 (S.D.N.Y. Mar. 25, 2009) (granting the defendants' summary judgment motion on an excessive force claim where the plaintiff suffered pain, bruises, swelling,

---

[19] Plaintiff's Declaration in Support of his Opposition to Summary Judgment is located at ECF pages 253–66 of Dkt. No. 204.  Plaintiff's Memorandum of Law in Opposition to Summary Judgment is located at ECF pages 1–46 of Dkt. No. 204.  Citations to the latter document refer to the ECF stamp at the top of the page.

and red marks, and was given an over-the-counter pain reliever at the hospital); *Bratton v. N.Y. State Div. of Parole*, No. 05-CV-950, 2008 WL 1766744, at *9–10 (N.D.N.Y. Apr. 14, 2008) (concluding on summary judgment that the plaintiff did not satisfy the injury requirement despite medical records showing that his wrists were swollen and bruised for three weeks as a result of handcuffs); *Hamlett v. Town of Greenburgh*, No. 05-CV-3215, 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) (concluding on summary judgment that the plaintiff's "brief numbness as a result of the handcuffs being too tight" did not "rise to the level of force required to sustain an excessive force claim"); *Vogeler*, 2005 WL 2482549, at *10 (granting the defendant's motion for summary judgment where the plaintiffs had failed to show "any measurable harm" from the handcuffing); *Wilder v. Village of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of . . . unlawful conduct in an arrest situation."), *aff'd*, 111 F. App'x 635 (2d Cir. 2004).  By contrast, "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage."  *Usavage*, 932 F. Supp. 2d at 592, 598 (gathering cases and denying summary judgment where there was evidence that the plaintiff suffered from nerve damage after handcuffing); *see also Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) (denying defendants' motion for summary judgment where plaintiff had alleged swelling and lasting nerve damage due to the handcuffing).  No such injuries are present here.  (*See* Pl.'s Dep. 51:9–15 (Q: "Are there any marks on your wrists now?"  A: "No, not right now."  Q: "How long did those marks on your wrists last?"  A: "Probably a couple of days, like that.").)  Here, "the fact that the tight handcuffing did not cause [Plaintiff] any continuing injury is fatal to the excessive force claim[,]" *Lynch*, 567 F. Supp. 2d at 468, and thus, the Court will dismiss the Handcuff Claim on this basis.

<u>ii.  Count Two: The Assault Claim</u>

Insofar as Plaintiff's excessive force claim is predicated on the alleged assault by Police Defendants, Plaintiff has not produced evidence "that the alleged use of force was serious or harmful enough to be actionable." *Ferebee v. City of New York*, No. 15-CV-1868, 2017 WL 2930587, at *8 (S.D.N.Y. July 6, 2017), *reconsideration denied*, 2017 WL 3208602 (S.D.N.Y. July 27, 2017).  Although the "focus of inquiry in an excessive-force claim is on the force used rather than the injuries sustained, '[t]he extent of injury may also provide some indication of the amount of force applied.'"  *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *11 (S.D.N.Y. July 10, 2018) (alteration in original) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam)); *see also Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *12 (S.D.N.Y. Sept. 7, 2016) (observing that "[a]lthough the severity of [a] plaintiff's alleged injuries is not dispositive, it is nonetheless highly relevant to the inquiry about whether the force applied was reasonable" (citation and quotation marks omitted)).  "A de minimis use of force will rarely suffice to state a constitutional claim," and "de minimis injury can serve as conclusive evidence that de minimis force was used."  *Ferebee*, 2017 WL 2930587, at *8 (citations and italics omitted); *see also Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same).

Although Plaintiff's account of his arrest includes a violent beating in which Police Defendants repeatedly pummeled his thighs and parts of his torso, (*see* SAC ¶ 33), his own subsequent testimony belies this account.  At his deposition, for example, Plaintiff testified that despite being punched with closed fists "[e]ight to ten times," (Pl.'s Dep. 47:13–17), he suffered no injuries, (*see id.* 47:3–8 (explaining that the officers kept "hitting [him] in the body area," but that he "really didn't get injured off of that" and "didn't pay it [any] mind"); *id.* 48:2–9 (Q:

"What part of your body did they punch? . . . A: "Ribs, chest, stomach."  Q: "You said you were

not injured?"  A:  "I was not injured.  Yeah, I wasn't injured."))  The alleged assault caused

neither bleeding nor bruising.  (*See id.* 48:10–14 (Q: "Were you bleeding from any part of your

body?"  A: "No."  Q: "So, did you have any bruising?"  A: "Not that I recall, no.").)  After being

taken to the hospital later in the evening, Plaintiff did not raise this alleged assault because he

"didn't pay [it] [any] mind," and "[it] didn't [faze] [him]."  (*Id.* 50:4–5.)  Similarly, in his

Memorandum of Law in Opposition to Summary Judgment, Plaintiff describes his pain from the

alleged assault as "minor" and "momentar[y]."  (*See* Pl.'s Opp'n 3.)

Thus, by Plaintiff's own admission, he suffered minor, momentary pain and no injuries

from the officers' alleged beating.  Under these circumstances, Plaintiff's "de minimis injury . . .

serve[s] as conclusive evidence that de minimis force was used."  *Ferebee*, 2017 WL 2930587, at

*8 (citation and italics omitted).  Accordingly, "no reasonable trier of fact could determine that

[Police Defendants] used excessive force when arresting Plaintiff."  *Id.* (granting summary

judgment and dismissing the plaintiff's excessive force claim where the "[p]laintiff himself

testified that he suffered no physical injuries as a result of the arrest"); *Cunninham*, 2007 WL

2743580, at *7 (granting summary judgment for defendants where the only injuries plaintiffs

alleged from being sprayed with mace were temporary discomfort and disorientation, which

were held to be de minimis).  Although this Court and others have allowed excessive force

claims to survive summary judgment where a plaintiff has suffered only minor injuries, *see, e.g.,*

*Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2017 WL

4326540, at *13 (S.D.N.Y. Sept. 28, 2017) (gathering cases), the Court has not located a case in

which a court allowed such a claim to survive in the absence of *any* injury.  And while the force

allegedly used by Police Defendants when arresting Plaintiff may *not* have been de minimis,

Plaintiff's testimony renders this particular aspect of his account "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555 (citation and quotation marks omitted).  Accordingly, the Assault Claim is dismissed.

### iii.  Count Two: The Search Claim

The third component of Plaintiff's excessive force claim is based on the allegation that during the arrest, certain Police Defendants "empt[ied] out [Plaintiff's] pockets, check[ed] [his] waistline, [and] reach[ed] down inside of [Plaintiff's] pants from the front side all the way from [his] underwear to [his] socks."  (SAC ¶ 33.)  Accordingly, this component of Count Two is more properly analyzed as an unreasonable search claim, rather than as a claim based on alleged excessive force.  Police Defendants have not addressed this aspect of Plaintiff's claim.  (*See generally* Police Defs.' Mem.)

The search of a person incident to an arrest is presumptively reasonable under the Fourth Amendment.  *See United States v. Robinson*, 414 U.S. 218, 235 (1973).  "Nevertheless, a search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner."  *Wang v. Vahldieck*, No. 09-CV-3783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012); *see also Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (noting "[a] lawful arrest . . . creates a presumption of reasonableness regarding an attendant search" that "can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner").  "[U]nreasonable, non-consensual, inappropriate touching," for example, "can constitute unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment."  *Golden v. County of Westchester*, No. 10-CV-8933, 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012)  (brackets and quotation marks omitted) (quoting

*Fontana v. Haskin*, 262 F.3d 871, 880–81 (9th Cir. 2001)); *see also Anderson v. Waterbury Police Dep't*, No. 14-CV-829, 2017 WL 1157843, at *11 (D. Conn. Mar. 28, 2017) ("[C]ourts in [the Second] Circuit have found that claims that a police officer's actions during and following the arrest of a suspect rise to the level of a sexual assault are properly analyzed under the Fourth Amendment and could give rise to at least one genuine issue of material fact that precludes summary judgment on the Fourth Amendment claim." (citation and quotation marks omitted)). However, "not every truthful allegation of sexual bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment." *Fontana*, 262 F.3d at 880. "Some bodily intrusions may be provably accidental or de minimis and thus constitutionally reasonable." *Id.* (italics omitted); *see also Wright v. City of Waterbury*, No. 07-CV-306, 2011 WL 1106217, at *6 (D. Conn. Mar. 23, 2011) (same).

Plaintiff has raised a triable issue of fact regarding the reasonableness of the search incident to his arrest. Although courts have found that an officer's brief contact with an arrestee's breasts or genital area, without more, does not violate the Fourth Amendment, those cases have involved pat-downs *on top of* an arrestee's clothing. *See Pascual v. Fernandez*, No. 11-CV-7075, 2013 WL 474292, at *6 (S.D.N.Y. Jan. 29, 2013) (finding that a pat-down of a female arrestee's breasts, buttocks, and inner thigh area *over her clothing* by a male officer was not constitutionally unreasonable); *Golden*, 2012 WL 4327652, at *6 (granting summary judgment on Fourth Amendment claim where the officer's search "was a minimally intrusive, *above the clothing*-pat down," even though it "included incidental contact with [the plaintiff's] breasts and genital area" (emphasis added)); *Wright*, 2011 WL 1106217, at *7 (finding that the police officer who "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions," did "not rise to the level of unreasonableness required for a Fourth Amendment

violation" because the officer "did not grab [the plaintiff's] groin area *or touch underneath his clothing*, and the search of [the] groin area was extremely quick" (emphasis added)); *Garcia v. N.Y. State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (dismissing Fourth Amendment claim where the plaintiff alleged that the officer "cupped her crotch or breasts" in part because the defendant "*did not touch underneath her clothing*" (emphasis added)). The search Plaintiff has described—in which the arresting officer(s) reached "down inside of [his] pants from the front side all the way from [his] underwear to [his] socks," (SAC ¶ 33)—goes beyond an over-the-clothing pat-down. This allegation raises a genuine dispute regarding the reasonableness of Police Defendants' search incident to arrest. *See Anderson*, 2017 WL 1157843, at *11 (denying defendants summary judgment on unreasonable search claim where the plaintiff testified that an officer "put one hand into [the plaintiff's] pants, . . . inside [the plaintiff's] underwear[,] . . . [and] moved [his hand] directly between [the plaintiff's] butt cheeks in a swiping motion from front to back"); *Thomas v. O'Brien*, No. 08-CV-318, 2010 WL 3155817, at *9 (N.D.N.Y. Aug. 9, 2010) (denying summary judgment on unreasonable search claim where the plaintiff alleged that the defendant officer "shoved his hand into [his] pants and groped and painfully squeezed [his] scrotum"); *cf. Martinez v. Belcourt*, No. 20-CV-286, 2020 WL 5118016, at *6 (D. Conn. Aug. 31, 2020) (concluding that the plaintiff had adequately stated an unreasonable search claim where the officer allegedly had "put his hands down [the plaintiff's] pants and fondled and squeezed his genitals").

Accordingly, Police Defendants' Motion is granted in part and denied in part with respect to Count Two. The Handcuff Claim and Assault Claim are dismissed, but the Search Claim survives.

b.  Use of Force During Cavity Search at Police Station (Count Five)

The excessive force claim in Count Five is predicated on Plaintiff's allegation that Canario, Pitt, Saintiche, and Arestin violently beat him in the strip search room at the Newburgh police station.  (*See* SAC ¶ 122.)  Insofar as Plaintiff's excessive force claim encompasses the cavity search itself, (*see id.* ¶¶ 63, 122), the Court treats that allegation as part of Plaintiff's unreasonable search claim in Count Six, discussed in Section II.B.3 *infra*.

As an initial matter, the Court notes that the Fourth Amendment's objective reasonableness standard continues to govern any excessive force claims based on events at the Newburgh police station.  The Second Circuit "decided long ago that the objective reasonableness standard established in *Graham* applies to actions taken with respect to a person who asserts, as does the plaintiff here, a claim for excessive force after [he] has been arrested and detained, but 'prior to the time when [he] is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.'"  *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)); *see also Franks v New Rochelle Police Dep't*, No. 13-CV-636, 2015 WL 4922906, at *9 (S.D.N.Y. Aug. 18, 2015) (recognizing that, under *Powell*, the Fourth Amendment standard applies until the person is arraigned or formally charged, and remains in the custody of the arresting officer).  Accordingly, the Court will analyze the excessive force claim in Count Five—as well as the excessive force claim in Count Eight—under the Fourth Amendment standard.

As recounted in Part I.A.2 *supra*, Plaintiff and Police Defendants give strikingly divergent accounts of what occurred in the strip search room.  In Plaintiff's version, he is slammed to the ground, beaten, and digitally penetrated by one of the officers.  (*See* SAC ¶¶ 59– 63.)  In the officers' version, Plaintiff voluntarily squats after having his arms held against a wall,

and the small bag of drugs falls from his body cavity without any further intervention by the officers.  (*See, e.g.*, Canario Aff. ¶ 15; Defs.' 56.1 ¶ 47.)  In the latter version, there is no "physical struggle," (Arestin Aff. ¶ 5), and none of the officers places his hands on or inside Plaintiff's buttocks, (*see* Defs.' 56.1 ¶ 48).

The Parties therefore present two conflicting versions of the relevant events.  There is no camera in the strip search room, and thus, no video footage to review.  Because the Court "may not weigh evidence or assess the credibility of witnesses at the summary judgment stage[,]" *Jeffreys*, 426 F.3d at 551, it may not resolve the "he said, she said" factual conflict presented by Count Five at this point in time, *see Fincher*, 604 F.3d at 726.

Police Defendants maintain that summary judgment is warranted in light of two considerations.  First, they argue that Plaintiff gave inconsistent testimony regarding which side of his face Pitt allegedly punched.  (*See* Police Defs.' Mem. 6–7, 14–15.)  In the Second Amended Complaint, Plaintiff alleges that Pitt punched him on the right side of his face.  (SAC ¶ 60.)  But Police Defendants argue that at his deposition, when Plaintiff "pointed to a picture taken of him at the hospital and his intake photo at the [Orange County Jail] . . . to identify swelling . . . from Pitt's alleged punch[,] . . . he pointed to marks on the left side of his face, not the right [side] where he says Pitt punched him."  (Police Defs.' Mem. 6–7; *see also id.* at 14–15 (arguing that Plaintiff "pointed to the left side of his face to identify the area struck and noted a mark under his left eye and pointed to a photo showing an unrelated injury").)  Police Defendants cite to three parts of the deposition transcript—pages 64, 77, and 148—in support of this claim.  (*See id.* at 6–7)  Page 64 contains the following exchange:

Q:     Where did [Pitt] punch you in the face?

A:     He punched me on this side of my face.

Q:      The right side?

A:      Yes.

Q:      Between your eye and your ear?

A:      Yes, like right here.  Like in my head.

(Pl.'s Dep. 64:13–21.)  Although the Court has not seen video footage of the deposition, the only

reasonable inference to be drawn from this excerpt is that Plaintiff pointed to the right side of his

face.  After Plaintiff indicates where he was punched, the examiner's follow-up question—"[t]he

right side?"—indicates that Plaintiff had pointed to the right side of his face.  (*See id.*)  Plaintiff

responds in the affirmative, leaving no doubt as to his testimony.  (*See id.*)  On page 77, Plaintiff

testifies that in the photo taken of him "when [he] was first admitted to the hospital[,]" his

"whole face was bruised from that punch where Detective Pitt punched [him] in the eye."  (Pl.'s

Dep. 77:15–20; *see also* Posner Aff. Ex. E ("Hospital Photo") (Dkt. No. 160-4).)  This statement

does not conflict with Plaintiff's original allegation or his testimony from earlier in the

deposition that Pitt punched him on the right side of his face.  And without video footage of the

deposition, the Court has no way of verifying whether Plaintiff pointed to the left side of his face

in the photo, as Police Defendants claim.  Finally, on pages 148 through 149 of the transcript, the

examiner shows Plaintiff the hospital photo, at which point the following exchange occurs:

Q:      I think earlier you pointed to that photograph before we had marked it when
        I was examining you initially and pointed [sic] to underneath your left eye
        to show what happened as a result of being punched by Detective Pitt; is
        that correct?

A:      Yes.  Just to note I did have lumps on my forehead, too.  I think you could
        see that lump, too.

(Pl.'s Dep. 148:25–149:9.)  In responding "[y]es" to the examiner's question, Plaintiff appears to

indicate that he had previously pointed to the left side of his face in the hospital photo.  But even

assuming this answer constitutes an inconsistency in Plaintiff's testimony, the Court cannot say that his testimony was so "contradictory or rife with inconsistencies such that it was facially implausible[,]" *Fincher*, 604 F.3d at 726, particularly in light of his earlier testimony—in the same deposition—that *did* comport with his initial allegations.  The Court therefore declines to grant summary judgment based on Police Defendants' first argument.

Police Defendants also argue summary judgment is warranted because "there are no hospital records corroborating any facial injury, which records also reflect he had no complaint of any."  (*See* Police Defs.' Mem. 15; *see also* ER Records 13 (stating "no gross deformity" to head and face); *id.* (stating that Plaintiff "denies any neck pain, back pain[,] or any other complaints"); Madell Aff'n ¶¶ 16, 24 (stating that "there was no gross deformity of the head and face," that his "objective physical examination of the plaintiff did not exhibit any evidence of trauma, such as bruising, contusions[,] or reflexes of pain," and that, if Plaintiff had "made any complaints resulting from a physical altercation, [he] would have documented the same"); Durbin-French Aff. ¶¶ 15–17 (same)).  But although Madell, Durbin-French, and the St. Luke's medical records suggest Plaintiff did not complain about any facial injury, Plaintiff maintains that he *did* complain to hospital staff about a facial injury resulting from the alleged assault in the strip search room.  (*See* SAC ¶ 86; Pl.'s Dep. 49:18–21 (explaining that when he arrived at the hospital, the "injuries [he] was stressing to [hospital staff] [were] [his] body cavity injuries and the bruise on [his] face [arising from the officers' alleged] excessive force on [him] just before the hospital"); *id.* 104:15–21 (Q: "Did you make any complaint about any injury to your face to the hospital?"  A: "I was like, look at my face, look at my face.  They beat me up, all that.  That's when I was explaining the body cavity search. . . .  My neck was strained because I was like – I had so much tension on me.  I told them my neck.  I told them about everything. . . .  But the

bruises clearly seen right there in the face, they didn't treat me for that.").)  Thus, Plaintiff has provided an account that is flatly at odds with the evidence and testimony produced by Police Defendants.

In considering these conflicting accounts, the Court is mindful that "it is undoubtedly the duty of district courts *not* to weigh the credibility of the parties at the summary judgment stage." *Jeffreys*, 426 F.3d at 554 (emphasis added).  Even where, as here, a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible."  *Fincher*, 604 F.3d at 726; *see also Bridgewater v. Taylor*, No. 08-CV-3593, 2011 WL 6762931, at *5 (S.D.N.Y. Dec. 21, 2011) (denying summary judgment where the plaintiff's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Butler v. Gonzalez*, No. 09-CV-1916, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (denying summary judgment where, although the plaintiff's evidence was "minimal," and his allegations "suffer[ed] from a lack of corroboration," there were no "material inconsistencies" in his account), *adopted by* 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010); *Sash v. United States*, 674 F. Supp. 2d 531, 541–42 (S.D.N.Y. 2009) (denying summary judgment because the court did not find the plaintiff's "version of events to be so incredible, or in such discord with other evidence, as to find his allegations 'wholly fanciful,'" where the plaintiff's claim relied "almost entirely" on his own consistent testimony (citation omitted)).

Indeed, courts have even denied summary judgment to defendants where, as here, a plaintiff's version of the events is contradicted by substantial evidence.  *See, e.g.*, *Scott*, 344 F.3d at 289–91 (holding that "[a]lthough [the plaintiff's] evidence may be thin, his own sworn

statement is adequate to counter summary judgment," and that "[b]y finding against [the plaintiff] on the basis of the disparity between some of [the plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof . . . [which] may only be evaluated by a finder of fact"); *Vital*, 168 F.3d at 622 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (reversing grant of summary judgment and noting that although "[i]t appears from the affidavits filed by appellees that [the plaintiff's] case may well be without merit[,]" the plaintiff's "affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution"); *cf. DeBlasio v. Rock*, No. 09-CV-1077, 2011 WL 4478515, at *13 (N.D.N.Y. Sept. 26, 2011) (partially denying summary judgment where the plaintiff relied exclusively on his own testimony, which was contradicted by evidence produced by the defendants, because the plaintiff's complaint and deposition testimony were "moderately contradictory," but "far less contradictory" than the testimony at issue in decisions granting summary judgment); *Bennett v. Falcone*, No. 05-CV-1358, 2009 WL 816830, at *5 (S.D.N.Y. Mar. 25, 2009) (partially denying summary judgment where the plaintiff's story was "certainly inconsistent with other evidence and [was] subject to serious question," but was "not so blatantly false that the [c]ourt may simply reject it as a matter of law" (citation omitted)); *Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5–6 (S.D.N.Y. Sept. 30, 2008) (partially denying summary judgment where the defendants' testimony, third-party eyewitness testimony, and other evidence contradicted the plaintiff's uncorroborated version of events, because the plaintiff's story did not have any "fatal internal inconsistencies").

Here, although Plaintiff's account of his facial injury relies exclusively on his own testimony and is contradicted by other testimony and medical evidence in the record, his account still provides "a plausible alternate version of events," *Bridgewater*, 2011 WL 6762931, at *5, that is neither "wholly fanciful," *Sash*, 674 F. Supp. 2d at 541 (citation omitted), nor "rife with inconsistencies," *Fincher*, 604 F.3d at 726.  It is true that some district courts in the Second Circuit have granted summary judgment on the basis of medical records where there is "direct[] and irrefutabl[e] contradict[ion]" of a plaintiff's descriptions of his injuries, such that "no reasonable jury could credit [the] plaintiff's account of the happening."  *Henry v. Brown*, 406 F. Supp. 3d 211, 214–15 (E.D.N.Y. 2016) (citation and emphasis omitted) (granting summary judgment for the defendant where, although the plaintiff alleged that he nearly lost his left leg and had a head injury so severe that he was "unconscious [and] lying in a pool of blood" for over an hour, the medical records reflected only a scab on his leg and no head injury whatsoever); *see also Allah v. Wilson*, No. 13-CV-4269, 2017 WL 4350611, at *4 (S.D.N.Y. July 31, 2017) (granting summary judgment where the plaintiff's medical records six days after an alleged beating revealed only a possible foot fungus); *Musaid v. Manka*, No. 13-CV-7880, 2016 WL 540806, at *5 (S.D.N.Y. Feb. 9, 2016) (granting the defendant's summary judgment motion where, although the plaintiff alleged that he had suffered broken bones, the x-ray images showed no broken bones at all).  But Plaintiff's excessive force claim in Count Five does not present such a case.  Although his alleged facial injury does not appear in his medical records, neither is his allegation "directly and irrefutably contradicted" by these records as was true in *Henry*, *Allah*, or *Musaid*.  *Cf. Morehouse v. Vasquez*, No. 17-CV-4836, 2020 WL 1049943, at *14 (S.D.N.Y. Mar. 4, 2020) (citation omitted) (denying summary judgment on excessive force claim where, although "a number of [the] [p]laintiff's alleged injuries [did] not appear in the medical

records, or [were] seemingly more serious than those that [did], not all of [the] [p]laintiff's allegations [were] 'directly and irrefutably contradicted' by the record" (citation omitted)). Because Plaintiff has offered an alternative version of events that is not "facially implausible," *Fincher*, 604 F.3d at 726, it is for the jury to determine whose account is more credible.

Finally, unlike the Handcuff Claim, which did not "rise to the level of injury necessary to sustain an excessive force claim for tight handcuffs," *see Sachs*, 2012 WL 3822220, at *15, Plaintiff's alleged facial injury does constitute a cognizable injury in the excessive force context, *see Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising."); *Ong*, 2017 WL 4326540, at *13 (concluding that defendant was not entitled to summary judgment on excessive force claim where the plaintiff's only injuries were a "very small" bruise on his abdomen and a second bruise on his chest); *Hamilton v. City of New York*, Nos. 07-CV-3633, 07-CV-3825, 2009 WL 2226105, at *3, *11 (E.D.N.Y. July 23, 2009) (holding that defendants were not entitled to summary judgment on plaintiff's excessive force claim where the alleged injury was a one-centimeter cut to plaintiff's right temple); *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) (denying summary judgment where the plaintiff had suffered bruises to her head, because "[a] plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient").

For these reasons, Police Defendants' Motion is denied with respect to Count Five.

<u>c.  Use of Force During Plaintiff's Attempt to Swallow Drugs (Count Eight)</u>

Police Defendants argue that the Booking Room Video demonstrates beyond dispute that excessive force was not used by Canario, Pitt, Saintiche, and Arestin when they tried to prevent Plaintiff from swallowing the recovered contraband.  (*See* Police Defs.' Mem. 13, 15.)  The Court agrees.

The Court has reviewed the relevant video footage in detail.  At 6:17:35 P.M., Plaintiff—whose ankle was shackled to a bench—leaps to his left and swipes the recovered contraband from the hands of Officer Canario.  As Plaintiff quickly spins 180 degrees to his right, he can be seen drawing his hands toward his mouth.  (*See* Booking 1 Video at 6:17.37.163–.390.)  Canario immediately pivots to his right, grabs the right side of Plaintiff's upper body with his right arm, pulls his left arm over the left side of Plaintiff's upper body, and drags Plaintiff to the ground.  Although this initial sequence unfolds in a flash, Plaintiff can be seen drawing his left arm toward his mouth as Canario pins him to the ground.  (*See id.* at 6:17:37.924; *see also* Pl.'s Dep. 71:14–16 (Q: "So, you stuffed it in your mouth, correct?"  A: "Yes.").)  Canario wraps his right arm around Plaintiff's head, and the two begin to tussle on the ground as Officers Saintiche, Arestin, Pitt, and a fourth police official swarm the scene.  (*See* Booking 1 Video at 6:17:38.179–.711.)  A fifth, unidentified officer runs toward the scene from the left side of the frame and stands near the edge of the commotion.  (*See id.* at 6:17:41.147.)  Canario, Saintiche, Arestin, and Pitt can be seen kneeling around Plaintiff and struggling to subdue him as several seconds pass.  (*See id.* at 6:17:45–49.)  Canario suddenly pulls his head from the scuffle, wincing and wiping his eyes, and begins to walk away, apparently having just deployed pepper spray.  (*See id.* at 6:17:49.920.)  Plaintiff was not in handcuffs and still had the drugs in his mouth when Canario used pepper spray.  (*See* Canario Aff. ¶ 23; Saintiche Aff. ¶ 13; Arestin Aff. ¶ 7.)  Pitt, Saintiche,

and Arestin continue trying to subdue Plaintiff and remove the drugs from his mouth.  (*See* Pl.'s Dep. 72:2–4 (stating that Pitt was "all in [his] mouth" attempting to "get the drugs out of [his] mouth"); *id.* 72:24–25 (officers were yelling, "he's trying to swallow it; he's trying to swallow it"); *id.* 74:2–3 (officers were yelling "he's resisting, he's resisting").)  Saintiche can be seen kneeling over Plaintiff's left side, Arestin is crouched near Plaintiff's head, and Pitt straddles Plaintiff's lower body.  A female officer, identified as Myra Rude ("Officer Rude"), (*see* Arestin Aff. ¶ 7), runs toward the fray, (*see* Booking 1 Video at 6:17:55), and another unidentified officer approaches several seconds later, (*see id.* at 6:18:03).  At 6:18:06, Pitt, Saintiche, Arestin, and the female officer are kneeling and crouching around Plaintiff, continuing to try to subdue him and remove the drugs from his mouth.  Five seconds later, with the drugs still in Plaintiff's mouth, Arestin deploys his taser on Plaintiff.  (*See id.* at 6:18:11; *see also* Arestin Aff. ¶ 7; Saintiche Aff. ¶ 13.)  As he does this, Pitt holds Plaintiff's legs while Saintiche backs away.  After Arestin uses the taser, Plaintiff rolls over onto his left side several seconds later.  (*See id.* at 6:18:16.)  The officers lean back in and begin to restrain Plaintiff, with Officer Rude helping to secure his hands in handcuffs.  As Plaintiff's hands are being secured, an unidentified officer appears to remain crouched over Plaintiff, with his right knee securing Plaintiff's upper legs.  Meanwhile, Pitt restrains Plaintiff's lower legs with his left knee and left hand.  By 6:19:09, there is only one officer leaning over Plaintiff, with his left hand near Plaintiff's right shoulder.  Plaintiff is lying on his left side.  Plaintiff rolls over onto his stomach at 6:19:17, and from roughly 6:19:32 until 6:21:01, Plaintiff is only restrained by a single officer, who has his right hand near Plaintiff's right shoulder blade.  From then until 6:21:58, Plaintiff remains handcuffed on the floor, with no officer restraining him.  At that point, one of the officers secures his legs using a pair of leg restraints.  Plaintiff is lifted to his feet at 6:23:52.

When courts are confronted with an excessive force claim, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015) (quoting *Graham*, 490 U.S. at 396–97). Such was the case here. By attempting to swallow the contraband that had been recovered moments earlier, Plaintiff not only threatened to destroy evidence, but also placed his own safety in peril. Plaintiff easily could have choked on the drugs, or, if he had managed to swallow them, there was a risk that the small bag holding the drugs could break inside Plaintiff's system, particularly given that it had been chewed moments earlier. (*See, e.g.*, Canario Aff. ¶ 22; Durbin-French Aff. ¶ 24.) Confronted with these threats, the officers responded swiftly and professionally. There were no kicks, punches, or other signs of gratuitous force. Moreover, it is clear that until Arestin deployed his taser, Plaintiff continued to resist the officers' attempts to subdue him and remove the contraband from his mouth. Under these circumstances, it was reasonable for the officers to respond with some amount of force. *See Graham*, 490 U.S. at 396 (noting that two factors courts may consider in evaluating the reasonableness of force are (1) "whether the suspect poses an immediate threat to the safety of the officers *or others*, and whether he is *actively resisting arrest*" (emphasis added)); *Mobley v. Matayeva*, No. 15-CV-3418, 2020 WL 5577711, at *4 (E.D.N.Y. Sept. 17, 2020) (recognizing that force may be used to prevent "an immediate threat to [the] [p]laintiff's health and safety," particularly where, "[h]ad the bag [of drugs inserted in plaintiff's rectum] perforated, the drugs contained therein would have made their way into [p]laintiff's system, putting his health at grave risk"). Moreover, the nature of the force used— holding Plaintiff against the ground, securing his arms and legs, and attempting to pry the

contraband from his mouth—was entirely reasonable under the circumstances.  *See Casiano v. Ashley*, — F. Supp. 3d —, 2021 WL 281460, at *4 (W.D.N.Y. Jan. 28, 2021) (dismissing excessive force claim on summary judgment where video evidence showed that the defendants "did not strike [the pretrial detainee]," but "grappled with her and wrestled her to the ground"); *Frost v. City of New York*, No. 15-CV-4843, 2019 WL 1382323, at *5, *11 (S.D.N.Y. Mar. 27, 2019) (dismissing excessive force claim on summary judgment where video evidence "establishe[d] that defendants used only force [against a pretrial detainee] that was objectively reasonable"), *aff'd in relevant part, rev'd and vacated in part on other grounds*, 980 F.3d 231, 256 (2d Cir. 2020) (observing that "although perhaps the struggle between [plaintiff] and the [defendants] could have been gentler," the defendants "were justified in using nontrivial amounts of force" in light of the "security problem at issue; the threat reasonably perceived by the [defendants]; and the fact that [plaintiff] was actively resisting" (brackets and citation omitted)); *Boomer v. Lanigan*, No. 00-CV-5540, 2002 WL 31413804, at *2, *6 (S.D.N.Y. Oct. 25, 2002) (granting summary judgment where video evidence showed a "scuffle" in which the defendants pushed the plaintiff into a cell and held him in place for several minutes, none of which showed "wantonness" on the part of defendants).

Canario's use of pepper spray was also reasonable under the circumstances.  "The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement."  *Walton v. Lee*, No. 15-CV-3080, 2019 WL 1437912, at *6 (S.D.N.Y. Mar. 29, 2019); *see also Williams v. City of New York*, No. 05-CV-10230, 2007 WL 2214390, at *12 (S.D.N.Y. July 26, 2007) (holding that an excessive force claim based on an officer's use of mace was "not actionable" where the plaintiff had not alleged any injuries apart from "the expected side-effects: temporary discomfort and

disorientation"). As was true of another Newburgh police officer in *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306 (S.D.N.Y. 1998), "it was not unreasonable for [Canario] to direct a stream of pepper spray at [Plaintiff]," particularly "[g]iven the undisputed evidence that he believed [Plaintiff] was about to swallow contraband," *id.* at 315; *see also Casiano*, 2021 WL 281460, at *4 (granting summary judgment where video evidence showed that the pretrial detainee "received one burst of pepper spray," without "any lasting or serious effects," and "was subdued relatively quickly and without resort to punches, kicks, or other forceful blows that might have inflicted greater injury").

Arestin's use of the taser was likewise reasonable. The Court is mindful that use of a taser constitutes a "serious intrusion." *Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (citation omitted) (finding that issues of fact precluded summary judgment where the defendant had allegedly tased the plaintiff a second time after he was already immobilized). Here, however, the circumstances justified this technique. The video shows that even after Canario deployed the pepper spray, (*see* Booking 1 Video at 6:17:49.920), the officers continued struggling to subdue Plaintiff and remove the contraband for approximately 22 additional seconds until Arestin used the taser, (*see id.* at 6:18:11). Where, as here, an arrestee is unrestrained and actively non-compliant with officers' directives, it is reasonable for officers to use a taser. *See Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295, at *9 (E.D.N.Y. Jan. 22, 2021) (granting summary judgment because defendant's first taser deployment was reasonable to subdue an "unrestrained, uncooperative" arrestee who had engaged in a serious offense); *Gomez v. Village of Sleepy Hollow*, No. 07-CV-9310, 2011 WL 2652450, at *11 (S.D.N.Y. July 6, 2011) (holding that an officer's use of a taser was reasonable in light of an "uncertain[] and volatil[e]" situation in which the plaintiff resisted arrest and

51

refused to comply with the officer's orders not to move); *Towsley v. Frank*, No. 09-CV-23, 2010 WL 5394837, at *7–8 (D. Vt. Dec. 28, 2010) (concluding on summary judgment that a defendant's first taser deployment was reasonable in an "increasingly tense and uncertain" situation where the officers used the taser to subdue an arrestee "who was under the influence of drugs," was "verbally combative" with officers, and was threatening to jump out of a window).[20] For the reasons above, Police Defendants' Motion is granted with respect to Count Eight.

### 3.  Unreasonable Search Claim (Count Six)

In Count Six, Plaintiff asserts that Police Defendants Canario, Pitt, Saintiche, and Arestin conducted an unreasonable search in violation of his Fourth Amendment rights.  (SAC ¶ 123.) As opposed to the unreasonable search claims in Counts 15 and 16, which are based on events that unfolded later in the evening at St. Luke's, (*see id.* ¶¶ 92–98, 132–33), Count Six is based on the search that took place in the strip search room at the Newburgh police station, (*see id.* ¶¶ 46–65, 123).[21]  Although Police Defendants have not moved for summary judgment on Count Six, (*see* Police Defs.' Mem. 35), Plaintiff has, (*see* Pl.'s Mem. 8).

---

[20] Although the Court need not reach the qualified immunity analysis in light of its finding that the use of force itself was objectively reasonable, the Court has little doubt that Arestin would be entitled to qualified immunity under these circumstances.  *See, e.g.*, *Sanders v. City of Dothan*, 409 F. App'x 285, 287 (11th Cir. 2011) (concluding that an officer was entitled to qualified immunity where he had "tasered [the plaintiff] in furtherance of the legitimate law-enforcement activity of searching for contraband in [the plaintiff's] mouth to prevent him from possibly destroying it by swallowing the contraband").

[21] In the Second Amended Complaint, Plaintiff indicates that Count Six is based on Police Defendants' (1) "repeated orders to strip search"; (2) "using physical force to secure [Plaintiff's] arms and legs against wall"; (3) "touching and grabbing [Plaintiff's] buttocks"; (4) "punch[ing] [Plaintiff] in the face"; (5) "punching and kneeing [Plaintiff] in the ribs[,] causing noticeable injuries"; and (6) "penetrating [Plaintiff's] body cavity[,] causing physical and emotional injuries."  (SAC ¶ 123.)  The second, fourth, and fifth actions described by Plaintiff go toward his excessive force claim in Count Five, and the Court has therefore addressed these actions in a separate context *supra*.  For purposes of analyzing Count Six, the Court will consider

In evaluating Plaintiff's claim, the Court will adopt the same terminology some courts in the Second Circuit have used when evaluating similar actions in the law-enforcement context. Thus,

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People v. Hall*, 886 N.E.2d 162, 165 (N.Y. 2008)); *see also Sloley v. VanBramer*, 945 F.3d 30, 36–37 (2d Cir. 2019) (relying on the categorical definitions adopted in *Gonzalez*); *Bobbit v. Marzan*, Nos. 18-CV-2465, 16-CV-2042, 2020 WL 5633000, at *9 (S.D.N.Y. Sept. 21, 2020) (same).  Thus, a "strip search" enables officers to examine a subject when "he stands naked in their presence."  *Monroe v. Gould*, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (quoting *United States v. Gonzalez*, 111 F. Supp. 3d 416, 431 (S.D.N.Y. 2015)).  A "visual body cavity search" is more invasive, and may require, for example, that the subject squat, bend over, or even "hold his buttocks open to allow officers to visually inspect his anus."  *Monroe*, 372 F. Supp 3d at 204 (citation omitted). However, this type of search involves no touching by the officers.  *Id.*  The "most invasive type of search" is the "manual body cavity search," which "crosses from a visual to a manual inspection of the subject's body cavity," *id.* (citation omitted), and includes "some degree of touching or probing of body cavities," *id.* (quoting *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016)).  Framing the relevant events within this terminology, all Parties agree that a "strip search" and "visual body cavity search" occurred at the Newburgh police station.  (*See* SAC

---

only the remaining actions described by Plaintiff, which are appropriately construed as supporting an unreasonable search claim.

¶¶ 48–50; Saintiche Aff. ¶¶ 6–7; Anderson Aff. ¶ 7.)  But while Police Defendants maintain that their search of Plaintiff ended there, (*see* Defs.' 56.1 ¶ 48), Plaintiff alleges that Canario, Pitt, Saintiche, and Arestin took it one step further, performing a "manual body cavity search" by "forcefully penetrat[ing] [his] anal cavity and snatch[ing]" the small bag of drugs hidden within, (SAC ¶ 63).

As an initial matter, Police Defendants make a procedural objection based on Plaintiff's main argument in support of his Motion.  In the Second Amended Complaint, Plaintiff's unreasonable search claim appears to be predicated on his allegation that Police Defendants unlawfully conducted a manual body cavity search.  (*See id.* ¶¶ 46–65, 123.)  But in the Memorandum of Law Plaintiff has submitted in support of his Motion, he argues that the visual body cavity search *itself* constituted an unreasonable search.  (*See* Pl.'s Mem. 13–15.)  Police Defendants argue that "no such claim is raised in the Second Amended Complaint[,]" which "only asserts [that] the manual spreading of his buttocks and [the] digital exam were unlawful." (Police Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Police Defs.' Opp'n") 1, 2 (Dkt. No. 193).)  They contend that Plaintiff should not be permitted to "amend his [Second Amended] [C]omplaint via a motion for summary judgment[,]" and that "[i]t is equally inappropriate to affirmatively seek summary judgment on a claim that is not pled in [this document]."  (*Id.* at 2.)

Although there is some merit to Police Defendants' complaint of whipsawing, the Court will nevertheless consider Plaintiff's argument regarding the visual body cavity search, for two reasons.  First, the factual allegations underpinning this argument were all pled in detail in the Second Amended Complaint, a critical feature that distinguishes this case from each of those relied upon by Police Defendants.  *Cf. Wilson v. City of New York*, 480 F. App'x 592, 594 (2d Cir.

2012) (summary order) (concluding that a plaintiff had waived any argument based on his excessive pre-*arraignment* detention where his complaint "contain[ed] no factual allegation regarding the length of his detention before being arraigned, or the times at which he was arrested or presented in court[,]" but had instead "focuse[d] on [his] . . . prolonged pre-*trial* detention, [without] ma[king] [any] reference to an excessive delay in arraignment" (emphasis added)); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (concluding that the plaintiffs could not raise an argument based on the defendant's alleged failure to issue a timely disclaimer where the complaint "[did] not make any reference to [the defendant's] alleged failure to disclaim coverage"); *Froio v. Monroe-Woodbury Cent. Sch. Dist.*, No. 17-CV-604, 2020 WL 2731970, at *7 n.6 (S.D.N.Y. May 26, 2020) (declining to consider a failure-to-accommodate claim where the plaintiff had entirely failed to allege such a claim in her second amended complaint, and had "not describe[d] a reasonable accommodation to which she was entitled but . . . [had] not receive[d]").  Second, because Plaintiff is proceeding pro se—another feature that distinguishes this case from each of those cited by Police Defendants—the Court has an obligation to construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474.  Accordingly, the Court will consider Plaintiff's argument that the visual body cavity search itself was unreasonable.

### a.  Whether Visual Body Cavity Search Violated Fourth Amendment

In *Sloley v. VanBramer*, the Second Circuit held that law enforcement must have "reasonable suspicion" to conduct a lawful visual body cavity search.  *See* 945 F.3d at 38. Although the Second Circuit had previously applied the "reasonable suspicion" standard to strip searches, *Sloley* recognized that "visual body cavity searches are even more intrusive[,]" requiring a person not only to "strip naked in front of a stranger, but also to expose the most

private areas of [his] body to others[,]" often while "assum[ing] degrading and humiliating positions." *Id.* (citation omitted). Accordingly, *Sloley* formally extended the "reasonable suspicion" standard to visual body cavity searches, *see id.* at 38, notwithstanding the fact that some district courts in the Second Circuit had been applying this standard to such searches already, *see id.* at 40–41 (gathering cases and observing that, "[a]s numerous district courts in this Circuit have recognized, Supreme Court and Second Circuit precedent clearly foreshadowed the rule we clarify today"); *see also, e.g.*, *Sims v. Farrelly*, No. 10-CV-4765, 2013 WL 3972460, at *8 (S.D.N.Y. Aug. 2, 2013); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 274 (S.D.N.Y. 2002). After *Sloley*, there is no doubt that "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Sloley*, 945 F.3d at 38 (citation and quotation marks omitted).

### i.  Whether Police Defendants Had Reasonable Suspicion

Reasonable suspicion requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Sloley*, 945 F.3d at 43 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). To decide whether an officer had reasonable suspicion that would warrant a visual body cavity search, courts "must look at the totality of the circumstances." *Id.* at 43 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun." (quoting *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007))). An officer must be able to "point to specific objective facts and rational inferences that [he] [is] entitled to draw from those

facts in light of [his] experience." *Bobbit*, 2020 WL 5633000, at *9 (quoting *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008)).  Finally, courts in the Second Circuit have repeatedly emphasized that the reasonable suspicion standard requires an *individualized* inquiry.  That is, "[t]he standard requires individualized suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search."  *Hartline*, 546 F.3d at 100; *see also Sloley*, 945 F.3d at 46 (concluding that, "in the absence of indicia" which the Second Circuit and New York State courts have "found to support *individualized* reasonable suspicion" that an arrestee is "secreting drugs inside his anal cavity," the defendant officer was not entitled to qualified immunity in connection with his visual body cavity search of the plaintiff (emphasis added) (citation omitted)); *Cannon v. Port Auth. of N.Y. & N.J.*, No. 15-CV-4579, 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (recognizing that "visual body cavity searches at a police station 'are still subject to the *Hartline* standard requiring individualized reasonable suspicion'" (quoting *Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *15 (S.D.N.Y. Mar. 1, 2018))); *Bobbit*, 2020 WL 5633000, at *9 (recognizing the "individualized suspicion" requirement in considering whether officers had reasonable suspicion to perform visual body cavity search).

Gathering relevant authority from New York State courts, *Sloley* identified various factors that can support a reasonable suspicion that an arrestee is secreting narcotics inside his person. *See* 945 F.3d at 46.[22]  For example, officers may have reasonable suspicion where the arrestee is seen placing his hands down his pants or making similarly suspicious movements.  *People v.*

---

[22] New York courts and the Second Circuit share the same reasonable suspicion standard with respect to visual body cavity searches.  Indeed, the rule adopted in *Sloley*—that officers must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity"—was borrowed from a 2008 decision by New York's highest court.  *See Sloley*, 945 F.3d at 41 & n.8 (discussing the New York Court of Appeals' decision in *Hall*, 886 N.E.2d 162, which interpreted the Fourth Amendment, rather than the New York state constitution).

*Hunter*, 902 N.Y.S.2d 678, 679–80 (App. Div. 2010) (finding reasonable suspicion based in part on the officers' observation of the arrestee "fidgeting with his hands down the back of his pants"); *People v. Harry*, 884 N.Y.S.2d 712, 712–13 (App. Div. 2009) (finding reasonable suspicion where an arrestee was placed in a patrol car and observed "moving around a lot, like sliding up and down in his seat and making movements with his hands" as though he were attempting to place or remove something from his pants); *People v. Clayton*, 868 N.Y.S.2d 303, 305–06 (App. Div. 2008) (finding reasonable suspicion where the arrestee was observed "wiggling around" in the patrol car and placing his hands in an area where the officer had felt a hard object during a pat-and-frisk). An officer may also have reasonable suspicion based on information that a particular arrestee is secreting objects in his person, or that he has a custom of doing so. *See Hunter*, 902 N.Y.S.2d at 680 (finding reasonable suspicion based in part on information the officers had received from a confidential informant that the arrestee "had a habit of carrying narcotics in his rectum"); *Clayton*, 868 N.Y.S.2d at 306 (finding reasonable suspicion based in part on the defendant's "history of secreting contraband in his rectum"). Finally, an officer clearly has reasonable suspicion where he has watched a suspect "retriev[e] an item from his buttocks area and exchang[e] it for money from a person found in possession of drugs minutes later." *People v. Barnville*, 819 N.Y.S.2d 234, 236 (App. Div. 2006).

None of these factors is present in this case. Instead, Police Defendants have invoked two separate considerations which they maintain give rise to reasonable suspicion. First, they argue that "Plaintiff was observed selling drugs in an area of Newburgh known for a great deal of drug activity." (Police Defs.' Opp'n 5.) And second, they argue that "it was well known to police, prescient in this case, that drug dealers 'cheek' their drugs to conceal them from police." (*Id.*) The Court will address each in order.

That Plaintiff was observed selling drugs shortly before his arrest must of course bear some weight in the Court's analysis. *See Sloley*, 945 F.3d at 39 ("To be sure, the type of crime for which someone is arrested may play some role in the analysis of whether a visual body cavity search incident to that arrest is supported by reasonable suspicion."). As the court observed in *Sloley*, "one may well more reasonably expect someone arrested for a misdemeanor drug offense to be secreting contraband than someone arrested for felony tax fraud." *Id.*

But although the "crime of arrest" is "one [factor] officers may take into account in their consideration of the totality of the circumstances surrounding [a] search[,]" it "is not a determinative factor[.]" *Id.* Indeed, courts in the Second Circuit have repeatedly recognized the rule that "being arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Quiles v. City of New York*, No. 15-CV-1055, 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016) (emphasis in original); *see also Nelson v. City of New York*, No. 18-CV-4636, 2019 WL 3779420, at *8 (S.D.N.Y. Aug. 9, 2019) (stating same rule); *Monroe*, 372 F. Supp. 3d at 204 (same); *Cordero v. City of New York*, 282 F. Supp. 3d 549, 562 (E.D.N.Y. 2017) (same); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) (same); *Sims*, 2013 WL 3972460, at *8 (same); *Sarnicola*, 229 F. Supp. 2d at 273–74 (same, and noting that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances"). In *Sims v. Farrelly*, for example, the plaintiff was arrested at the scene of a drug bust, taken to the police station, and subjected to a visual body cavity search. *See* 2013 WL 3972460, at *2–3. The stated basis for this search was "the narcotics nature of the incident, the easy concealability . . . of crack cocaine, and the criminal history of many of the subjects." *Id.* at *8 (record citation omitted). Denying the

defendant's motion for summary judgment on the plaintiff's unreasonable search claim, Judge

Ramos concluded that this "general[]" rationale was insufficient to sustain an "individualized

reasonable suspicion . . . that [the] [p]laintiff was secreting narcotics on his person." *Id.*

Similarly, in *Sarnicola v. County of Westchester*, the defendant officer had "ordered a strip search

[of the plaintiff] simply and solely because [the plaintiff] was arrested for suspected involvement

in a drug-related felony." 229 F. Supp. 2d at 274. Granting the plaintiff's motion for summary

judgment on her unreasonable search claim, then- (now Chief) Judge McMahon concluded that

because the defendant "had no particularized reason to suspect that [the plaintiff] was secreting

drugs on her person[,]" his search failed to "pass constitutional muster." *Id.* Thus, Plaintiff's

arrest for a narcotics offense does not, without more, establish reasonable suspicion for the visual

body cavity search that was performed.

Here, of course, Police Defendants argue they had reasonable suspicion for the search not

merely because Plaintiff was arrested for a narcotics offense, but because he was actually

*observed* dealing drugs. (*See* Police Defs.' Opp'n 5 (noting that "Plaintiff was *observed* selling

drugs" (emphasis added)).) But in the absence of specific signs that Plaintiff was actually

secreting drugs inside a body cavity, there is still no individualized reasonable suspicion to

justify the search. The Second Circuit applied this principle in *Hartline v. Gallo*. There, the

plaintiff was arrested following a traffic stop in which the officer observed the stem of a

marijuana plant on the floor of her car and subsequently found the butt of a marijuana cigarette, a

pipe, and a container with a few seeds. 546 F.3d at 97–98. The plaintiff was subjected to a

visual body cavity search when she arrived at the police station. *See id.* at 98. Reversing the

district court's decision granting summary judgment for the defendants, the Second Circuit held

that the officer's search had violated the Fourth Amendment. *See id.* at 101. In the court's

analysis, the absence of any indication that the plaintiff was concealing drugs in her body proved decisive. The officer, for example, "had no reason to believe that [the plaintiff] was under the influence of narcotics at the time of her arrest." *Id.* He "found no useable narcotics in [her] vehicle, nor did he see [her] take any suspicious actions which might have suggested she was hiding something as he approached her vehicle." *Id.* He noticed nothing in her "physical appearance that suggested she was secreting drugs on her person, nor did he engage in a less invasive pat down search that suggested the presence of contraband." *Id.*[23] Under these facts, the officer's visual body cavity search was not supported by individualized reasonable suspicion, and the plaintiff's "Fourth Amendment rights were violated," *id.* at 102.

Similarly, in *Sloley*, an officer had performed a visual body cavity search on an arrestee whom the officer suspected was involved in illegal drug activity. *See* 945 F.3d at 35 ("According to [the officer], he recognized [the plaintiff's] name 'as referring to an individual who was well known in the area for being wrapped up in illegal drugs.'" (record citation omitted)). Although there was a factual dispute over whether the officer had recovered crack cocaine from the plaintiff's vehicle prior to the visual body cavity search, the Second Circuit concluded that "once th[at] disputed fact . . . [was] disregarded, the evidence available to [the officer] support[ed] no more than a mere hunch that [the plaintiff] was secreting drugs inside his anal cavity." *Id.* at 46. There was "no evidence," for example,

---

[23] Though the Second Circuit also observed that the plaintiff "had been arrested for nothing more serious than a B-misdemeanor[,]" *Hartline*, 546 F.3d at 101, the Second Circuit held in *Sloley* that whether an offense is a misdemeanor or felony makes no difference in the Fourth Amendment reasonable-suspicion analysis, *see Sloley*, 945 F.3d at 38–39 (noting that "it makes little sense in this context to draw Fourth Amendment lines that rest on the felony-misdemeanor distinction[,]" and "clarify[ing] . . . that th[e] rule [that strip searches conducted incident to a misdemeanor arrest be supported by reasonable suspicion] applies equally to visual body cavity searches incident to all arrests").

> that [the plaintiff] was fidgeting or moved about suspiciously, that he reached or
> attempted to reach his hands down his pants, that anyone observed [him] putting
> drugs down his pants or retrieving drugs (or anything else) from inside his pants,
> or that [he] himself was previously known to secrete drugs inside his anal cavity.

*Id.* (citations omitted).  Reversing the district court's grant of summary judgment for the defense,

the Second Circuit concluded that the officer's "'hunch of criminal activity [was] insufficient' to

establish reasonable suspicion." *Id.* (citation omitted).

Lower courts in the Second Circuit have reached the same conclusion under similar facts.

In *Bobbit v. Marzan*, for example, the police performed a visual body cavity search after the

plaintiff tried to enter Green Haven Correctional Facility "with pills, vials of an unknown liquid

substance, and bread, together in plastic wrap," that were discovered in her sock during a

security scan.  2020 WL 5633000, at *11.  The court concluded that these facts did not "give rise

to reasonable suspicion that would justify the intrusive search performed on [the] [p]laintiff," *id.*

The court observed that "[i]t [was] not reasonable to infer from the discovery of contraband in

[the] [p]laintiff's sock that she was also concealing contraband on her body in locations where it

could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and

use the bathroom, all in view of an officer." *Id.*  "If anything," the court explained, "the natural

inference is the reverse: a smuggler would not risk concealing a bulky package in her sock if she

also was willing to secrete contraband in more sensitive parts of her body." *Id.*  Moreover, there

was "no evidence" the plaintiff had shown any signs of concealing contraband in a body cavity,

such as fidgeting suspiciously or reaching down her pants, nor was there evidence to suggest she

had a reputation for such concealment. *Id.*  Accordingly, the court granted the plaintiff's motion

for summary judgment on her Fourth Amendment claim. *See id.* at *12.

In *Monroe v. Gould*, an officer had performed a manual body cavity search on the

plaintiff after the latter was arrested for possessing marijuana and a gravity knife. *See* 372 F.

Supp. 3d at 204.  But although the police had "found [the] plaintiff walking away from a vehicle containing cocaine, and a subsequent search of [the] plaintiff [had] revealed marijuana and a gravity knife on his person," the police could "not point to [the] plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body."  *Id.* at 204–05 (emphasis omitted).  Having found that the officer lacked reasonable suspicion for the search, the court denied the defendants' motion for summary judgment based on this search.  *See id.* at 205.

As the foregoing cases suggest, without some particular indicator that Plaintiff was secreting drugs inside his body, the fact that he was arrested for reportedly dealing drugs is insufficient to establish reasonable suspicion.  Although Police Defendants muddy the waters by invoking Plaintiff's subsequent testimony that it was his practice to conceal drugs in his anal cavity, (*see* Police Defs.' Opp'n 5; Pl.'s Dep. 25:19–26:7), there is no evidence the officers knew this fact at the time of the search, and thus, it is irrelevant, *see Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun.'" (citation omitted)).  In sum, Police Defendants' first asserted basis for reasonable suspicion—the fact that Plaintiff was observed dealing drugs, (*see* Police Defs.' Opp'n 5)—does not, without more, support such a suspicion.  Insofar as Police Defendants also rely on the fact that Plaintiff was observed dealing drugs "in an area of Newburgh known for a great deal of drug activity," (*id.*), this argument fails for the obvious reason that it does not describe an "individualized suspicion, specifically directed to the person who is targeted for the [visual body cavity] search."  *Bobbit*, 2020 WL 5633000, at *9 (quoting *Hartline*, 546 F.3d at 100).  Unsurprisingly, Police Defendants provide no authority for the proposition that police have reasonable suspicion to invade a suspect's privacy when they arrest

him in a neighborhood afflicted by crime.  Such a notion runs contrary to well-established law

and offends the protections enshrined in the Fourth Amendment.

Police Defendants' second asserted basis for reasonable suspicion—that "it was well

known to police . . . that drug dealers 'cheek' their drugs to conceal them from police," (Police

Defs.' Opp'n 5)—fails for the same reason.  This statement describes a generalized suspicion,

rather than one individualized to Plaintiff specifically.  Without a particular reason to believe that

Plaintiff himself had a custom of secreting drugs inside his body cavity, the officers' knowledge

regarding drug dealers *generally* does not establish reasonable suspicion.  *See Sloley*, 945 F.3d at

46 (finding no reasonable suspicion where the plaintiff "himself was [not] previously known to

secrete drugs inside his anal cavity").  Indeed, another court in this District has rejected an

argument similar to the one advanced by Police Defendants.  *See Bobbit*, 2020 WL 5633000, at

*11–12 (finding no reasonable suspicion for visual body cavity search notwithstanding the

assertion, proffered by the officer who ordered the search, "that in his experience, behavior like

[the] [p]laintiff's [was] consistent with an effort to hide drugs").  In view of the basic principle

that reasonable suspicion must be "specifically directed to the person who is targeted" for a

visual body cavity search, *id.* at *9, Police Defendants did not have such suspicion based on the

alleged custom of other drug dealers.  For this and the reasons stated above, Police Defendants

Canario, Pitt, Saintiche, and Arestin did not have reasonable suspicion to perform a visual body

cavity search on Plaintiff.

### ii.  Whether Police Defendants Are Qualifiedly Immune

Of course, "[c]oncluding that a constitutional violation has been established is only the

first step in a two-step inquiry."  *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 496

(S.D.N.Y. 2002).  The Court must also consider the possibility that Canario, Pitt, Saintiche, and

Arestin are entitled to qualified immunity.  *See id.*  "To be entitled to qualified immunity at the

summary judgment stage of a case, a defendant must show that, even viewing the evidence in the

light most favorable to the plaintiff, the defendant's actions did not violate clearly established

law."  *Bobbit*, 2020 WL 5633000, at *4 (quoting *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir.

2007)).  Where, as here, an officer must "have reasonable suspicion before undertaking a search,

[he] is entitled to qualified immunity unless [a court] can say on the somewhat unique facts

before [it] that it is clearly established that no reasonable suspicion justified a visual body cavity

search."  *Sloley*, 945 F.3d at 43 (citation and quotation marks omitted).  "Stated differently,

qualified immunity is unavailable if 'no reasonable officer could have believed that there was

reasonable suspicion.'"  *Id.* (quoting *Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016)).

> *Sloley* precludes qualified immunity in this case.  *Sloley* held that as of 2013,
>
> every reasonable officer in the [defendants'] position as New York State Troopers
> would have known [the rule] that visual body cavity searches conducted incident
> to any arrest must additionally be supported by a specific, articulable factual basis
> supporting a reasonable suspicion to believe the arrestee secreted evidence inside a
> body cavity.

*Sloley*, 945 F.3d at 40 (citation and quotation marks omitted); *Sanchez v. Bonacchi*, 799 F. App'x

60, 62 (2d Cir. 2020) (summary order) (recognizing that "[u]nder *Sloley*, as of 2013, . . . [this

rule] was clearly established"); *Bobbit*, 2020 WL 5633000, at *12 (recognizing same).  Thus,

after finding that the defendant lacked reasonable suspicion to perform a visual body cavity

search, the Second Circuit concluded as follows:

> [I]n the absence of indicia that this [c]ourt or New York State courts have found to
> support individualized reasonable suspicion that [a suspect] was secreting drugs
> inside his anal cavity, . . . no reasonable officer could have believed that there was
> reasonable suspicion to conduct a visual body cavity search.

*Sloley*, 945 F.3d at 46 (citations, brackets, and quotation marks omitted).  Because the events in

this case occurred on May 8, 2015, well after the reasonable-suspicion rule with respect to visual

body cavity searches was "clearly established," the Police Defendants who performed such a search on Plaintiff are not entitled to qualified immunity.  In the absence of any evidence that has been held to support reasonable suspicion in this context—such as fidgeting or moving suspiciously, reaching into one's pants, or having an *individual* reputation for concealing drugs inside one's body cavity—this Court must conclude, as did the Second Circuit in *Sloley*, that "no reasonable officer could have believed . . . there was reasonable suspicion to conduct a visual body cavity search."  *Id.* (quotation marks omitted).

Accordingly, Plaintiff's Motion for Summary Judgment with respect to the visual body cavity search alleged in Count Six is granted.

### b.  Alleged Manual Body Cavity Search

Insofar as Plaintiff moves for summary judgment with respect to the alleged manual body cavity search, the Motion is denied.  Whereas Plaintiff maintains that "one of the[] officers "forcefully penetrate[d] [his] anal cavity and snatch[ed]" the bag of drugs secreted there, (SAC ¶ 63), the officers deny that any such manual inspection occurred, (*see* Canario Aff. ¶ 16; Arestin Aff. ¶ 5).  The Court is therefore presented with a "factual clash" it may not resolve on summary judgment.  *See Kassel*, 272 F. Supp. 3d at 535.  Accordingly, Plaintiff's Motion is denied with respect to that portion of Count Six that involves the alleged manual body cavity search.

### 4.  Sexual Harassment and Sexual Abuse Claims Based on Events at Police Station (Counts Three and Four)

Plaintiff styles Count Three as a claim for "sexual harassment" against Canario, Pitt, Sainticse, and Arestin based on "repeated orders to strip search a second time, using physical force, touching and grabbing [his] buttocks[,] and penetrating [his] body cavity."  (SAC ¶ 120.) This claim is based on the allegations in paragraphs 48–57 of the Second Amended Complaint, which recount Plaintiff's version of what occurred in the strip search room at the Newburgh

police station.  (*See id.* ¶¶ 48–57, 120.)  Similarly, Plaintiff styles Count Four as a claim for

"sexual abuse" against Canario, Pitt, Saintiche, and Arestin for "using physical force, touching

and grabbing [his] buttocks[,] and penetrating [his] body cavity."  (*Id.* ¶ 121.)  This claim is

based on paragraphs 63–64 of the Second Amended Complaint, which describe the specific

moment at which Plaintiff allegedly felt an unidentified officer "forcefully penetrate [his] anal

cavity and snatch the plastic sandwich baggie containing the white-rock like substance [Plaintiff]

had hidden there."  (*Id.* ¶ 63.)  The crux of Plaintiff's theory is that "the officers['] actions in

conducting the strip search rise to the level of sexual assault," and thus, he argues, "there is a

genuine issue of material fact regarding whether their actions were unreasonable under the

Fourth Amendment."  (Pl.'s Opp'n 9.)

    Police Defendants have moved for summary judgment on both claims, arguing that,

"[w]ithout some evidence the officers did the exam with a sexualized motive such as their own

gratification or [Plaintiff's] sexual humiliation[,] there is nothing to support a claim of sexual

harassment or abuse."  (Police Defs.' Mem. 28.)  They also note that "[d]ismissal of these [two]

causes of action will not prevent [Plaintiff] from offering evidence in support of his [s]ixth

[c]ause of [a]ction" alleging an unreasonable search in violation of the Fourth Amendment, (*id.*

at 29), which the Court has already discussed *supra*.  But "[t]he record," Police Defendants

argue, "does not support separate claims of sexual abuse and harassment."  (*Id.*)

    In opposition to Police Defendants' Motion, Plaintiff invokes *Boddie v. Schnieder*, 105

F.3d 857 (2d Cir. 1997).  (*See* Pl.'s Opp'n 10.)  In *Boddie*, the Second Circuit considered whether

"the sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and

give rise to an Eighth Amendment claim under [§] 1983."  *See* 105 F.3d at 859.  As the Court

explained, the Eighth Amendment "sets constitutional boundaries on the conditions of

imprisonment[,]" proscribing the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment." *Id.* at 861. An Eighth Amendment violation has two components: "First, the alleged 'punishment' must be, 'objectively, sufficiently serious[]'"; and second, "the prison official involved must have a 'sufficiently culpable state of mind.'" *Id.* (citations omitted). In *Boddie*, the court concluded that allegations of sexual abuse *may* satisfy both elements of the constitutional test, "thereby stating an Eighth Amendment claim under [§] 1983." *Id.*

*Boddie*, however, does not govern this case. Plaintiff was not incarcerated when the alleged violations occurred, and thus, his claims do not arise under the Eighth Amendment. As discussed in Section II.B.2.b *supra*, because Plaintiff was still in the custody of the police and had not yet been formally arraigned when the alleged abuses occurred, his claims are properly examined under the Fourth Amendment.

It is well-established, moreover, that "sexual misconduct by a police officer during a 'seizure' is analyzed under the Fourth Amendment." *Spencer v. Sullivan County*, No. 18-CV-365, 2019 WL 4514011, at *6 (S.D.N.Y. Sept. 19, 2019) (citation and alteration omitted); *see also Jackson v. Mastrangelo*, 405 F. Supp. 3d 488, 491 (W.D.N.Y. 2019) (same); *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *6 (S.D.N.Y. Oct. 30, 2015) (same); *Wright*, 2011 WL 1106217, at *6 (same). As a number of cases illustrate, however, claims for "sexual harassment" and "sexual abuse" are not independently cognizable causes of action under the Fourth Amendment. Instead, courts evaluate an officer's alleged sexual conduct as part of the inquiry into whether a search was unreasonable and invasive. For example, in *Wright*, the plaintiff alleged that two police officers had "sexually assaulted him" when they searched the plaintiff in connection with his arrest. *See* 2011 WL 1106217, at *6. The sexual assault claim

was based on the fact that one of the two officers had allegedly "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions[,]" while the other officer "failed to intervene." *Id.* at *7. The court's analysis focused on whether the officers' conduct constituted an unreasonable search under the Fourth Amendment. *See id.* at *6–7. Similarly, in *Love v. Town of Granby*, No. 03-CV-1960, 2004 WL 1683159 (D. Conn. July 12, 2004) (recommended ruling), the plaintiff alleged that two police officers had committed sexual assault and battery in connection with his arrest and confinement, *id.* at *4. According to the plaintiff, one of the officers grabbed [the plaintiff's] scrotum, used profanity, and referred to him using a homophobic slur. *Id.* at *5. Although the defendants argued that sexual assault and battery were state law claims over which the court should decline to exercise pendent jurisdiction, the court concluded that the plaintiff's "claims [were] properly analyzed under the Fourth Amendment." *Id.* at *4–5. "Beyond the specific proscription of excessive force," explained the court, "the Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity, and other harassing and abusive behavior that rises to the level of unreasonable seizure." *Id.* at *5 (quoting *Fontana*, 262 F.3d at 878–79 (evaluating a plaintiff's allegations of sexually harassing behavior by a police officer following an arrest under the Fourth Amendment's "unreasonable seizure" standard)).

Plaintiff's constitutional claims for "sexual harassment" and "sexual abuse" are therefore duplicative of his unreasonable search claim in Count Six. Indeed, Count Six is based on the same allegations underpinning Counts Three and Four. (*See* SAC ¶ 123.) Because the alleged sexually harassing behavior is properly analyzed with respect to the unreasonable search alleged in Count Six, Counts Three and Four do not give rise to separately cognizable constitutional claims, and should therefore be dismissed. *Cf., e.g., Lopes v. Westchester County*, No. 18-CV-

8205, 2020 WL 7029002, at *10 (S.D.N.Y. Nov. 30, 2020) (dismissing substantive due process claim as duplicative of equal protection claim); *Matthews v. City of New York*, No. 15-CV-2311, 2016 WL 5793414, at *5–6 (S.D.N.Y. Sept. 30, 2016) (dismissing substantive due process claims that were duplicative of Fourth Amendment claims).  Police Defendants' Motion is therefore granted with respect to Counts Three and Four.

### 5.  Deliberate Indifference Based on Failure to Supervise (Count Seven)

In Count Seven, Plaintiff asserts a deliberate indifference claim against Sergeant Anderson based on his "failure to supervise Canario, Pitt, Saintiche[,] and Arestin in conducting [the] strip search which resulted in injuries that [were] serious and [which constituted a] deprivation of the Fourteenth Amendment."  (SAC ¶ 124.)  This claim is predicated on paragraph 45 of the Second Amended Complaint, in which Plaintiff explains that "[t]here [were] no cameras in th[e] strip searching room[,] nor was there anyone . . . to supervise/monitor the search."  (*Id.* ¶ 45; *see also id.* ¶ 124 (incorporating ¶ 45).)  Plaintiff alleges that "Sergeant Anderson held the responsibility to supervise his subor[d]inates during this search but failed to do so, and as a result [Plaintiff] was seriously injured and deprived of [his] Fourth and Fourteenth Amendment[] [rights]."  (*Id.* ¶ 45.)

In his Memorandum of Law, Plaintiff elaborates on this failure-to-supervise allegation. (*See* Pl.'s Mem. 15.)  Anderson, he argues, "had a direct responsibility in monitoring the strip search in order to [e]nsure that the strip search was conducted in a manner that best [preserved] the Plaintiff's dignity and minimize[d] the potential abuse and humiliation[.]"  (*Id.*)  He argues that Anderson's "gross negligence in failing to supervise his subordinates in conducting the strip search, thus[] giving them the right to conduct the search in any manner they pleased[,] was the proximate cause of the constitutional violations that . . . occurred during the strip/visual body

cavity search." (*Id.*)  Plaintiff also argues that Anderson "had constructive notice of such unconstitutional practices . . . through prior disciplinary violations of his subordinates [such] that[,] as a supervisory official, he had a direct responsibility [to] monitor[] the strip search . . . to [e]nsure that [no constitutional violations occurred]." (*Id.* at 16.)  In view of these arguments and the allegations in the Second Amended Complaint, the Court understands Plaintiff to raise a deliberate indifference claim based on Anderson's alleged failure to supervise his subordinates.

### a.  Plaintiff's Newly Added Unreasonable Search Claim Against Anderson

In addition to this deliberate indifference claim, Plaintiff's Memorandum of Law suggests a separate theory of liability based on Anderson's *order* to have the search performed.  (*See id.* at 15 ("Sgt. Anderson . . . had ordered Pitt, Canario, Arestin[,] and Saintiche to conduct a strip search on the Plaintiff . . . ."); *id.* at 16 (arguing that Anderson "directly participated in the[] [unconstitutional search] by ordering Pitt, Canario, Arestin, and Saintiche to conduct a 'strip search' and [then] failing to supervise [them]").)  Indeed, Plaintiff explicitly raises this theory of liability in a single sentence, arguing that "Anderson should also be held liable for the unreasonable search claim [in Count Six]." (*Id.* at 15.)

As noted, this Court is obligated to construe liberally the pleadings of pro se litigants and interpret them to raise the strongest arguments they suggest.  *See Triestman*, 470 F.3d at 474.  Indeed, that is why the Court has considered Plaintiff's new legal theory under Count Six over Police Defendants' procedural objection, *see supra* Section II.B.3, and has liberally construed Plaintiff's malicious abuse of process claim in Count 10 as a claim for denial of the right to a fair trial, *see infra* Section II.B.6.

Here, however, the Court would be overextending its discretion by allowing Plaintiff to pursue his second theory of liability with respect to Anderson.  Whereas Plaintiff's legal theory

in Count Six and the fair trial claim in Count 10 are both grounded in facts alleged in the Second

Amended Complaint, that submission contained no allegations—and asserted no claims—with

respect to Anderson's role in *ordering* the search.  (*See generally* SAC.)  The Second Amended

Complaint—filed after the close of discovery—is quite clear in specifying the relevant facts and

legal theory Plaintiff would use to establish Anderson's liability.  Anderson, Plaintiff alleged,

was "deliberate[ly] indifferen[t]" in "fail[ing] to supervise" his subordinates while they

"conduct[ed] [the] strip search."  (*Id.* ¶ 124.)  Plaintiff may not now, on a motion for summary

judgment, constructively amend his pleadings to incorporate a new claim against Anderson

(unreasonable search) based on facts (Anderson's ordering of the search) that were never alleged

in the Second Amended Complaint.  *See Richardson v. City of New York*, No. 17-CV-8622, 2020

WL 5801476, at *7 (S.D.N.Y. Sept. 29, 2020) (concluding that a pro se plaintiff "may not

belatedly assert [new] claims at the summary judgment stage"), *appeal docketed*, No. 20-3560

(2d Cir. Oct. 16, 2020); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016)

("It is well settled that a litigant may not raise new claims not contained in the complaint in

opposition to a motion for summary judgment."); *Enzo Biochem, Inc. v. Amersham PLC*, 981 F.

Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in

its briefing papers."); *Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 450 (N.D.N.Y. 2013)

("It is well settled that papers on a motion for summary judgment is not the proper vehicle to add

a new claim."); *cf. AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726–

27 (2d Cir. 2010) (affirming district court's denial of plaintiffs' attempt to amend complaint

"several months after cross-summary judgment motions had been filed").  Thus, the Court need

not consider Plaintiff's putative unreasonable search claim against Anderson.

<u>b.  Deliberate Indifference Based on Failure to Supervise</u>

As noted, Plaintiff seeks to hold Anderson liable for the alleged unconstitutional acts of his subordinates.  (*See* SAC ¶¶ 45, 124.)  The gravamen of Plaintiff's claim seems to be that Anderson was not present in the strip search room to supervise the visual body cavity search, thereby giving Pitt, Canario, Saintiche, and Arestin "the right to conduct the search in any manner they pleased."  (Pl.'s Mem. 15.)  Although Plaintiff does not specify which particular acts occurred as a result of Anderson's absence, the Court understands Plaintiff to refer to (1) the alleged excessive force and (2) the alleged digital penetration.  (*See* SAC ¶¶ 53–63, 122–23.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)).  Until recently, plaintiffs could establish the liability of a supervisory official for a subordinate's conduct under § 1983 by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of the plaintiffs by failing to act on information indicating that unconstitutional acts were occurring.

*Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (brackets omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  But in *Tangreti*, the Second Circuit held that "there is no special rule for supervisory liability[,]" thereby doing away with "the special standards for

supervisory liability set forth in *Colon*." *Tangreti*, 983 F.3d at 617–18.  As the court explained, the Supreme Court's 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), had "cast doubt on the continued viability" of these special standards.  *Tangreti*, 983 F.3d at 617.  In *Iqbal*, the Supreme Court stated that in § 1983 suits against state officials, such officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."  *Id.* at 616 (italics omitted) (quoting *Iqbal*, 556 U.S. at 676).  In the years since *Iqbal* was decided, district courts in this Circuit tried, "with inconsistent results, to determine [its effect] on supervisory liability."  *Id.* at 617 & n.3.  *Tangreti* put the matter to rest by rejecting a special standard for supervisory liability and clarifying that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).  Accordingly, when a plaintiff brings a § 1983 suit against a supervisory official, "'[t]he factors necessary to establish a [constitutional] violation will vary with the constitutional provision at issue[,]' because the elements of different constitutional violations vary."  *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).  Whatever the alleged constitutional violation, after *Tangreti*, "[t]he violation must be established against the supervisory official directly."  *Id.* at 618.

The Second Circuit's analysis in *Tangreti* illustrates how the Court may resolve the instant claim without reference to the supervisory liability factors in *Colon*.  In *Tangreti*, an inmate at York Correctional Institute had been sexually abused by three correctional officers "on numerous occasions" over a span of more than a year from 2013 to 2014.  *See id.* at 612.  The inmate brought a § 1983 suit against eight prison supervisors alleging that they had shown deliberate indifference to the substantial risk of sexual abuse in violation of the Eighth Amendment.  *Id.*  The district court granted summary judgment to all but one of these

defendants.  *Id.*  With respect to this last defendant, the district court found that she "was

conceivably personally involved" in the alleged constitutional violations based on *Colon* factors

four (gross negligence in supervising the subordinates who committed the violations) and five

(deliberate indifference based on failure to act on information that unconstitutional acts were

occurring).  *See Tangreti v. Semple*, No. 17-CV-1420, 2019 WL 4958053, at *19–21 (Oct. 8,

2019), *reversed and remanded*, 983 F.3d 609 (2d Cir. 2020).  Reversing the district court, the

Second Circuit explained that the plaintiff "must . . . establish that [the defendant] violated the

Eighth Amendment by [the defendant's] own conduct, not by reason of [the defendant's]

supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619.  In other words,

"[s]he must show that [the defendant] herself acted with 'deliberate indifference,'" which in the

Eighth Amendment context means "that [the defendant] personally knew of and disregarded an

excessive risk to [the plaintiff's] health or safety." *Id.* (citation and some quotation marks

omitted).  The plaintiff could not, however, "rely on a separate test of liability specific to

supervisors." *Id.*

Here, in light of *Tangreti*, Plaintiff must establish that Anderson committed a

constitutional violation through his own conduct, rather than through his supervision of Pitt,

Canario, Saintiche, and Arestin.  That is, Plaintiff must establish that Anderson himself showed

deliberate indifference.  Because Plaintiff was a pretrial detainee at the time of the alleged

violations, his deliberate indifference claim is analyzed under the Due Process Clause of the

Fourteenth Amendment.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("[Because

Plaintiff] was in pre-trial detention at the time of the alleged incidents . . . [t]he district court

correctly concluded that [his] claims ar[o]se under the Due Process Clause . . . .").[24]  Deliberate

indifference claims under the Fourteenth Amendment are analyzed somewhat differently than the

same claims under the Eighth Amendment, which applies to inmates who have been convicted

and sentenced.  *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (explaining the different

mens rea requirements for Eighth Amendment and Fourteenth Amendment deliberate

indifference claims).  To be sure, the overarching framework remains the same.  Under both the

Eighth and Fourteenth Amendments, to prevail on a deliberate indifference claim a plaintiff must

establish (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the

defendant "acted with deliberate indifference."  *Feliciano v. Anderson*, No. 15-CV-4106, 2017

WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

     The first element "is evaluated the same way under both the Eighth Amendment and

Fourteenth Amendment."  *Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301, 2018 WL

1626175, at *19 n.19 (S.D.N.Y. Mar. 30, 2018) (citing *Darnell*, 849 F.3d at 30).  This

requirement is "objective"; the detainee must show that "the alleged deprivation" is "sufficiently

serious."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation

and quotation marks omitted).  In other words, the plaintiff must show that he was "[detained]

under conditions posing a substantial risk of serious harm."  *Blandon v. Capra*, No. 17-CV-65,

2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84

F.3d 614, 620 (2d Cir. 1996)).

---

[24] Because Plaintiff was in police custody at the time of the alleged constitutional
violation, he is treated as a pre-trial detainee for purposes of the deliberate-indifference analysis.
*See Fredericks v. Doe*, No. 20-CV-11043, 2021 WL 308808, at *2, *4 (S.D.N.Y. Jan. 29, 2021)
(treating a plaintiff who was allegedly assaulted by three detectives at a police precinct as a
pretrial detainee for purposes of the deliberate-indifference analysis).

The second element "applies differently to claims under the Eighth Amendment and the Fourteenth Amendment." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citing *Darnell*, 849 F.3d at 34–35).  While the Eighth Amendment imposes a subjective standard—that the defendant-official "knows of and disregards an excessive risk to inmate health or safety," *Darnell*, 849 F.3d at 32 (citation omitted)—the Fourteenth Amendment, applicable here, imposes an objective standard.  That is, the defendant-official need only "recklessly fail[] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.  However, "[d]espite the slightly lower standard" applicable to pretrial detainees, "which is akin to objective recklessness, any § 1983 claim or a violation of due process requires proof of a mens rea greater than mere negligence." *Miller v. County of Nassau*, No. 16-CV-5843, 2018 WL 1597401, at *3 (E.D.N.Y. Mar. 31, 2018) (quotation marks and italics omitted) (ultimately quoting *Darnell*, 849 F.3d at 36).

Assuming Plaintiff satisfies the first element of his deliberate-indifference claim, he still has produced no evidence that Anderson recklessly failed to mitigate a risk that he either knew or should have known about. *See Darnell*, 849 F.3d at 35.  Although Plaintiff asserts that Anderson "had constructive notice of . . . unconstitutional practices . . . through prior disciplinary violations of his subordinates," (Pl.'s Mem. 16), he has not pointed the Court to a single such violation.  There is no evidence in the record, for example, regarding prior complaints or legal actions against Pitt, Canario, Saintiche, or Arestin.  Nor is there evidence in the record regarding prior unreasonable search or excessive force claims against other members of the Newburgh Police Department more generally.

Though it preceded *Tangreti* and involved a motion to dismiss, this Court's decision in *Gantt v. Ferrara*, No. 15-CV-7661, 2018 WL 4636991 (S.D.N.Y. Sept. 27, 2018), is nevertheless instructive here.  In *Gantt*, the plaintiff alleged that Newburgh's police chief had failed to properly train and supervise one of his subordinate officers who allegedly had used excessive force against the plaintiff.  *See id.* at *6, *8.  To determine whether the plaintiff had adequately alleged the police chief's personal involvement in the putative violation, this Court looked to the fourth *Colon* factor—whether "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts."  *Id.* at *6 (quoting *Grullon*, 720 F.3d at 139).  Although after *Tangreti* courts must now resolve claims against supervisor-defendants without reference to *Colon*'s special standards for supervisory liability, the legal standard under the fourth *Colon* factor is virtually identical to the Fourteenth Amendment deliberate-indifference standard applicable here.  To establish personal involvement based on this factor, a plaintiff formerly had to show that a defendant:

> knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the] [p]laintiff.

*Id.* (quoting *Frederick v. Sheahan*, No. 10-CV-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)); *see also Kucera v. Tkac*, No. 12-CV-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013) (noting that an "alleged failure [to supervise or train] [would] satisfy the fourth *Colon* factor if [the officers] 'knew or should have known that there was a high degree of risk that subordinates would behave inappropriately but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk'" (alterations and citation omitted)).  Much like Plaintiff has done here, the plaintiff in *Gantt*

alleged that the defendant "had knowledge of [his subordinate's] prior use of excessive force" by virtue of numerous prior "civil complaints and lawsuits alleging excessive force and police misconduct." *Gantt*, 2018 WL 4636991, at *7 (record citation omitted).  But because the plaintiff had "provide[d] no detail of these other complaints, such as when they were filed and whether the alleged misconduct was similar," this Court concluded that his allegations were "insufficient to make out a claim" that the defendant had been deliberately indifferent.  *See id.* (citing *Guillory v. Cuomo*, No. 14-CV-971, 2014 WL 11173632, at *4 (N.D.N.Y. Dec. 2, 2014) (dismissing claim for lack of personal involvement where "[the] [p]laintiff cite[d] to his four prior lawsuits but d[id] not allege how any defendant [named] . . . had any involvement or any knowledge of any of the incidents described in any of those lawsuits")).

Here too, Plaintiff has alleged in conclusory fashion that Anderson "was aware of . . . [his subordinates'] prior disciplinary violations," (Pl.'s Mem. 16), but has offered no evidence in support of that claim.  Without record evidence that Anderson knew about or should have known about an excessive risk to Plaintiff's safety, *see Darnell*, 849 F.3d at 35, the Court must deny Plaintiff's Motion in this respect and grant summary judgment in favor of Police Defendants, *see Rodriguez v. Goins*, No. 18-CV-1380, 2020 WL 6150984, at *4 (N.D.N.Y. Aug. 17, 2020) (granting summary judgment where there was no evidence that the defendant knew or should have known about the threat allegedly posed by the pretrial detainee's fellow inmate), *adopted by* 2020 WL 6146597 (N.D.N.Y. Oct. 20, 2020); *Charles v. Rockland Cnty. Off. of Sheriff*, No. 16-CV-166, 2019 WL 1299804, at *4 (S.D.N.Y. Mar. 21, 2019) (same).

Accordingly, Police Defendants' Motion is granted with respect to Count Seven.

6.  Abuse of Process and Denial of Right to Fair Trial Claims (Count 10)

In Count 10, Plaintiff asserts what is styled as a claim for malicious abuse of process against Police Defendants Canario and Pitt.  (SAC ¶ 127.)  In the Second Amended Complaint, this claim is predicated on the allegations that Canario and Pitt "falsified incriminating statements to obtain, secure[,] and execute [a] search warrant [in order] to carry out body cavity / x-ray examinations," and that they "provided statements to [the] prosecution and falsely charg[ed] / fil[ed] [a] felony and misdemeanor complaint."  (*Id.*)  Plaintiff and Police Defendants have both moved for summary judgment on this claim.  (*See* Police Defs.' Mem. 23–25; Pl.'s Mem. 16–17.)

As his Memorandum of Law makes clear, however, Plaintiff is actually asserting a cause of action for denial of the right to a fair trial.  (*See* Pl.'s Mem. 16–17.)  Such a claim is distinct from a claim for malicious abuse of process.  *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244–51 (2d Cir. 2020) (discussing the cause of action for denial of one's right to a fair trial); *Thagard v. Lauber*, 317 F. Supp. 3d 669, 684 (W.D.N.Y. 2018) (explaining that a claim for the denial of the right to a fair trial "is a separate legal theory from a claim for abuse of process under § 1983"); *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391–95 (E.D.N.Y. 2013) (analyzing malicious abuse of process claim and fair trial claim as distinct causes of action); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 343–44, 346–47 (S.D.N.Y. 2009) (same).

Although ordinarily the Court would decline to consider a claim that was not explicitly pled in the Second Amended Complaint, the Court is ever mindful of its obligation to construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474 (italics omitted).  Count 10 is predicated in part on the allegation that Pitt "provided false statements to the . . . D[istrict]

A[ttorney]," that "[t]he substance of these false statements violated [Plaintiff's] rights to a fair

trial," and that "Pitt was maliciously building a stronger case for the prosecution when providing

such false statements to the prosecution."  (SAC ¶¶ 108–09; *id.* ¶ 127 (incorporating these

allegations).)  As discussed *infra*, these allegations clearly sound in a Fourteenth Amendment

fair trial claim, rather than a Fourth Amendment abuse of process claim.  Moreover, while Police

Defendants have objected to what they characterize as Plaintiff's constructive amendment with

respect to Count Six, *see* discussion *supra*, they raise no such objection with respect to Count 10.

Indeed, they have responded to Plaintiff's arguments regarding his fair trial claim.  (*See* Police

Defs.' Opp'n 8–9.)  Accordingly, the Court will consider this claim on its merits.

### a.  Plaintiff's Fair Trial Claim

A criminal defendant's "right to a fair trial" is enshrined in the Due Process Clause of the

Fourteenth Amendment.  *Frost*, 980 F.3d at 244 (quoting *Ramchair v. Conway*, 601 F.3d 66, 73

(2d Cir. 2010)).  "This right is violated 'when a police officer creates false information likely to

influence a jury's decision and forwards that information to prosecutors.'"  *Frost*, 980 F.3d at 244

(brackets omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

"[T]he harm occasioned by such an unconscionable action is redressable in an action for

damages under 42 U.S.C. § 1983."  *Ricciuti*, 124 F.3d at 130.  Despite the "nomenclature, a

criminal defendant's right to a fair trial protects more than the fairness of the trial itself," and, as

relevant here, "a criminal defendant can bring a fair trial claim even when no trial occurs at all."

*Frost*, 980 F.3d at 249; *see also Ricciuti*, 124 F.3d at 130 (reversing dismissal of fair trial claim

despite the fact that all criminal charges were dismissed before trial); *Polanco v. City of New

York*, No. 14-CV-7986, 2018 WL 1804702, at *11 (S.D.N.Y. Mar. 28, 2018) ("Somewhat

counterintuitively, a claim for denial of the right to a fair trial does not require that the underlying

action actually proceeded to a trial on the merits."); *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (fair trial claim does not require "an actual trial").

To prevail on his fair trial claim, Plaintiff "must show that 'an (1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) [Plaintiff] suffer[ed] a deprivation of liberty as a result." *Soomro*, 174 F. Supp. 3d at 815 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order); *Ricciuti*, 124 F.3d at 130). Thus, Plaintiff is required to establish not only that the police fabricated evidence, but also that this evidence *caused* his deprivation of liberty. *See Moroughan v. County of Suffolk*, — F. Supp. 3d —, 2021 WL 298714, at *34 (E.D.N.Y. Jan. 20, 2021) ("The Second Circuit has held that the fabricated evidence must *cause* the deprivation of liberty." (citing *Zahrey v. Coffey*, 221 F.3d 342, 350–51 (2d Cir. 2000))). In this respect, the relevant inquiry is "whether the liberty deprivations that occurred are legally traceable back even further to the earlier investigatory act of fabrication . . . ." *Zahrey*, 221 F.3d at 352.

As a threshold matter, the Parties dispute whether the information allegedly forwarded to prosecutors—i.e., Plaintiff's putative statement that he was secreting more drugs inside his body—was fabricated to begin with.[25] If this were the only factual dispute with respect to

---

[25] Plaintiff maintains he never made such a statement. (*See* SAC ¶ 108; Pl.'s Mem. 16–17.) But as noted in Section I.A.3 *supra*, Canario avers that "[a]t some point prior to [when Canario] [took] [Plaintiff] to the hospital at approximately 6:40 p.m.[,] [Plaintiff] told [Canario] he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them." (Canario Aff. ¶ 25.) Canario "advised both Sergeant Anderson and Detective Pitt about these comments," which became part of the basis for the acquisition of the search warrant. (*See id.*) Pitt echoes Canario's account, explaining that at some point after he had helped remove the drugs from Plaintiff's mouth, he "learned that Officer Canario had reported [that] [Plaintiff] had told him he had additional drugs secreted in his body that had not been located[,] and [he] was directed to prepare an application for a search warrant based upon this information so that a

Plaintiff's fair trial claim, the Court could still grant summary judgment for Police Defendants based on the lack of causal connection between the alleged fabrication and Plaintiff's deprivation of liberty.  *See Zahrey*, 221 F.3d at 348 ("[I]f [the plaintiff] had claimed only that [the defendant] fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of [the plaintiff's] liberty, no constitutional violation would have been alleged."). Here, however, there is also a genuine dispute as to whether Police Defendants' alleged fabrication could have caused Plaintiff's deprivation.

Police Defendants appear to argue there was no causation in part because "no false information was turned over to the prosecutor." (Police Defs.' Mem. 24.)  But Plaintiff has provided two documents, evidently filed in connection with his prosecution, that complicate that assessment. (*See* Pl.'s Mem. Ex. J (Dkt. No. 183).)[26]  Dated October 13, 2015 and submitted by Orange County District Attorney David M. Hoovler ("Hoovler"), both documents are labeled "Notice to Defendant of Intention to Offer Confessions or Admissions." (*See id.*)  In the first document, Hoovler informs Plaintiff that he "intend[ed] to offer into evidence certain voluntary statements made by [Plaintiff] to Detective Michael Pitt of the City of Newburgh Police Department on May 8, 2015 at the City of Newburgh Police Department[,]" the substance of which was "that the police did not get it all and he has more up his buttocks." (*Id.*)  In the second document, Hoovler informs Plaintiff of an additional statement he intended to offer into evidence. (*Id.*)  In that statement, Plaintiff purportedly told Canario, Arestin, Saintiche, and/or Pitt: "[Y]ou guys are gay; you just want to see my ass; is this what you want[?]; that's not mine;

---

digital rectal search could be performed at a local hospital." (Pitt. Aff. ¶ 14.)  Thus, there is a factual dispute as to whether Plaintiff ever said he was concealing more drugs.

[26] Plaintiff's Exhibit J is located at ECF pages 30–31 of Dkt. No. 183.

you won't find the rest; it's either up too far or I ate it[.]"  (*Id.*)  Plaintiff also purportedly

suggested "that it was his knife from the ground; [and] that the object that was recovered was

just a lighter."  (*Id.*)[27]  Without question, these documents at least raise the possibility that the

investigating officers "forward[ed] th[e] [allegedly fabricated] information to prosecutors."

*Soomro*, 174 F. Supp. 3d at 815.  Thus, Police Defendants' argument that "no false information

was turned over to the prosecutor," (Police Defs.' Mem. 24), simply ignores the genuine dispute

of fact regarding the alleged fabrication.[28]

Police Defendants also appear to argue there was no causation because "no charges

alleging [Plaintiff] had additional drugs were [ever] filed," and Plaintiff "was solely prosecuted

on the evidence tampering charge to which he pled guilty[,] and does not even know the

disposition of the sole drug possession charge which only related to what was found at the police

station."  (Police Defs.' Mem. 24 (record citations omitted).)  The problem with this argument is

---

[27] The second document also contains a disclaimer which states that "[a]lthough notice pursuant to [Criminal Procedure Law] § 710.30 has been gratuitously given, the People reserve their right to not introduce such statements in their case-in-chief against [Plaintiff] as not relevant to the charged criminal transaction."  (Pl.'s Mem. Ex. J.)

[28] Although Police Defendants dismiss the significance of the documents submitted by Plaintiff, the Court finds their arguments unpersuasive.  Police Defendants note, for example, that the forms on which the District Attorney provided notice to Plaintiff "are those of the District Attorney, not the [Police] [D]efendants."  (Police Defs.' Opp'n 9.)  The relevance of this fact eludes the Court, for part of the inquiry is whether police forwarded fabricated evidence to the prosecution.  *See, e.g.*, *Moroughan*, 2021 WL 298714, at *34; *Soomro*, 174 F. Supp. 3d at 815.  That Plaintiff's alleged statements to the police subsequently showed up on the District Attorney's "forms" suggests that the police provided these statements to the prosecution.  Police Defendants also point to various discrepancies between the two documents filed by the District Attorney and the evidence in the record, noting, for example, that while the District Attorney's first document indicates that Plaintiff made the relevant statement to Pitt, (*see* Pl.'s Mem. Ex. J), Pitt indicates that he heard the statement from someone else, (*see* Pitt. Aff. ¶ 14).  (*See* Police Defs.' Opp'n 9.)  But such discrepancies do not alter the Court's analysis: Whether the District Attorney accurately characterized the circumstantial details surrounding Plaintiff's alleged statements is not particularly relevant; what matters is that he had learned of these statements in the first place.

that it frames the potential harm from the allegedly fabricated evidence too narrowly.  In other words, Plaintiff may still establish the causation element of his fair trial claim even if the prosecutor did not *use* the fabricated evidence.  The recent decisions in *Frost* and *Moroughan* are instructive on this point.

In *Frost*, the plaintiff alleged that detectives had coerced a witness into identifying him as the shooter in connection with a murder investigation, and then provided that evidence to prosecutors, who used it to seek the plaintiff's detention and prosecution.  980 F.3d at 244–45.  Although the allegedly coerced identification was never used at trial, *see id.* at 249, the court held that the plaintiff's fair trial claim survived summary judgment because there were triable questions as to whether (1) the witness's identification was coerced in the first instance, and (2) whether such evidence "would likely have influenced the jury" had such evidence been presented at trial, *see id.* at 250.  As the court observed, a "prosecutor's decision to pursue charges rather than to dismiss a complaint without further action may depend on the prosecutor's assessment of the strength of the case, which in turn may be critically influenced by fabricated evidence."  *Id.* at 248 (brackets and ellipsis omitted) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016)).  Taken together, the two triable questions identified by the court "create[d] a genuine dispute as to whether [the witness's] identification "critically influenced" the decision to prosecute [the plaintiff], thereby resulting in a deprivation of his liberty."  *Id.* at 250.

In *Moroughan*, the plaintiff alleged that police officers fabricated his confession and provided this fabricated evidence to the prosecution.  *See* 2021 WL 298714, at *3, *34.  Ultimately, however, the charges against the plaintiff were dismissed before trial.  *See id.* at *13.  The defendants argued—much as Police Defendants have argued here—that because "the

plaintiff's statement was never used, or even considered during his brief pending criminal prosecution," his fair trial claim had to be dismissed, *id.* at *36 (record citation omitted). The court disagreed, observing that "the Second Circuit recently rejected [that] precise argument [in *Frost*]." *Id.* (noting that "the fair trial claim survived summary judgment in *Frost* even though the allegedly fabricated evidence was presented to the prosecutor, but never used at any trial"). In *Moroughan*, moreover, there was evidence in the record that the district attorney, while investigating the charges, had considered the allegedly fabricated confession, which he found "corroborated [the defendants'] accounts as evidence against [the] plaintiff." *Id.* In light of this evidence, as well as the Second Circuit's holding in *Frost*, the court concluded there were genuinely disputed issues of material fact precluding summary judgment. *Id.* at *37.

Here, as in *Frost* and *Moroughan*, disputed issues of material fact preclude summary judgment on Plaintiff's fair trial claim. The documents filed by District Attorney Hoovler raise the distinct possibility that Plaintiff's allegedly fabricated statements "critically influenced" Hoovler's "assessment of the strength of the case." *See Frost*, 980 F.3d at 248. Although Police Defendants rely on the fact that Plaintiff "was solely prosecuted on the evidence tampering charge to which he pled guilty," (Police Defs.' Mem. 24), they cannot get around the fact that Hoovler evidently thought Plaintiff's alleged statements had *some* potential relevance to his prosecution. Indeed, even if the disclaimer on Hoovler's second document were interpreted to suggest that he had no intention of introducing Plaintiff's alleged statement at trial, (*see* Police Defs.' Opp'n 9), that is not the relevant inquiry, as the discussion above illustrates. The Court's concern is whether the statement "would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Frost*, 980 F.3d at 250. Because there is a genuine dispute of material fact regarding the causation element of Plaintiff's fair trial claim, the Court may not

grant summary judgment.  Thus, Plaintiff's Motion and Police Defendants' Motion are both denied with respect to this claim.

Finally, the Court notes that to the extent Plaintiff has framed his fair trial claim around Police Defendants' acquisition of a search warrant, (*see* Pl.'s Mem. 16–17), he seems to misconceive the nature of his own claim.  In a fair trial claim such as the one he has raised, the relevant injury is a plaintiff's deprivation of liberty.  *See, e.g.*, *Frost*, 980 F.3d at 250 (explaining that the fair trial right "protects against deprivation of liberty"); *Zahrey*, 221 F.3d at 349 (explaining that "the right at issue" in a fair trial claim "is appropriately identified as the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"); *Soomro*, 174 F. Supp. 3d at 815 (stating that the plaintiff must suffer a deprivation of liberty to prevail on a fair trial claim); *Moroughan*, 2021 WL 298714, at *34 (noting that "the fabricated evidence must cause the deprivation of liberty").  Whereas "the claim of denial of the right to a fair trial finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and the Fourteenth Amendments," *Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *10 n.13 (E.D.N.Y. Sept. 22, 2017); *see also Gogol v. City of New York*, No. 15-CV-5703, 2017 WL 3449352, at *11 (S.D.N.Y. Aug. 10, 2017) (same); *but cf. Garnett*, 838 F.3d at 276 n.6 (stating that "[w]hether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide"), the right to be free from an unreasonable search by law enforcement arises under the Fourth Amendment, *see Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 392 (S.D.N.Y. 2020).  Although a deprivation of liberty may arise "from an allegedly fabricated statement in a search warrant," *see Polanco*, 2018 WL 1804702, at *12 & n.13, the relevant injury in such a scenario would still be the deprivation of liberty, rather than the resultant search itself.  Thus, insofar as

Plaintiff alleges that the search warrant was procured through fabricated evidence, (*see* Pl.'s Mem. 16–17), he appears to be challenging the legality of the search that was subsequently undertaken pursuant to that warrant.  Such a challenge is appropriately framed as an unreasonable search claim, rather than a fair trial claim.

### b.  Malicious Abuse of Process Claim

Although Count 10, as discussed, is appropriately treated as a fair trial claim, the Court will briefly address Plaintiff's putative abuse of process claim to avoid any doubt.

"The elements of a § 1983 cause of action for malicious abuse of process are provided by state law."  *Sorrell v. County of Nassau*, 162 F. Supp. 3d 156, 171 (E.D.N.Y. 2016) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).  In New York,

> a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Deanda*, 137 F. Supp. 3d at 576 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  The third element—a collateral objective—is "[t]he crux of a malicious abuse of process claim."  *Marshall v. Port Auth. of N.Y. & N.J.*, No. 19-CV-2168, 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)).  Thus, to prevail on such a claim, "a plaintiff must establish that the defendants had an improper purpose in instigating the action," and must establish that the defendants "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."  *Marshall*, 2020 WL 5633155, at *8 (brackets omitted) (quoting *Savino*, 331 F.3d at 77).  "A collateral objective is usually characterized by personal animus, and may include infliction of economic harm, extortion, blackmail[,] or retribution."  *Dash v. Montas*, —F. Supp. 3d—, 2020 WL 1550708, at *10 (E.D.N.Y. Mar. 31, 2020) (citations, brackets, and quotation marks omitted).

Here, Plaintiff has not come forward with *any* evidence to suggest that Pitt or Canario sought to investigate or facilitate the prosecution of Plaintiff with any collateral objective. Without evidence that these Defendants maintained some personal animus toward Plaintiff, or "aimed to achieve a collateral purpose beyond or in addition to his prosecution," *Marshall*, 2020 WL 5633155, at *8, his claim for malicious abuse of process fails.  Thus, insofar as Count 10 purports to raise a malicious abuse of process claim, that claim is denied.  *See id.* at *9 (granting summary judgment for defendants where the plaintiff "ha[d] not offered any evidence that the officers had an 'improper motive or pursued a collateral purpose outside the legitimate ends of process'" (citation omitted)); *Dash*, 2020 WL 1550708, at *11 (granting summary judgment for defendants where plaintiff provided no evidence that the defendant "harbored any personal animus toward [him] or acted with some other collateral objective . . . not related to law enforcement").

For the reason above, Police Defendants' Motion and Plaintiff's Motion are both denied with respect to Count 10.

### 7.  Unreasonable Search and Right to Privacy Claims Based on Events at St. Luke's (Counts 15, 16, and 17)

To resolve Defendants' Motions with respect to the claims arising from the events at St. Luke's, the Court must address two threshold issues.  First, the Court must address Plaintiff's contention that the manual body cavity search and x-ray examination at St. Luke's occurred during the first—and, according to Plaintiff, the *only*—visit to the hospital, before the police had secured a search warrant.  (*See* SAC ¶¶ 75–102; Pl.'s Opp'n 18–20; Pl.'s Dep. 102:8–13.) Second, the Court must consider the validity of the warrant itself, and whether Police Defendants had a good-faith basis to rely on the warrant.

a.  Timing and Sequence of the Manual Body Cavity Search and X-Ray
Examination at St. Luke's

As noted in Section I.A.4.b *supra*, Plaintiff maintains that a manual body cavity search
and x-ray examination were performed during his first visit to St. Luke's, and that, contrary to
Defendants' version of events, there was no second visit to the hospital later in the evening.
According to Plaintiff's account, therefore, the manual body cavity search and x-ray were
performed without a search warrant, (*see* Pl.'s Opp'n 19; Pl.'s Dep. 103:10–104:8), which the
police did not obtain until later in the evening, (*see* Defs.' 56.1 ¶¶ 81–83).

Plaintiff's medical records from St. Luke's, however, corroborate Defendants' version of
events.  According to the digital timestamps from these records, Plaintiff was first admitted to St.
Luke's at "1847" (6:47 P.M.) on May 8, 2015.  (*See* ER Records 4; Posner Aff. Ex. O
("Berberich Aff.") ¶ 10 (Dkt. No. 160-14).)  These records indicate that he left the hospital "in
police custody" either at "1939" (7:39 P.M.), (*see* ER Records 4), or at "1927" (7:27 P.M.), (*see*
*id.* at 16).[29]  The Court has thoroughly reviewed the first 20 pages of Police Defendants' Exhibit
D, which contains the medical records pertaining to Plaintiff's initial visit to St. Luke's.  (*See* ER
Records 2–21.)  These records indicate that between "1905" (7:05 P.M.) and "1935" (7:35 P.M.),
medical staff flushed Plaintiff's eyes (to remove residual pepper spray), performed an "EKG" (an
electrocardiogram), and performed "wound care [on] [a] small abrasion to [the] patient[']s back,"

---

[29] Although there is a 12-minute difference between the digital timestamps on page four
and page 16 of these records, the Court finds this difference immaterial.  The Court also notes
that the time stamp on page 16—"1927"—appears on a sheet of paper that was printed and then
signed by Plaintiff and the caregiver.  (*See* ER Records 16.)  It makes intuitive sense that there is
a short gap of time between when the sheet was printed (7:27 P.M.) and when, according to the
hospital's time-keeping system, Plaintiff was formally discharged (7:39 P.M.).  (*See* ER Records
4).  Moreover, although Laura Berberich, St. Luke's Director of Health Information
Management, states that Plaintiff was discharged at "1938" (7:38 P.M.), (*see* Berberich Aff.
¶ 10), this disparity is also immaterial.

which included "cleans[ing] [the abrasion] with [a] normal saline antibiotic" and covering the
wound with a bandage, after which Plaintiff was "discharged back into [the] custody of [the]
police department."  (*See id.* at 8.)  But although these records contain information regarding
Plaintiff's vital signs, (*see id.* at 5, 10, 13–14), medical history, (*see id.* at 12), and discharge
instructions, (*see id.* at 14, 16–19), there is no mention of either a manual body cavity search or
x-ray examination having been performed.

Exhibit D also contains a second set of records pertaining to a subsequent emergency
room visit later in the evening.  According to the digital timestamps in these records, Plaintiff
was admitted a second time at "2300" (11:00 P.M.) on May 8, 2015, and discharged at "0137"
(1:37 A.M.) on May 9, 2015.  (*See id.* at 23; *see also id.* at 36–37 (indicating discharge time of
"0135"); Berberich Aff. ¶ 10 (stating that discharge time was "01:39").)  The "Emergency Room
Note" for this second visit indicates that Plaintiff was "seen earlier today" at the hospital and was
now there "for [a] search warrant rectal exam."  (*Id.* at 29; *see also id.* at 24 (stating that "police
[were] present . . . with search warrant to search the rectal area"); *id.* at 31 (listing "secondary
impression" as "search warrant rectal exam").)  The same note states: "Per Sergeant, [x-ray] if
needed may be completed as well."  (*Id.* at 29.)  According to the records, Plaintiff was "seen"
and an "eval[uation]" was performed by Nurse Practitioner Durbin-French at "00:30" (12:30
A.M.).  (*See id.* at 25; *cf.* Durbin-French Aff. ¶¶ 13, 21 (indicating that she saw Plaintiff at 12:25
A.M. and performed a rectal examination).)  An x-ray examination was performed at
approximately "00:37" (12:37 A.M.).  (*See* ER Records 25; Durbin-French Aff. ¶¶ 24–27
(discussing the x-ray examination performed on Plaintiff).)  And at "01:30" (1:30 A.M.), the x-
rays were "reviewed by [Durbin-French]," Plaintiff was "cleared for [discharge]," and discharge
instructions were provided to Plaintiff and the police.  (*See* ER Records 25–26; Durbin-French

Aff. ¶¶ 28–31.)  The records reflect that no "foreign body" was found in Plaintiff's rectum.  (ER Records 28, 31, 34, 37; *see also* Durbin-French Aff. ¶ 28.)

Further undermining Plaintiff's version of events is the testimony and timesheet of Nurse Lemos.  As discussed in Part I.A.4.b *supra*, Plaintiff maintains that the manual body cavity search and x-ray were performed by Nurse Lemos during his first and only visit to St. Luke's between approximately 6:50 P.M. and 7:40 P.M.  But Nurse Lemos's time records for that evening show that she did not clock in until 10:45 P.M., a fact to which she has testified.  (*See* Lemos Aff. ¶ 5 & attached timesheet.)  Thus, there is no way she could have examined Plaintiff as he claims.

In the Court's view, these records "directly and irrefutably contradict" Plaintiff's version of events.  *See Henry*, 406 F. Supp. 3d at 214 (citation and italics omitted).  As discussed in Section II.B.2.b *supra*, the Court may not grant summary judgment merely because a Plaintiff's alleged injuries do "not appear in the medical records," provided his allegations are not "directly and irrefutably contradicted" by those records.  *See Morehouse*, 2020 WL 1049943, at *14 (quoting *Henry*, 406 F. Supp. 3d at 214).  But although the Court declined to dismiss Count Five notwithstanding the tension between Plaintiff's allegations and the evidence in his medical records, the conflict here is of a different character and magnitude.  For example, with respect to Count Five, the Court relied on Plaintiff's allegations that he complained to hospital staff about his supposed injuries.  In that context, the Court observed that although Plaintiff's account relies exclusively on his own testimony and is contradicted by his medical records, his account still provides a "plausible alternative version of events" that could preclude summary judgment.  *See Bridgewater*, 2011 WL 6762931, at *5.  That is not the case here.  The digital timestamps in the medical records conclusively establish that there were two visits—one between approximately

6:45 P.M. and 7:40 P.M., and another between approximately 11:00 P.M. and 1:40 P.M.

Likewise, the Director of Health Information Management at St. Luke's, Laura Berberich, has

reviewed the "audit trail" of Plaintiff's electronic medical records and affirmed that "there were

two visits to St. Luke's Emergency Department on 5/8/2015"—the first of which lasted from

"18:47" to "19[:]38," and the second of which lasted from "23:00" to "01:39."  (Berberich Aff.

¶¶ 9–10.)[30]  As noted, the records for the first hospital visit contain no mention of a manual body

cavity search or an x-ray.  Given the other detail in these records, it is implausible that hospital

staff would perform these two procedures without including them in the records.  Although

Plaintiff may create a triable issue of fact by alleging that he complained about a bruise or

contusion which do not appear in his records, he may not do the same by alleging in conclusory

fashion—without a shred of supporting evidence—that hospital staff performed two significant

procedures and then simply omitted them from the records.  Nor has he plausibly challenged the

timesheet produced by Nurse Lemos.

Plaintiff's response is to argue that the police and medical staff must have conspired to

falsify the medical records, fabricating evidence of a second hospital visit that took place after

police had obtained a search warrant.  (*See, e.g.*, Pl.'s Opp'n 17 (referring to the "falsified

hospital medical records"); *id.* at 20 (stating that evidence of a second hospitalization was

"forged and falsified"); SAC ¶¶ 102, 112, 137.)   But as courts have routinely held, a plaintiff

may not survive summary judgment through a conclusory assertion that relevant records were

---

[30] Plaintiff's argument that Ms. Berberich is an expert witness, (*see* Pl.'s Opp'n 15), is misguided.  "To testify as an expert witness, an individual must be 'qualified as an expert by knowledge, skill, experience, training, or education.'"  *SEC v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 1512713, at *3 (S.D.N.Y. Apr. 8, 2019) (quoting Fed. R. Evid. 702).  An expert witness is one who "assists the jury in comprehending and deciding issues beyond the understanding of a layperson."  *Lek*, 2019 WL 1512713, at *3 (citation and quotation marks omitted).  That does not describe Ms. Berberich, who is serving as an ordinary fact witness.

forged or falsified. *See, e.g., Goonewardena v. Spinelli*, No. 15-CV-5239, 2020 WL 1557745, at *11 (E.D.N.Y. Mar. 5, 2020) (granting summary judgment for the defendants where the plaintiff "ha[d] not adduced any evidence [to support his theory] that the certified court documents and transcripts [relied upon by the defendants] may have been fabricated, [and] ha[d] [not] . . . uncovered any reason to believe that the documents [were] inaccurate"), *report and recommendation adopted in relevant part*, 2020 WL 1550724 (E.D.N.Y. Mar. 31, 2020); *Engles v. Dougherty*, No. 14-CV-1185, 2017 WL 6466309, at *11 (N.D.N.Y. Aug. 22, 2017) (holding, for purposes of summary judgment, that the "[p]laintiff's conclusory allegation that the medical professionals and other officers 'covered up,' and fabricated [the] plaintiff's medical records and logbooks to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, . . . be insufficient to sway any rational fact finder" (record citation omitted)), *report and recommendation adopted sub nom. Engles v. Souza*, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017); *Hilton v. Maltese*, No. 09-CV-1373, 2012 WL 6965105, at *6 & n.10 (N.D.N.Y. Dec. 14, 2012) ("Plaintiff's conclusory assertion that the transcript and other records of his disciplinary hearing were completely fabricated is not sufficient to establish a material issue of fact . . . ."), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013); *Lewis v. Johnson*, No. 08-CV-482, 2010 WL 3785771, at *20 (N.D.N.Y. Aug. 5, 2010) (concluding that the "[p]laintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated [the] plaintiff's medical records to suppress evidence of his alleged injuries . . . would . . . be insufficient to sway any rational fact finder"), *report and recommendation adopted*, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010); *Farid v. Ellen*, No. 01-CV-8292, 2006 WL 59517, at *11 (S.D.N.Y. Jan. 11, 2006) (dismissing the plaintiff's Eighth Amendment deliberate-indifference claim on summary judgment in part because "[t]he most that plaintiff ha[d] provided

[to establish the defendant's conscious disregard] [was] his speculation that [the] defendant . . .

had somehow doctored plaintiff's medical records to fabricate details of his medical history"),

*aff'd*, 593 F.3d 233 (2d Cir. 2010).  Accordingly, there are no genuine disputes of material fact

regarding the basic timing and sequence of the manual body cavity search and x-ray examination

at St. Luke's.  The evidence establishes that both procedures took place during Plaintiff's second

visit to the hospital, after the police had obtained a search warrant.

> b.  Whether Police Defendants Are Entitled to Qualified Immunity Based
> On Good-Faith Reliance On Search Warrant

Because the manual body cavity search and x-ray examination at St. Luke's were

conducted pursuant to a search warrant, they are presumed reasonable.  *See Fabrikant v. French*,

691 F.3d 193, 214 (2d Cir. 2012) ("Ordinarily, an arrest or search pursuant to a warrant issued by

a neutral magistrate is presumed reasonable because such warrants may issue only upon a

showing of probable cause."); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.

1991) ("Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding

of probable cause, creates a presumption that it was objectively reasonable for the officers to

believe that there was probable cause . . . ."); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404,

426 (S.D.N.Y. 2013) ("A search is presumptively reasonable when executed pursuant to a

warrant.").  Although Plaintiff's theory is that the manual body cavity search and x-ray

examination were performed without a search warrant, he has also challenged the validity of the

warrant itself, arguing that Police Defendants "wrongfully procur[ed]" the warrant by relying on

the fruits of a "prior illegal search" and fabricating Plaintiff's statement that he had more drugs

inside of him.  (Pl.'s Mem. 16–17; *see also* SAC ¶ 108.)  Because the Court has concluded that

Defendants did rely on the search warrant during the second visit to St. Luke's, Plaintiff's

challenge to the warrant merits consideration.

"To be valid under the Fourth Amendment, a search warrant must (1) be based on probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place to be searched, and (4) describe with particularity the things to be seized." *Green*, 96 F. Supp. 3d at 286 (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).  It is well-established, however, that a "police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity." *Id.* at 286 (quoting *Simms v. Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997)).  Thus, courts confronted with a suppression motion "have recognized that evidence obtained by government agents 'in objectively reasonable reliance' on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Scully*, 108 F. Supp. 3d 59, 103 (E.D.N.Y. 2015) (quoting *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)).  "When a government agent genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.'" *Scully*, 108 F. Supp. 3d at 103 (quoting *United States v. Leon*, 468 U.S. 897, 920–21 (1984)); *see also United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (same).  These same principles "appl[y] in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful." *Calderon v. City of New York*, No. 14-CV-1082, 2015 WL 2079405, at *5 (S.D.N.Y. May 4, 2015) (gathering cases); *see also Conroy v. Caron*, 275 F. Supp. 3d 328, 346–47 (D. Conn. 2017) (stating same principle).  Accordingly, if the Court finds that Police Defendants reasonably relied on the search warrant in good faith, it need not determine whether the search was, in fact, supported by probable cause. *See Scully*, 108 F. Supp. 3d at 103 (gathering cases and observing that "the Second Circuit and

district courts in this Circuit have, at times, declined to evaluate a probable cause showing altogether and instead decided Fourth Amendment claims based on the good faith exception").

To invoke the good faith exception, however, an officer's reliance on a duly issued warrant "must be objectively reasonable."  *Id.* at 103 (quoting *Leon*, 468 U.S. at 922); *see also Raymonda*, 780 F.3d at 118 (same).  Courts have recognized four circumstances in which the good faith exception "cannot shield even an officer who relie[d] on a duly issued warrant":

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Raymonda*, 780 F.3d at 118 (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).

The second and fourth factors do not apply here.  With respect to the second factor, although the judge issuing a search warrant "must 'perform his neutral and detached function' as a judicial officer 'and not serve merely as a rubber stamp for the police," courts will not "hastily assume a magistrate's surrender of his judicial independence to the police or prosecution." *Clark*, 638 F.3d at 100, 101 (quoting *Leon*, 468 U.S. at 914).  Here, there is no evidence that Judge Williams "allowed himself to become a member, if not the leader, of the search party," as was the case, for example, in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979).  There, the Supreme Court invalidated a warrant where the issuing judge had accompanied police and prosecutors to an adult bookstore and, over the course of six hours, determined for himself which obscene materials could be seized.  *See id.* at 322.  Moreover, even if the reviewing court determines that the issuing judge "committed legal error in his assessment of probable cause," it may not infer "abandonment of judicial neutrality and detachment" on that basis alone.  *Clark*, 638 F.3d at 101.  Here, there is no evidence to suggest that Judge Williams abandoned his

judicial role, and thus, "this factor did not preclude the officers' good faith reliance on the challenged warrant." *Id.*

With respect to the fourth factor, "a warrant is facially defective when it omits or misstates information specifically required to be contained therein," such as "the place to be searched, and the persons or things to be seized." *Id.* at 102 (quoting U.S. Const. amend. IV). This factor is also inapposite here. The search warrant issued by Judge Williams authorized law enforcement personnel and medical staff to search for and seize "cocaine[,] marihuana[,] or other controlled substances and/or packaging material consistent with the sale of such items." (Search Warrant & Supporting Aff. 2.) The warrant authorized them "to search and inspect, and photograph and/or record in any way the person of [Plaintiff,] including an inspection of the rectal area[,]" for these products. (*Id.*) Because the warrant identified with particularity both the items to be seized and the place to be searched, it was not facially defective so as to preclude good faith reliance. *Cf. Groh*, 540 U.S. at 564 (concluding that a search warrant's failure to identify the items to be seized prevented reasonable reliance); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) (upholding a lower court's conclusion that a "warrant was constitutionally defective [where] the description [of items to be seized] in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit").

Here, rather, Plaintiff's challenge to the warrant implicates the first and third factors that may vitiate good faith reliance. He argues that Pitt "provided false statements to [Judge Williams] . . . in order to secure a search warrant," (SAC ¶ 108), thereby suggesting that "the issuing magistrate [was] knowingly misled[,]" *Raymonda*, 780 F.3d at 118. He also argues that the search warrant was obtained by using the fruits of a prior unconstitutional search, (*see* Pl.'s

Mem. 16), thereby suggesting that the warrant "application [was] so lacking in indicia of probable cause as to render reliance upon it unreasonable[,]" *Raymonda*, 780 F.3d at 118.  The Court will consider each challenge in turn.

### i.  Whether Judge Williams Was Misled

"Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, . . . the shield of qualified immunity is lost." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (ellipsis in original) (quoting *Golino*, 950 F.2d at 871)).  "A [§] 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 [(1978).]" *Id.*  In such cases, "the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." *Id.*; *see also United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y. 2013) ("To require suppression, a movant must demonstrate, by a preponderance of the evidence, both the affiant's *intent* to mislead the issuing judge and the *materiality* of the affiant's falsehoods or omissions." (citing *United States v. Rajaratnam*, 719 F.3d 139, 145–46 (2d Cir. 2013))).  It is not enough for a plaintiff to set forth "[u]nsupported conclusory allegations of falsehood or material omission"; rather, he "must make specific allegations accompanied by an offer of proof." *Velardi*, 40 F.3d at 573; *see also Calderon*, 2015 WL 2079405, at *5 (same).  With respect to the materiality requirement, "a false statement is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" *Calderon*, 2015 WL 2079405, at *6 (quoting *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005)); *see also Lahey*, 967 F. Supp. 2d at 711.  "To determine if misrepresentations or omissions

are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711; *Conroy*, 275 F. Supp. 3d at 347 (same); *see also Calderon*, 2015 WL 2079405 (same).  Thus, "to survive the defendants' motion for summary judgment on this issue," plaintiffs must meet three criteria:

> [T]hey must have made an offer of proof supporting specific allegations of deliberate or reckless misrepresentation, as required by *Franks*; the alleged misrepresentations must be legally relevant to the probable cause determination; and there must be a genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'

*Velardi*, 40 F.3d at 574.  The *Franks* standard is therefore considered "a high one."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *Calderon*, 2015 WL 2079405, at *5 (same).

Here, Plaintiff alleges that Pitt "intentionally, knowingly[,] and with reckless disregard for the truth" fabricated Plaintiff's statement that he had more drugs inside his anal cavity, and that he did so to support the application for a search warrant.  (Pl.'s Mem. 16; *see also* SAC ¶ 108; Search Warrant & Supporting Aff. 4 ("[Plaintiff] then made a statement that he does have more narcotics in his rectum.").)  The Court assumes there is a genuine issue of fact about whether Judge Williams would have issued the warrant on the basis of an affidavit omitting this statement, just as it assumes that Pitt's alleged fabrication is legally relevant to the probable cause determination.[31]  But even with these assumptions in place, Plaintiff has not provided a

---

[31] Both assumptions are almost certainly true.  Contrary to Police Defendants' argument, (*see* Police Defs.' Mem. 26), the case for probable cause would likely sustain a fatal blow if Plaintiff's alleged statement were omitted from the warrant application.  Stated differently, Plaintiff's putative statement that he had more drugs in his anal cavity was almost certainly a material factor in Judge Williams' decision to issue the warrant.  Indeed, without this statement, it is not clear what the basis for probable cause would be.  Without evidence that drug dealers routinely store *multiple* bags of narcotics in their anal cavity, the fact that the officers had already discovered Plaintiff's contraband would arguably suggest there was no need for an additional search.  Though the Court need not pursue this discussion in light of its finding that Plaintiff has failed to provide a sufficient offer of proof, it is safe to say that if Plaintiff *had* come forward

sufficient "offer of proof" in support of his allegations as required by *Franks*. *Velardi* and its

progeny have made clear that even in a § 1983 action, and even in the context of a summary

judgment motion, a plaintiff challenging the validity of a warrant must still satisfy the rigorous

standards in *Franks*. *See Velardi*, 40 F.3d at 573; *Calderon*, 2015 WL 2079405, at *5; *Conroy*,

275 F. Supp. 3d at 347; *Spafford v. Romanowsky*, 348 F. Supp. 2d 40, 46 (S.D.N.Y. 2004). Under

*Franks*, "a challenge to the veracity of the affidavit [on which a warrant was based] merits a

[suppression] hearing only if the challenger makes a 'substantial preliminary showing' that the

affiant knowingly and intentionally made a false statement that was 'necessary to the finding of

probable cause.'" *Simms*, 115 F.3d at 1107 (brackets and ellipsis omitted) (quoting *Rivera*, 928

F.2d at 604). As noted, this "substantial preliminary showing" requires that the plaintiff's

allegations be "supported by an offer of proof." *Calderon*, 2015 WL 2079405, at *5 (citing

*Velardi*, 40 F.3d at 573). Courts have made clear that a plaintiff's own, uncorroborated

statements do not constitute a sufficient offer of proof under *Franks*. *See United States v. Nix*,

No. 15-CR-6126, 2016 WL 11268960, at *5 (W.D.N.Y. Apr. 25, 2016) (challenge to search

warrants did not warrant a *Franks* hearing where the defendant "provide[d] no basis for his claim

and no sworn, corroborating statements other than his own"); *Bourguignon v. Guinta*, 247 F.

Supp. 2d 189, 194 (D. Conn. 2003) (granting summary judgment for defendants on a pro se

plaintiff's § 1983 false arrest claim where the plaintiff "presented no evidence to support his

claims" that the arrest warrant affidavit contained material misrepresentations and omissions);

*United States v. Rollack*, 90 F. Supp. 2d 263, 270 (S.D.N.Y. 1999) (concluding that a defendant's

own affidavit submitted in support of his challenge to the veracity of a search warrant affidavit

---

with such proof, Police Defendants would not be entitled to qualified immunity based on the
good faith exception.

"[was] insufficient to establish the substantial preliminary showing required to warrant a *Franks* hearing").

Although Plaintiff denies having said there were more drugs in his anal cavity, he has provided no "offer of proof" besides his own conclusory allegation that this statement was fabricated. (*See* Pl.'s Mem. 16–17.)  Under the "stringent" standard in *Franks*, such "unadorned conclusory charges" do not make out a "substantial preliminary showing," *Nix*, 2016 WL 11268960, at *5, and are therefore insufficient to defeat a summary judgment motion, *see Velardi*, 40 F.3d at 574.  Plaintiff's only other challenge to the search warrant affidavit is based on perceived inconsistencies between Pitt's testimony and other statements by the officers. (*See* Pl.'s Mem. 17.)  Although Plaintiff's argument is a confusing swirl of theories and allegations, his principle contention seems to be that one of Pitt's statements in an incident report is inconsistent with an account offered by Arestin.  (*See id.*)  In an incident report summarizing his involvement in the events of May 8, Pitt stated that after he and the other officers retrieved the drugs Plaintiff had tried to swallow, and after Plaintiff had been transported to the hospital, Pitt was "advised by [Sergeant] Weaver and [Officer] Canario that [Plaintiff] had stated to officers that he had more 'drugs' up his ass that [they] didn't find."  (*See* Pl.'s Opp'n Ex. K (Dkt. No. 204).)[32]  In a separate incident report, Arestin states that Plaintiff made this alleged statement after he had tried to swallow the recovered contraband.  (*Id.* Ex. J.)[33]  Plaintiff appears to argue that Arestin's account is inconsistent with Pitt's account, because "Pitt's police report indicates that [he] was advised by Canario and Sgt. Weaver that the Plaintiff had made such admissions

---

[32] Exhibit K to Plaintiff's Opposition submission is located at ECF page 295 of Dkt. No. 204.

[33] Exhibit J to Plaintiff's Opposition submission is located at ECF page 294 of Dkt. No. 204.

during the strip search." (Pl.'s Mem. 17.) In fact, that is not what Pitt's incident report says. His report does not specify *when* Plaintiff had reportedly made the remark about having additional drugs. (*See* Pl.'s Opp'n Ex. K.) Thus, Plaintiff has attacked an inconsistency that does not exist. Although Plaintiff complains of other perceived inconsistencies among the officers' incident reports, they are not significant. (*See* Pl.'s Mem. 17.) At most, these perceived inconsistencies might be read to suggest some ambiguity as to *when* Plaintiff made the alleged remark, but not *whether* he made the remark in the first place.

Because Plaintiff has offered no more than "[u]nsupported conclusory allegations of falsehood or material omission," which are insufficient to "support a *Franks* challenge," *Velardi*, 40 F.3d at 573, he has failed to establish that Judge Williams "was knowingly or recklessly misled by any statements or omissions in [Pitt's] affidavit," *Falso*, 544 F.3d at 128. Thus, on this basis at least, Plaintiff has failed to establish that Defendants' good faith reliance on the warrant was not objectively reasonable.

ii.  Whether Warrant Application Was So Lacking in Indicia of Probable Cause As To Render Reliance Upon it Unreasonable

Plaintiff also argues that Pitt used the fruits of a prior unconstitutional search to obtain the search warrant. (*See* Pl.'s Mem. 16.) In paragraph 8 of the affidavit submitted in support of the search warrant, Pitt wrote the following:

> [Plaintiff] was transported to the City of Newburgh Police Department. While at the station he [sic] was advised by his supervisor Sgt. Anderson that he wanted Strip Search conducted. While conducting a strip search for any possible narcotics, officers located a small clear plastic bag containing an off white rock like substance, which later field tested possible for the presence of cocaine, in the rectum area of [Plaintiff].

(Search Warrant & Supporting Aff. 4.) Relying on a 1975 case from Maryland's Court of Appeals, Plaintiff argues that "[e]vidence derived as a result of a prior illegal search or seizure[]

cannot be used as a valid basis to justify the existence of probable cause in a subsequent application for a search warrant." (Pl.'s Mem. 16 (citing *Everhart v. State*, 274 Md. 459, 481 (1975).) The Court interprets Plaintiff's argument to implicate the third circumstance in which officers may not claim the good faith exception—that is, "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable . . . ." *Raymonda*, 780 F.3d at 118.

Liberally construed to raise the strongest possible argument in the context of the instant analysis regarding qualified immunity and the good faith exception, Plaintiff's position is "that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." *United States v. Ganias*, 824 F.3d 199, 222 (2d Cir. 2016). The Second Circuit, though, has declined to adopt such a rule on at least three occasions, beginning with *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), and continuing with *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996), and *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016). *See also United States v. Calhoun*, No. 16-CR-92, 2017 WL 1078634, at *14 (D. Conn. Mar. 21, 2017) (observing that the Second Circuit has applied the "good faith exception to circumstances where the warrant affidavit included information arguably tainted by a Fourth Amendment violation, if it would nevertheless be objectively reasonable for the officers to believe that the resulting warrant had validly issued").

In *Thomas*, an agent for the Drug Enforcement Agency ("DEA"), acting without a search warrant, used a drug-sniffing dog to perform a "canine sniff" at an apartment. 757 F.2d at 1366. The canine sniff indicated there were narcotics inside the apartment, and the agent submitted this evidence to a magistrate in support of a search warrant application. *Id.* Relying on this and other evidence, the judge determined there was probable cause and issued a warrant. *Id.* The

defendant moved to suppress the evidence uncovered during execution of the search warrant,

arguing that the canine sniff was a predicate constitutional violation, and that the fruits of this

unlawful search were material to the judge's finding of probable cause. *Id.* at 1366. The Second

Circuit decided as a matter of first impression that the canine sniff constituted a search, *id.* at

1367, and further concluded that without the evidence obtained from that search, there would

have been no probable cause, *id.* at 1368. The court nevertheless concluded that suppression was

not warranted because the agent's reliance on the warrant was objectively reasonable. *See id.* As

the court explained:

> The DEA agent brought his evidence, including the positive "alert" from the canine,
> to a neutral and detached magistrate. That magistrate determined that probable
> cause to search existed, and issued a search warrant. There is nothing more the
> officer could have or should have done under these circumstances to be sure his
> search would be legal. The magistrate, whose duty it is to interpret the law,
> determined that the canine sniff could form the basis for probable cause; it was
> reasonable for the officer to rely on this determination.

*Id.* Accordingly, the court found that the agent was entitled to the good faith exception. *Id.*

The Second Circuit distinguished *Thomas* when deciding *Reilly*. In *Reilly*, two police

officers unlawfully went onto the defendant's curtilage and observed "a clearing with about 20

marijuana plants." 76 F.3d at 1274. To obtain a search warrant, the officers submitted to the

county court judge a "bare-bones" description of the defendant's land," and "failed to give [the

judge] information as to their behavior." *Id.* at 1280. The omitted information "was crucial," the

court explained, and "[w]ithout it, the issuing judge could not possibly make a valid assessment

of the legality of the warrant that he was asked to issue." *Id.* In short, the affidavit submitted to

the judge "was almost calculated to mislead." *Id.* The court held that in such a situation, "[t]he

good faith exception . . . does not protect searches by officers who fail to provide all potentially

adverse information to the issuing judge." *Id.* In dicta, the *Reilly* court suggested that the good

faith exception also did not apply for a second reason: "The issuance of the warrant was itself premised on material obtained in a prior [illegal] search." *Id.* The court was quick to clarify, however, that

> [i]n deciding that the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a pre-warrant search, *we do not hold that the fruit of illegal searches can never be the basis for a search warrant that the police can subsequently use in good faith.*

*Id.* at 1280–81 (emphasis added). There is a clear tension between the court's first and second statements that was never fully resolved in *Reilly*. But despite this ambiguity, the court still clarified that the good faith inquiry is focused not on whether there was a predicate unconstitutional search, but on whether the officers fully disclosed their actions to the issuing magistrate in good faith. As it observed:

> The facts surrounding th[e] prior search . . . raise[d] serious doubts about the officers' good faith at that earlier time. The officers went to [the judge] with the fruits of this prior search in hand, and it was on the basis of that evidence that they asked him to issue a warrant. Yet the officers never gave [the judge] a full account of what they did. And without such an account, [the judge] could not possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a valid warrant. This fact, *by itself*, makes [the good faith exception] inapplicable.

*Id.* at 1280 (emphasis added). Thus, the court made clear that its holding was based solely on the officers' bad faith when failing to describe their actions to the issuing magistrate.

Whatever ambiguity lingered after *Reilly* was laid to rest in *Ganias*. There, agents for the U.S. Army's Criminal Investigation Division executed a search warrant and obtained several mirrored hard drives belonging to an accountant as part of an investigation into two of the accountant's clients (but not the accountant himself). 824 F.3d at 202–03. But even after the government had finished "identifying and segregating" the files that fell within the scope of the warrant, it continued to retain all the data that had been seized in the raid. *Id.* at 205–06. Roughly three years after the raid, government investigators began to suspect that the accountant

himself may have been involved in tax-related crimes. *Id.* at 206. Accordingly, the investigating agent sought a search warrant to search files which she knew to be on the mirrored hard drives, but which had not previously been accessed. *Id.* at 207. The magistrate issued the warrant, and the government ultimately indicted the accountant for tax evasion. *Id.* On appeal, the defendant argued that the government could not rely in good faith on the search warrant because the issuance of the warrant was based on an alleged constitutional violation—unlawful retention of the mirrored hard drives. *Id.* at 222.[34] Invoking *Reilly*, he made the same argument Plaintiff essentially raises here: "that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." *Id.* But *Reilly*, the Second Circuit said, "stands for no such thing." *Id.* The basis of the holding in *Reilly*, the court explained, was the officers' failure to provide the magistrate "with an account of what they did," such that the magistrate "was unable to ascertain whether the evidence on which the officers relied in seeking the warrant was 'itself obtained illegally and in bad faith.'" *Id.* (quoting *Reilly*, 76 F.3d at 1281). Contrasting the facts in *Reilly* to those in *Thomas*, the *Ganias* court said that the distinction between those cases "did not turn on whether the violation found was *predicate*, or prior to, the subsequent search warrant on which the officers eventually relied, but on whether the officers' reliance on the warrant was reasonable." *Ganias*, 824 F.3d at 223. Thus, "it is not the case that good faith reliance on a warrant is never possible in circumstances in which a predicate constitutional violation has occurred." *Id.* In *Ganias*, the court found that the agent had "provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding the retention of the mirrored copies of [the defendant's] hard

---

[34] The Second Circuit declined to decide whether the government's retention of the hard drives constituted a Fourth Amendment violation. *See Ganias*, 824 F.3d at 209.

drives—the alleged constitutional violation on which [the defendant] relie[d]." *Id.* at 224.  As in

*Thomas*, then, the magistrate had enough information to determine whether the alleged

unconstitutional act precluded issuance of the warrant, and the government agents were entitled

to rely in good faith on the warrant that followed.  *See id.* at 224–25.

   The Court concludes that here, as in *Thomas* and *Ganias*, the search warrant affidavit

contained sufficient information to apprise the issuing judge of the officers' prior conduct.

Although the Court has found that Police Defendants' visual body cavity search violated the

Fourth Amendment, *see supra* Section II.B.3.a, the search warrant affidavit submitted to Judge

Williams clearly states that the officers had performed a "strip search" of Plaintiff and had

uncovered a small bag of drugs inside Plaintiff's "rectum area," (*see* Search Warrant &

Supporting Aff. 4).  Even if Judge Williams, applying strict definitional categories, interpreted

"strip search" to connote something less invasive than what took place, Pitt's statement that

drugs were found in Plaintiff's "rectum area" likely would have disabused him of that notion.

Thus, in contrast to the affidavit in *Reilly*, the affidavit submitted to Judge Williams was not a

"bare-bones" document "calculated to mislead."  76 F.3d at 1280.  Like the agents in *Thomas* and

*Ganias*, Pitt apprised Judge Williams "of the relevant conduct, so that [Judge Williams] was able

to determine whether any predicate illegality precluded issuance of the warrant."  *Ganias*, 824

F.3d at 223.  Whether this Court would have reached the same probable cause determination as

Judge Williams is not the relevant inquiry, for "a court reviewing a challenged warrant—whether

at the district or appellate level—'must accord considerable deference to the probable cause

determination of the issuing magistrate.'"  *Clark*, 638 F.3d at 93 (quoting *Walczyk*, 496 F.3d at

157).  What matters is whether Pitt "disclosed all crucial facts for the legal determination in

question to the [issuing] judge."  *Ganias*, 824 F.3d at 223.  The Court concludes that he did.

There is one final point that merits comment.  In *Reilly*, the Second Circuit distinguished *Thomas* not only based on the agent's full disclosure to the issuing magistrate, but also based on the novelty of the predicate constitutional violation in question: Whereas no court in the Second Circuit had held a canine sniff unconstitutional before *Thomas* was decided, it was well-established before *Reilly* that an invasion of curtilage was unconstitutional.  *See Reilly*, 76 F.3d at 1281.  Thus, in contrast to the officers in *Reilly*, the DEA agent in *Thomas* "did not have any significant reason to believe that what he had done was unconstitutional."  *Id.*  The Second Circuit invoked this distinction once again in *Ganias*, where it observed that, at the time of the alleged constitutional violation there—retention of mirrored hard drives—"no court in this Circuit had held that [such] retention . . . could violate the Fourth Amendment," and thus, the government agent had no particular reason to suspect that her conduct was unconstitutional.  824 F.3d at 225; *see also Calhoun*, 2017 WL 1078634, at *16 (observing that "[i]n *Thomas* and *Ganias*, the Second Circuit was deciding novel questions at the very edge of Fourth Amendment law").  In this sense, the instant case falls more in line with *Reilly* than with *Thomas* or *Ganias*. As noted *supra* Section II.B.3.a.ii, reasonable police officers in New York state would have known as of 2013 that visual body cavity searches require reasonable suspicion.  *See Sloley*, 945 F.3d at 40.  Thus, in contrast to the canine sniff in *Thomas* or the retention of mirrored hard drives in *Ganias*, the visual body cavity search here does not sit at the vanguard of Fourth Amendment violations.  But while the novelty of the predicate conduct may provide an *additional* basis for distinguishing the facts in *Thomas* and *Ganias* from those in *Reilly*, that was not the *primary* distinction on which the Second Circuit relied in either *Reilly* or *Ganias*.  In both cases, the court focused mainly on whether the law enforcement officers had sufficiently disclosed their underlying conduct to the issuing magistrate.  *See Ganias*, 824 F.3d at 222–24;

*Reilly*, 76 F.3d at 1280–81.  Nothing in either opinion suggests that where, as here, a predicate constitutional violation has occurred, the novelty of that violation is a *sine qua non* for an officer's subsequent good faith reliance on a warrant, particularly when the officer has sufficiently disclosed the circumstances of that violation to the issuing magistrate.  Thus, although the visual body cavity search at the police station was not a novel constitutional violation, this fact does not foreclose Police Defendants' good faith reliance on the subsequently issued warrant.

　　If Pitt and his fellow officers believed they had committed a constitutional offense, Pitt might well have omitted certain details from his affidavit to Judge Williams.  But instead, his affidavit acknowledged the "strip search," as well as the fact that drugs had been located in Plaintiff's "rectum area."  (Search Warrant & Supporting Aff. 4.)[35]  His transparency in the matter suggests his good faith in seeking the warrant.  Most important, Judge Williams was sufficiently apprised of the underlying facts to reach a determination not only whether there was probable cause, but also "whether any predicate illegality precluded issuance of the warrant." *Ganias*, 824 F.3d at 223.  Having "disclose[d] all potentially adverse information to the issuing judge," Police Defendants were entitled to rely on the subsequently issued warrant. *Id.* at 221.

　　Based on the foregoing analysis, the Court cannot say that Pitt's application was "so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Raymonda*, 780

---

[35] Indeed, the description Pitt provided in the search warrant affidavit is arguably *more* incriminating to the officers than the account they have given elsewhere.  As discussed in Section I.A.2 *supra*, the officers in the strip search room have affirmed that the bag of drugs *fell out* of Plaintiff's buttocks.  But Judge Williams might easily have read the language in Pitt's affidavit to suggest that the officers had manually retrieved the drugs from Plaintiff's "rectum area."  (Search Warrant & Supporting Aff. 4.)  Thus, Pitt's imprecise use of language actually may have suggested that a more serious constitutional infraction took place—namely, a manual body cavity search.  Pitt's description further suggests he was not trying to conceal the officers' underlying conduct.

F.3d at 118.  Because none of the four circumstances that might preclude good faith reliance apply to the facts of this case, the Court finds that Police Defendants' good faith reliance on the warrant was "objectively reasonable," *see id.*, and they are therefore shielded by qualified immunity with respect to the searches that occurred pursuant to the search warrant, *see Simms*, 115 F.3d at 1106; *Green*, 96 F. Supp. 3d at 286.

Having determined that the Police Defendants who reasonably relied on the search warrant in good faith are entitled to qualified immunity, the Court turns to consider the relevant claims themselves.

### c.  Manual Body Cavity Search at St. Luke's (Count 15)

In Count 15, Plaintiff brings an unreasonable search claim against Police Defendants Canario and Saintiche and Medical Defendant Lemos.  (SAC ¶ 132.)  The gravamen of the claim is that these Defendants performed a manual body cavity search "without [a] warrant, consent[,] or trained medical doctors."  (*Id.*)  Plaintiff alleges in relevant part that Canario and Saintiche "forcefully turned [him] over onto [his] side and pinned [him] down on the hospital bed."  (*Id.* ¶ 92; *see also* Pl.'s Opp'n 29 (arguing that Canario and Saintiche "physically assisted Lemos in performing the digital rectal examination by forcefully pinning the Plaintiff to the hospital bed while he was handcuffed to it").)  According to his account, Lemos then "came over, pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds," which "consist[ed] of her twirling [two] fingers around in a circular motion as far up as she could go."  (SAC ¶¶ 93–94.)  The Court will consider the claim against Canario and Saintiche separately from the claim against Lemos.

i.  Unreasonable Search Claim Against Canario and Saintiche

Officers Canario and Saintiche have both affirmed that they took Plaintiff to St. Luke's for his second visit after learning that a judge had issued a search warrant to inspect Plaintiff's anal cavity for additional narcotics.  (*See* Canario Aff. ¶ 26; Saintiche Aff. ¶ 19.)  Apart from his meritless claim that the manual body cavity search actually took place during the first and only visit to St. Luke's, which the Court has already rejected, *see supra* Section II.B.7.a, Plaintiff has offered no credible basis to question Canario and Saintiche's good faith reliance on the search warrant.  Accordingly, for the reasons just discussed, Canario and Saintiche are entitled to qualified immunity with respect to Plaintiff's unreasonable search claim in Count 15.

Having concluded that Canario and Saintiche are shielded by qualified immunity, the Court need only consider whether they exceeded the scope of the authorized search or carried out the search in an unreasonable manner.  *See Walter v. United States*, 447 U.S. 649, 656 (1980) (plurality opinion) ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization."); *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000) ("[A] search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search."); *Vaher*, 916 F. Supp. 2d at 426 ("[E]ven when a search is conducted pursuant to a valid search warrant, police officers must still execute the warrant in good faith and within the confines of the limitations contained in the search warrant."); *Bolden*, 344 F. Supp. 2d at 416 ("No search warrant shields a police officer from carrying out a search in an unreasonable manner or from employing excessive force during a search.").

Insofar as Count 15 is predicated on the manual body cavity search, Canario and Saintiche neither exceeded the scope of the authorized search nor conducted the search in an

unreasonable manner. The only allegation that could remotely suggest improper behavior is Plaintiff's contention that Canario and Saintiche forcefully pinned him to the hospital bed. (*See* SAC ¶ 92.) But even if the Court accepts Plaintiff's allegations as true, Canario and Saintiche's actions do not constitute an unreasonable or excessive use of force under the circumstances. "Physical force is often necessary when effectuating arrests or executing search warrants and, thus, 'not every push or shove' is unconstitutionally excessive, 'even if it may later seem unnecessary in the peace of a judge's chambers.'" *Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 20–21 (E.D.N.Y. 2013) (quoting *Maxwell*, 380 F.3d at 108). Here, quite apart from the valid law enforcement interest in locating and seizing the supposed narcotics, (*see generally* Search Warrant & Supporting Aff.), the evidence shows there was also an urgent medical interest in performing the search, (*see* Durbin-French Aff. ¶ 24 (explaining that a "foreign object, whether swallowed or inserted into the rectum[,] could cause an obstruction which could be a surgical emergency")). Under these circumstances, it would have been reasonable for Canario and Saintiche to restrain Plaintiff in order to allow medical staff to perform the search. *Cf. J.L. v. E. Suffolk Boces*, No. 14-CV-4565, 2018 WL 1882847, at *10–11 (E.D.N.Y. Apr. 19, 2018) (concluding on summary judgment that, in the context of a Fourth Amendment seizure, the defendant's use of force—tackling the plaintiff and holding his arms—was objectively reasonable in light of a "fast-moving and potentially dangerous situation"); *see also Spencer v. Roche*, 755 F. Supp. 2d 250, 257, 260–61, 268 (D. Mass. 2010) (concluding on summary judgment that a manual body cavity search had been performed in a reasonable manner where the arrestee—who was handcuffed to the gurney—had his arms and legs held down by police during the search), *aff'd*, 659 F.3d 142 (1st Cir. 2011).

Accordingly, Police Defendants' Motion is granted with respect to Count 15.

<u>ii.  Unreasonable Search Claim Against Medical Defendant</u>

Although Plaintiff brings his unreasonable search claim against Nurse Lemos based on his discredited theory that there was only one trip to St. Luke's, (*see* SAC ¶ 132; Pl.'s Opp'n 21–22), his medical records establish that it was Nurse Practitioner Durbin-French who performed the manual body cavity search during the second visit to the hospital, (*see* ER Records 25; *see also* Durbin-French Aff. ¶¶ 6, 11–23).  Accordingly, Medical Defendants argue that the Court should dismiss Counts 12 through 18 because Plaintiff has named the wrong Defendant.  (*See* Med. Defs.' Mem. 17.)  Although here it is questionable whether Plaintiff's mistake in naming the wrong party was the result of mistake rather than bad faith, *cf. Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 772 (S.D.N.Y. 2011), in light of the latitude afforded to pro se litigants, as well as federal courts' preference "to resolve disputes on their merits rather than based on technical deficiencies in the pleadings or motion papers," *Simon v. City of New York*, No. 09-CV-1302, 2011 WL 317975, at *3 (E.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011), the Court will exercise its discretion and allow a substitution of Defendant Durbin-French for Nurse Lemos in Counts 12 through 18.

To determine whether Plaintiff's claim survives summary judgment, the Court must first decide whether Durbin-French was functioning as a state actor.  "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."  *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (citation omitted).  Thus, to prevail on a § 1983 claim, a plaintiff must establish (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States."  *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citation and quotation marks

omitted).  Although the first (i.e., "color-of-state-law") requirement is often fulfilled by

defendants who are government officials acting with state power, a plaintiff may also establish a

§ 1983 claim against a "private individual defendant" where that individual and a "state official

were acting in concert."  *Porter-McWilliams v. Anderson*, No. 07-CV-407, 2007 WL 4276801, at

*2 (S.D.N.Y. Dec. 3, 2007); *see also Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir.

2002) ("A private actor acts under the color of state law when the private actor is a willful

participant in joint activity with the State or its agents." (quotation marks omitted) (quoting

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))).  Three main tests have emerged to

determine when a private entity functions as a state actor:

> For the purposes of [§] 1983, the actions of a nominally private entity are
> attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power
> of the state or is controlled by the state ("the compulsion test"); (2) when the state
> provides significant encouragement to the entity, the entity is a willful participant
> in joint activity with the state, or the entity's functions are entwined with state
> policies ("the joint action test" or "close nexus test"); or (3) when the entity has
> been delegated a public function by the state, ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations

and some quotation marks omitted).

As a general matter, "private hospitals do not act under the color of law for § 1983

purposes."  *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 200 (N.D.N.Y. 2006) (quotation marks

omitted); *see also Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir. 2000) (holding that a private

hospital was not a state or municipal facility and thus was not liable pursuant to § 1983, insofar

as it was acting "as a private actor providing medical care"); *Goonewardena v. N. Shore Long

Island Jewish Health Sys.*, No. 11-CV-2456, 2014 WL 1271197, at *11 n.14 (E.D.N.Y. Mar. 26,

2014) (finding that, because the defendant was a private hospital and the plaintiff failed to plead

any facts suggesting that the hospital acted in concert with state actors, the hospital could not be

a state actor under § 1983). However, private medical providers may be held liable as state actors under certain circumstances; thus, when a private company provides medical care in prisons, it "performs a role traditionally within the exclusive prerogative of the state and therefore . . . is the functional equivalent of the municipality." *Bess v. City of New York*, No. 11-CV-6704, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013). But "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test." *Hollman v. County of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011); *see also Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, at *12 (E.D.N.Y. Dec. 22, 2008) ("Providing isolated emergency treatment to a prisoner on equal terms with the general public . . . does not constitute state action."); *Morse v. City of New York*, No. 00-CV-2528, 2001 WL 968996, at *8 (S.D.N.Y. Aug. 24, 2001) ("The fact that [the plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes.").

This case presents the less common scenario in which a private hospital employee did act as an instrumentality of the state. In performing the cavity search and x-ray, Durbin-French was helping the police locate and seize any illegal narcotics, and thus, she was primarily performing a law-enforcement function rather than a medical function. While there may also have been a compelling medical interest in identifying and removing any contraband secreted inside Plaintiff's body cavity, this interest was ancillary to the law-enforcement interest. It is unlikely, for example, that the search would have occurred without the search warrant signed by Judge Williams, and the purpose of the search warrant was to "search for and seize" illegal narcotics.

(*See* Search Warrant & Supporting Aff. 2.)  By searching Plaintiff's person at the compulsion of

the police in order to locate and seize illegal narcotics, Durbin-French was "perform[ing] a role

traditionally within the exclusive prerogative of the state."  *Bess*, 2013 WL 1164919, at *2.  This

feature distinguishes the case from those in which hospitals and their staff act primarily to

provide medical care, in which case they are held not to be state actors.  *Cf., e.g.*, *Kavazanjian*,

2008 WL 5340988, at *2–3 (finding that a hospital's treatment of an arrestee—which included x-

rays and CT scans to check for spinal fractures and other internal injuries, a rectal examination to

check for blood or pelvic fractures, and insertion of a catheter to identify any blood coming from

the kidneys or bladder—constituted "isolated emergency treatment [provided] . . . on equal terms

with the general public," and therefore did not constitute state action).  Indeed, the Court has

found guidance in the Second Circuit's *Kia P.* decision, which underscores the importance of

examining the nature of a healthcare provider's actions on a case-by-case basis.  There, for

example, the court held that where a private hospital had tested and treated a newborn for

suspected methadone withdrawal, it was acting "in its capacity as a private provider of medical

care," and was not a state actor for purposes of § 1983 liability.  *See* 235 F.3d at 756.  But the

court also observed that insofar as the hospital delayed releasing the newborn due to the "specter

of potential child abuse or neglect," the hospital was acting "in its social welfare role" and "as

part of the reporting and enforcement machinery for" the government agency responsible for

detecting and stopping child abuse, in which case the hospital *was* functioning as a state actor.

*Id.*  Although the court ultimately concluded that the hospital's "actions in its capacity as a state

actor had no effect, and thus did not subject it to liability under § 1983," *id.* at 757, the court's

analysis illustrates the subtle distinctions that are relevant when deciding whether a private

healthcare provider functions as a state actor.

The Court's conclusion that Durbin-French acted under color of law by performing the cavity search and x-ray finds support in another recent case from this Circuit.  In *Turner v. Procopio*, No. 13-CV-693, 2020 WL 2220244 (W.D.N.Y. Mar. 27, 2020), *report and recommendation adopted*, 2020 WL 2219503 (W.D.N.Y. May 7, 2020), *appeal dismissed*, 2020 WL 7329107 (2d Cir. 2020), the police obtained a search warrant for a cavity search "of the vaginal and rectal area" of the plaintiff, who was suspected of smuggling drugs, 2020 WL 2220244, at *3.  The search warrant also authorized an x-ray of the plaintiff's pelvic area.  *Id.* The plaintiff was transported to the hospital, where a doctor performed an x-ray and then performed a manual body cavity search of the plaintiff's vaginal and rectal cavities.  *Id.*  The plaintiff brought a § 1983 action against the doctor, as well as a nurse who was present during the search, alleging that she had been subjected to an unlawful search.  *Id.* at *1.  The court concluded that the doctor and nurse were both "entitled to qualified immunity as private individuals and medical personnel acting pursuant to a facially valid search warrant," thereby assuming that these defendants were state actors for purposes of § 1983 liability.  *See id.* at *13. In reaching this conclusion, the court relied in part on *Rodriques v. Furtado*, 950 F.2d 805 (1st Cir. 1991), a case in which the First Circuit, under nearly identical facts, held that the doctor performing the cavity inspection functioned as a state actor, *id.* at 814.  As the court in *Rodriques* observed, "[t]he scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant."  *Id.*  That rationale is equally apt here.  Durbin-French's "role in the search was purely that of an auxiliary to normal police search procedures," and she "exercised the power of search traditionally reserved exclusively to the State because of the 'coercive power' and 'significant encouragement' represented by the search

warrant." *See id.* (citation omitted).  For these reasons, the Court finds that Durbin-French was

functioning as a state actor and is subject to liability under § 1983.

The Court must also consider the possibility, however, that Durbin-French is entitled to

qualified immunity.  The question whether qualified immunity may extend to private individuals

functioning as state actors "is a more complicated question than one might think." *P.P. v. City of*

*New York*, No. 13-CV-5049, 2014 WL 4704800, at *16 (S.D.N.Y. Sept. 19, 2014).  The Supreme

Court's opinions in *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Filarsky v. Delia*, 566

U.S. 377 (2012), provide the touchstone for this Court's analysis.

In *Richardson*, the Supreme Court held that two prison guards employed by a private, for-

profit company that managed a correctional facility in Tennessee were not entitled to qualified

immunity.  *See* 521 U.S. at 412.  In reaching this conclusion, the Court considered whether the

rationale for qualified immunity justified extending the protection to private prison guards.  *See*

*id.* at 407–12.  The Court concluded that "the most important special government immunity-

producing concern—unwarranted timidity—is less likely present, or at least is not special, when

a private company subject to competitive market pressures operates a prison." *Id.* at 409.  The

Court explained that when a private firm whose guards are too aggressive faces claims for

damages, that will raise costs, "thereby threatening [the firm's] replacement." *Id.*  At the same

time, however, a firm with overly timid guards will also face competitive pressures from other

firms "that demonstrate their ability to do both a safer and more effective job." *Id.*  Thus, the

Court reasoned, "marketplace pressures provide the private firm with strong incentives to avoid

overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job

performance." *Id.* at 410.  That was particularly true given several factors in *Richardson*, where

(1) the defendants worked for "a large, multistate private prison management firm"; (2) that firm

was "systematically organized to perform a major administrative task for profit"; (3) the firm "perform[ed] that task independently, with relatively less ongoing direct state supervision"; (4) the firm was required to buy insurance to compensate civil rights tort victims; and (5) the firm's contract expired after three years, meaning its performance was "disciplined, not only by state review," but also by general marketplace pressures.  *Id.* at 409–10.  The Supreme Court contrasted this system to that in which government employees operate, which "is often characterized by multidepartment civil service rules that, while providing employees security, may limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees."  *Id.* at 410–11.

In concluding that private prison guards were not entitled to qualified immunity, the *Richardson* Court underscored the narrow nature of its holding.  That is, *Richardson* involved a context in which a private firm, "with limited direct supervision by the government," undertook a major administrative task for profit, and "in competition with other firms."  *Id.* at 413.  The Court explicitly noted that the case did "not involve a private individual briefly associated with a government body, serving as an adjunct to government on an essential government activity, or acting under close official supervision."  *Id.*

The Supreme Court confronted this latter scenario 15 years later in *Filarsky*.  In that case, the defendant was a private employment attorney hired on an ad hoc basis by the City of Rialto, California to interview a firefighter in connection with an administrative investigation.  566 U.S. at 381.  The firefighter was suspected of using medical leave to conduct a home-improvement project.  *Id.* at 380–81.  As part of the interview, the attorney ordered the firefighter to produce certain building supplies he had been observed purchasing.  *Id.* at 381.  After complying with the order, the firefighter brought a § 1983 action against the municipality and the lawyer, among

others, arguing that the order to produce the materials violated his rights under the Fourth and

Fourteenth Amendments.  *Id.* at 382.  The Ninth Circuit denied qualified immunity to the lawyer,

reasoning that he was a private attorney, and not a City employee.  *Id.* at 382–83.  The Supreme

Court unanimously reversed.  "Affording immunity not only to public employees but also to

others acting on behalf of the government," the Court said, "serves to ensure that talented

candidates are not deterred by the threat of damages suits from entering public service."  *Id.* at

390 (citation, quotation marks, and brackets omitted).  The Court observed that the government

often "must look outside its permanent work force to secure the services of private individuals,"

particularly where there is a need "for specialized knowledge or expertise."  *Id.*  Of particular

relevance here, the Court noted that

> [s]ometimes . . . private individuals will work in close coordination with public
> employees, and face threatened legal action for the same conduct . . . Because
> government employees will often be protected from suit by some form of immunity,
> those working alongside them could be left holding the bag—facing full liability
> for actions taken in conjunction with government employees who enjoy immunity
> for the same activity.  Under such circumstances, any private individual with a
> choice might think twice before accepting a government assignment.

*Id.* at 391 (record citation omitted).  Accordingly, the Court held that private individuals

"engaged in public service on a temporary or occasional basis" are "entitled to seek the

protection of qualified immunity."  *Id.* at 388–89, 393–94.

 To determine whether a private actor is entitled to seek the protection of qualified

immunity, another court in this District has analyzed whether the private actor more resembles

the private attorney in *Filarsky* or the private prison guards in *Richardson*.  In *P.P. v. City of New

York*, the defendants included individual social and case workers employed by non-profit

corporations that provided foster-care services pursuant to a contract with the City of New York.

*See* 2014 WL 4704800, at *1–2.  Then-Judge (now Chief Judge) McMahon explained that in

contrast to private prison operators, whose profit motives "can be counted upon to draw the most talented candidates," private foster-care homes would have a harder time recruiting "talented candidates to be social workers (an already thankless job) if those employees were exposed to § 1983 liability without the safe harbor of qualified immunity." *Id.* at *19. Thus, the defendants in *P.P.* were more like the private lawyer in *Filarsky*, and therefore able to invoke the protections of qualified immunity. Another court in this District has extended the protections of qualified immunity to private actors, *see Sullivan v. City of New York*, No. 14-CV-1334, 2015 WL 5025296, at *8 (S.D.N.Y. Aug. 25, 2015) (extending qualified immunity to an employee of the New York City Criminal Justice Agency, which is a "not-for-profit entity under contract with the City of New York to aid the City's administration of the criminal justice system by, among other things, performing bail interviews"), and, as noted *supra*, another court in the Second Circuit has extended qualified immunity to private healthcare providers under circumstances virtually identical to those in this case, *see Turner*, 2020 WL 2220244, at *13.

Here, the Court has no difficulty concluding that Durbin-French is entitled to qualified immunity. Police Defendants came to St. Luke's to conduct a highly invasive search that required "specialized knowledge or expertise" beyond its "permanent work force." *Filarsky*, 566 U.S. at 390. Like the lawyer in *Filarsky*, Durbin-French participated in this public service on a brief, limited basis, working "in close coordination with public employees." *Id.* at 391. Under these circumstances, it would make no sense for Durbin-French to "be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Id.* The Court therefore holds that Durbin-French is entitled to qualified immunity in connection with the visual body cavity search and x-ray performed on Plaintiff.

But even if Durbin-French has qualified immunity based on her good faith reliance on the

search warrant, she—like Police Defendants—is only protected to the extent her search was

conducted in a reasonable manner within the scope of the warrant.  *See Walter*, 447 U.S. at 656;

*Shi Yan Liu*, 239 F.3d at 140–41; *Vaher*, 916 F. Supp. 2d at 426; *Bolden*, 344 F. Supp. 2d at 416.

Here, Plaintiff alleges that the nurse did not use lubricant when probing his anal cavity.  (*See*

SAC ¶ 135; Pl.'s Opp'n 24.)[36]  By contrast, Durbin-French maintains that whenever she

performed a search of this nature, she "would don examination gloves and apply a liberal amount

of lubricant" before penetrating the person's anal cavity.  (Durbin-French Aff. ¶ 19.)  Although

the Court has not identified a case explicitly holding that lubricant is a requisite part of a

reasonable manual body cavity search, the relevant case law suggests as much.  *See United*

*States v. Fowlkes*, 804 F.3d 954, 964, 967 (9th Cir. 2015) (concluding that police officers

performed an unreasonable search when they extracted contraband from an arrestee's anal cavity

without the use of lubricant, medical personnel, or a sanitary setting); *Diggins v. Coe*, No. 16-

CV-242, 2019 WL 2491909, at *1 (S.D. Ill. June 14, 2019) (noting that on summary judgment,

the court had concluded "it was possible for a jury to find" that the "lack of lubrication rendered

[a manual body cavity] search unreasonable"); *cf. Davenport v. Tanner*, No. 13-CV-505, 2015

WL 4635449, at *2 *7–9 (E.D. La. July 31, 2015) (manual body cavity search not performed in

unreasonable manner where the examining physician used a "lubricated index finger" to perform

the search); *Roche*, 659 F.3d at 257, 260–61 (concluding on summary judgment that a manual

body cavity search had been reasonably performed where the doctor "lubricated his fingers"

---

[36] Insofar as Plaintiff's claim against Durbin-French is also predicated on the allegation that she told him the police had "a search warrant and . . . [could] use deadly force in order to get [him] to comply," (*see* SAC ¶ 88), the claim fails, for "[g]eneralized fear or intimidation alone is not enough to . . . render [a] search unlawful," *Chambers v. Lombardi*, No. 17-CV-7557, 2020 WL 2097558, at *7 (S.D.N.Y. May 1, 2020).

before the search).[37]  Thus, whether the manual body cavity search was performed in a

reasonable manner turns on a disputed issue of fact—namely, whether Durbin-French used

lubricant.  Because the Court is confronted with a "he said, she said" scenario, it may not resolve

this issue on summary judgment.  *See Fincher*, 604 F.3d at 726.  The jury will have to decide for

itself whose version of events to believe.

      Accordingly, Medical Defendants' Motion is denied with respect to Count 15.

### d.  X-Ray Examination (Count 16)

      Plaintiff's unreasonable search claim in Count 16 is based on the x-ray that was

performed in addition to the manual body cavity search.  (*See* SAC ¶ 133; Pl.'s Opp'n 23.)

Having found that Canario, Saintiche, and Durbin-French are entitled to qualified immunity, the

only question to resolve is whether the x-ray examination exceeded the scope of the search

warrant.[38]

---

[37] To the extent Plaintiff also argues the search was unreasonable because it was
performed without anesthesia or medical dilation, (*see* SAC ¶ 135; Pl.'s Opp'n 24), his claim is
baseless.  Plaintiff appears to rely on *Fowlkes*, *supra*, where several police officers retrieved
contraband from an arrestee's anal cavity without "summon[ing] medical personnel, [without]
mov[ing] [the arrestee] to a sanitary location, . . . [and] without the assistance of anesthesia,
lubricant, or medical dilation."  804 F.3d at 959.  Here, by contrast, the search was performed by
a trained nurse in a hospital setting.  Moreover, when the Ninth Circuit discussed why the search
in *Fowlkes* was unreasonable, the court only mentioned the fact that it was performed (i) without
lubrication, (ii) outside a sanitary setting, and (iii) without "the guidance or assistance of medical
personnel."  *See id.* at 964, 967.

[38] As with Count 15, Plaintiff's claim in Count 16 is based on the allegation that the
search was performed "without [a] warrant, consent[,] or trained medical doctors."  (SAC ¶ 133.)
The Court has already concluded that the second visit to St. Luke's occurred after the police had
obtained a search warrant, and thus, the police and medical staff did not need Plaintiff's consent
to execute a search pursuant to the warrant, *see Michigan v. Tyler*, 436 U.S. 499, 506 (1978)
("[A] search of private property without proper consent is unreasonable unless it has been
authorized by a valid search warrant" (citation and quotation marks omitted)); *see also Bumper v.
North Carolina*, 391 U.S. 543, 553 (1968) (Harlan, J., concurring) (observing that "if the officers
had a valid search warrant, no consent was required to make the search lawful").  Plaintiff's

The Court notes at the outset that there is some inconsistency in the record as to who ordered the x-ray examination and for what purpose. Plaintiff alleges that Canario and Saintiche were responsible for suggesting that an x-ray examination be performed. (*See* Pl.'s Opp'n 23.) Durbin-French states that the x-ray was performed "not because a police officer requested it," but because "good medical practice requires that a KUB x-ray be done . . . [when the patient has possibly] ingest[ed] a foreign object or plac[ed] objects in the rectum." (Durbin-French Aff. ¶¶ 24–25.) However, there is also a note in the medical records which states, "[p]er Sergeant, [x-ray] if needed may be completed as well," (ER Records 29), which suggests that the x-ray request may have come from the police.

But regardless of who decided to have the x-ray examination performed, the Court concludes that this search was still within the scope of the warrant. Another court in this District has observed in a slightly different context that "x-ray searches are less invasive than a strip search," and thus, "a prisoner's rights are not violated by x-ray searches conducted pursuant to a reasonable prison policy." *See Manley v. Ramos*, No. 13-CV-2662, 2014 WL 1496094, at \*2 (S.D.N.Y. Apr. 16, 2014). Here too, the x-ray performed on Plaintiff was far less invasive than the manual body cavity search performed a few minutes earlier. And although the search warrant issued by Judge Williams did not explicitly provide for an x-ray examination, *cf. Turner*, 2020 WL 2220244, at \*3 (involving a search warrant that authorized an x-ray of the plaintiff's pelvic and stomach area), the breadth of the search warrant's language still encompasses such a procedure. Specifically, the warrant provides that police and medical personnel were authorized not only "to search and inspect," but also to "*photograph* and/or record *in any way the person* of

---

claim that the medical personnel performing the manual body cavity search and x-ray lacked appropriate medical training is baseless and unsupported by the record.

[Plaintiff,] including an inspection of the rectal area." (Search Warrant & Supporting Aff. 2 (emphasis added).) Two conclusions follow from this language. First, police and medical personnel were authorized to search Plaintiff's entire "person," not just his "rectal area." (*Id.*) Second, they were authorized to "photograph" Plaintiff "in any way." (*Id.*) To perform an x-ray examination is "to examine, treat, or photograph with X-rays," *see* Merriam-Webster, *x-ray*, Merriam-Webster.com/dictionary/x-ray (last visited Mar. 1, 2021), and thus, this procedure fell squarely within the scope of the warrant.

In reaching this conclusion, the Court has found persuasive guidance in *Spencer v. Roche*, a case in which the plaintiff likewise argued that a KUB x-ray exceeded the scope of a search warrant authorizing a manual body cavity search of the plaintiff's anal cavity. *See* 659 F.3d at 144, 146, 148–49. Rejecting this argument, the First Circuit observed that a diagnostic x-ray "is a routine medical procedure that is brisk, painless, and generally regarded as safe," and there was no evidence the x-ray was performed in a dangerous or inappropriate manner, particularly given that it had been performed "by trained professionals in a hospital setting." *Id.* at 147. (*Cf.* Durbin-French Aff. ¶ 27 (noting that Plaintiff's KUB x-ray "was performed in the x-ray department, by a trained radiology technician[] in a hospital setting and with minimal intrusion upon the [P]laintiff").) Insofar as the x-ray had revealed areas of the plaintiff's body beyond the scope authorized in the warrant, such as his stomach, the court said that such viewing "was incidental to the valid anal cavity search and, thus, did not require an independent showing of probable cause." 659 F.3d at 148. The court also observed that based on evidence in the record, a KUB x-ray "is the only type of x-ray that can capture the entire anal cavity." *Id.* (*Cf.* Durbin-French Aff. ¶ 24.) "It follows inexorably," the court said, "that the KUB x-ray was within the scope of the warrant." 659 F.3d at 148.

Although *Spencer*'s rationale is equally applicable to the facts of this case, the conclusion here is even more straightforward in light of the expansive authorizing language in the search warrant.  The Court therefore concludes that the x-ray did not exceed the scope of the warrant, and Canario, Saintiche, and Durbin-French are each entitled to qualified immunity.  Police Defendants and Medical Defendants' respective Motions are both granted with respect to Count 16.

### e.  Right to Privacy Claim (Count 17)

In Count 17, Plaintiff brings a cause of action for violation of his right to privacy.  (*See* SAC ¶ 134.)  This count is based on the fact that Durbin-French—a nurse of the opposite sex— performed the anal cavity search.  (*See id.*)

The Second Circuit has recognized that a visual body cavity search—and, *a fortiori*, a manual body cavity search—is invasive "[r]egardless of who performs the search."  *Harris*, 818 F.3d at 58.  But although "all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex."  *Id.* at 59 (citation omitted).  Accordingly, the Second Circuit has stated that in the prison context, "cross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon."  *Id.* at 62.

In *Holland v. City of New York*, 197 F. Supp. 3d 529 (S.D.N.Y. 2016), another court in this District had occasion to apply these principles in the pretrial-detainee context.  While being held as a pretrial detainee at Rikers Island, the plaintiff in *Holland* was subjected to an invasive visual body cavity search by a female corrections officer during an emergency lockdown inspection that arose in response to a stabbing in the plaintiff's housing unit.  *Id.* at 536.  The court dismissed the unreasonable search claim, holding that the corrections officer was entitled to

qualified immunity.  *See id.* at 542–45.  As Judge Torres explained, "there appear to be no Supreme Court or Second Circuit decisions establishing that, in an emergency situation, inmates have a Fourth Amendment right to be free from strip searches—even body cavity searches—by officers of the opposite sex."  *Id.* at 544.  The court therefore found that, in the absence of allegations "that the search was unnecessarily prolonged or repeated," the cross-gender search was justified in light of the exigent circumstances.  *Id.*

As in *Holland*, exigent circumstances justified the cross-gender search at issue here. Given the urgency in locating and removing any illegal contraband—not least for the sake of Plaintiff's safety—it was not unreasonable for Durbin-French to perform the search herself.  As she explains in an affidavit, she and Dr. Madell "would alternate patients as they presented to the [Emergency Department] after 11 pm."  (Durbin-French Aff. ¶ 12.)  Thus, the fact that Durbin-French was assigned to Plaintiff indicates that Dr. Madell—a male nurse—was occupied with another patient.  Given the pressing law-enforcement interest in locating any illegal contraband, as well as the medical interest in protecting Plaintiff's health and safety, it was reasonable for Durbin-French to proceed with the search herself.  Accordingly, Medical Defendants' Motion is granted with respect to Count 17.

### 8.  Sexual Harassment and Sexual Abuse Claims Based on Events at St. Luke's (Counts 12 and 13)

In Count 12, Plaintiff asserts a claim for "sexual harassment" based on the manual body cavity search at St. Luke's.  (*See* SAC ¶ 129.)  Insofar as this claim is predicated on Defendants' "repeated orders to submit to [an] unlawful body cavity search," (*id.*), the Court has already established that the search was lawful, *see supra* Section II.B.7.a–b, and that any orders to comply were not unreasonable under the circumstances, *see supra* note 36.  To the extent this claim is based on Canario and Saintiche's "using physical force," (SAC ¶ 129), the Court has

already considered—and rejected—that theory of liability, *see supra* Section II.B.7.c.i.  Finally, to the extent this claim is based on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 129), the claim is duplicative of the unreasonable search claim in Count 15 and must therefore be dismissed for the same reasons already discussed in Section II.B.4 *supra*.

In Count 13, Plaintiff asserts a claim for "sexual abuse," also based on the manual body cavity search at St. Luke's.  (*See* SAC ¶ 130.)  Insofar as this claim is predicated on Defendants' "using physical force to secure [Plaintiff's] body to [the] bed," (*id.*), the Court already rejected that argument, *see supra* Section II.B.7.c.i.  To the extent this claim is predicated on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 130), the claim is duplicative of the unreasonable search claim in Count 15 and, like Count 12, must be dismissed for the same reasons already discussed in Section II.B.4 *supra*.

Accordingly, Police Defendants' Motion and Medical Defendants' Motion are both granted with respect to Counts 12 and 13.

### 9.  Deliberate Indifference Claims Based on Events at St. Luke's (Counts 18 and 19)

Plaintiff brings a deliberate indifference claim in Count 18 and a supervisory liability claim in Count 19, both of which stem from his medical treatment at St. Luke's.  (*See* SAC ¶¶ 135–36.)  In his Opposition to Defendants' respective summary judgment motions, Plaintiff also purports to raise new state-law claims for medical malpractice.  (*See* Pl.'s Opp'n 37.)  The Court will not consider these putative claims for the same reasons discussed in Section II.B.5.a *supra*.  Plaintiff may not constructively amend his pleadings on summary judgment in order to assert claims that appear nowhere in the Second Amended Complaint.

### a.  Deliberate Indifference (Count 18)

Although the deliberate indifference claim in Count 18 is brought against Defendant Lemos, (*see* SAC ¶ 135), as with Counts 12 through 17, Plaintiff has named the wrong defendant.  To the extent Count 18 is predicated on Medical Defendants' "failure to x-ray [Plaintiff's] back and neck, examine [his] body cavity for infection, . . . [and] prescribe pain medications," as well as their "ignoring [his] complaints," (*id.*; *see also id.* ¶¶ 86, 116), these alleged failures all pertain to Plaintiff's first visit to St. Luke's.  (*See generally* ER Records 2–21.)  According to Plaintiff's medical records, the Medical Defendant who treated Plaintiff during this first visit was Dr. Madell.  (*See id.* at 3–4, 14, 16–21.)

But even if Plaintiff had named the proper defendant, his deliberate indifference claim must be dismissed insofar as it is based on his first visit to St. Luke's.  In contrast to Plaintiff's second visit to the hospital, when police and medical personnel executed a search warrant, the sole purpose of the first visit was to provide Plaintiff with appropriate medical care after the police had used a taser and pepper spray to subdue him at the police station.  But as discussed in Section II.B.7.c.ii *supra*, "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test."  *Hollman*, 2011 WL 280927, at *5.  Here, then, "[t]he fact that [Plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes."  *Morse*, 2001 WL 968996, at *8.  Thus, to the extent Plaintiff has plausible claims based on perceived medical failures during the first visit, those claims are not cognizable under § 1983, for Dr. Madell and his colleagues were not functioning as state actors.

To the extent that Count 18 is predicated on Durbin-French's failure to "use lubricant and anesthesia" during the manual body cavity search, (*see* SAC ¶ 135), that claim is duplicative of Plaintiff's unreasonable search claim in Count 15.  Even if this allegation were considered on its own as a deliberate indifference claim, Plaintiff has failed to show either that (1) the "deprivation of medical care [was] sufficiently serious," or that (2) the defendant "acted or failed to act with a sufficiently culpable state of mind."  *Dumel v. Westchester County*, No. 19-CV-2161, 2021 WL 738365, at *8 (S.D.N.Y. Feb. 25, 2021) (alteration in original) (citation, alterations, and quotation marks omitted).  For example, even accepting Plaintiff's allegation that Durbin-French failed to use lubricant when conducting the manual body cavity search, Plaintiff has failed to establish that such a failure rises above the level of mere negligence.  *See id.* at *9 (explaining that the second element of a deliberate indifference claim under the Fourteenth Amendment "requires proof of a mens rea greater than mere negligence" (citation omitted)).  Thus, to the extent Count 18 is based on the manual body cavity search, it cannot survive summary judgment.

For these reasons, Medical Defendants' Motion is granted with respect to Count 18.

### b.  Supervisory Liability Based on X-Ray and Removal of Taser Barbs (Count 19)

In Count 19, Plaintiff brings a deliberate indifference claim against Dr. Madell and Durbin-French based on their alleged "failure to supervise Lemos in conducting [the] body cavity / x-ray examinations and [their] failure to supervise Lemos when treating / removing taser barbs out of [Plaintiff's] back," which, according to Plaintiff, "resulted in serious physical and emotional injuries and the deprivation of [his] Fourth and Fourteenth Amendment [rights]."  (SAC ¶ 136.)  As discussed, Lemos neither removed the taser barbs nor performed the manual body cavity search or x-ray examination.  But as with Count 18, even if Plaintiff had named the proper defendants, this claim would still fail, for several reasons.

To the extent Count 19 is predicated on Dr. Madell's removal of the taser barbs, because he was providing ordinary medical treatment "to an individual in police custody on the same terms as the hospital would provide to the public at large," *Hollman*, 2011 WL 280927, at *5, neither he nor his supervisors were functioning as state actors, thus precluding § 1983 liability. Insofar as Count 19 is predicated on the manual body cavity search and x-ray examination, Plaintiff's claim runs into a different dead-end.  As explained in Section II.B.5.b *supra*, after *Tangreti*, a plaintiff must establish that a defendant committed a constitutional tort through the defendant's "own conduct, not by reason of [his] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619.  Here, that means Plaintiff must show that Durbin-French's supervisor "recklessly fail[ed] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Maldonado*, 460 F. Supp. 3d at 395 (quoting *Darnell*, 849 F.3d at 35).  Apart from his own conclusory assertions, Plaintiff has made no showing that Durbin-French's cavity search (or the x-ray) constituted an excessive risk to his health or safety, let alone that Durbin-French's supervisor knew about or should have known about that risk and failed to take appropriate action.  Accordingly, the deliberate indifference claim in Count 19 cannot survive summary judgment and must be dismissed. Medical Defendants' Motion is therefore granted in this regard.

### 10.  Conspiracy Claims (Counts 14 and 20)

In Count 14, Plaintiff alleges that Canario, Saintiche, and Lemos conspired to deprive him of his "rights to be free from unreasonable search and seizures."  (SAC ¶ 131.)  This claim stems from Plaintiff's baseless theory that there was only one visit to the hospital.  He has alleged that the search warrant signed by Judge Williams was at some point

> brought back to the hospital by Canario and Saintiche so that they could conspire with the medical staff . . . to make them cover-up the fact that [he] was illegally body cavity searched and x-rayed earlier[,] and to record th[o]se events as if they [had] happened . . . almost . . . [four] hours later . . . . And they all came to an agreement that between 6:47 P.M. and 7:39 P.M.[,] . . . [Plaintiff] was only treated for [his] back and eyes.

(*Id.* ¶ 111.)  In Count 20, Plaintiff alleges that Pitt, Canario, Saintiche, Lemos, and Durbin-French all conspired to deprive Plaintiff of "medical care," and all "participated in falsifying medical records and police documents stating that [Plaintiff] was re-admitted at the hospital, [and] that [he] made no complaints concerning pain and injuries"—all so that the co-conspirators could "cover-up their illegal activities."  (*Id.* ¶ 137.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (summary order) (same) (citing *Ciambriello*, 292 F.3d at 324–25). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence."  *Pangburn*, 200 F.3d at 72 (quotation marks omitted).  To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (quotation marks omitted).  "To survive a motion for summary judgment, [the] plaintiff's evidence of a [§] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan."  *House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, at *20 (S.D.N.Y. Nov. 24, 2020) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261–62 (S.D.N.Y. 2003)); *see also Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (observing that a plaintiff must "make an effort

to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end" (citations and quotation marks omitted)).

Unsurprisingly, Plaintiff has produced no evidence to substantiate his fanciful tale that police and medical personnel orchestrated an elaborate scheme to fabricate and falsify records. Although his handwritten, single-spaced, 46-page Opposition brief is filled with conclusory allegations that such a conspiracy occurred, he offers only one remotely substantive argument in support. (*See* Pl.'s Opp'n 46.) Specifically, he argues that a timestamp in the upper left-hand corner of his medical records shows that the records can be tampered with. (*Id.*) The medical records are constructed such that each page contains a banner at the top of the page with Plaintiff's name, age, sex, account number, and unit number. (*See* ER Records 4–11, 23–28.) Below the banner, the records contain a detailed digital trail of Plaintiff's respective visits, including his admission and discharge times, when he was seen (and by whom), and what treatment he received, among other data. (*See id.*) Above the banner, the medical records contain three additional fields—(1) "Run Date"; (2) "Run Time"; and (3) "Run User." (*See id.*) The data in these fields are identical on each page of the records pertaining to a particular visit. Thus, the records pertaining to Plaintiff's first visit all indicate a "Run Date" of May 10, 2015, a "Run Time" of "0102," and a "Run User" named "N. KDC." (*See id.* at 4–11.) The records pertaining to Plaintiff's second visit indicate a "Run Date" of May 12, 2015, a "Run Time" of "0022," and a "Run User" named "N. CCD." (*See id.* at 23–28.) In her supporting affidavit, the St. Luke's official charged with overseeing the hospital's electronic medical records system explains that, "[t]o make an entry in the [electronic medical record system], a staff member must log-in and use their [sic] own secure password. Anyone accessing the [system] or making an

entry in the [system] automatically generates a date/time entry." (Berberich Aff. ¶ 8.) She goes on to explain that the date and time entries on Plaintiff's medical records—i.e., the information below the banner—corresponds with Defendants' version of events, (*see id.* ¶¶ 9–12), which is true. But Plaintiff argues that the data fields above the banner show that "once [a] user logs in[to] the [electronic medical record system], any date/time, notes, names[,] and signatures can be edited/entered into the audit trail." (Pl.'s Opp'n 46.)

This argument has several problems. First, so far as Plaintiff purports to dispute Berberich's testimony regarding the functionality of the electronic medical records system, he has no personal knowledge of how the system actually operates. *See Myers v. County of Nassau*, 825 F. Supp. 2d 359, 366 (E.D.N.Y. 2011) (observing that affidavits or deposition testimony offered to defeat summary judgment "must be based upon the personal knowledge of the witness, . . . and the speaker must be shown competent to testify [to facts admissible in evidence]"). Relatedly, Plaintiff's argument—that the data fields above the banner show that a user can enter the system after the fact to cook the books—is pure speculation. Moreover, even if Plaintiff's theory had some empirical grounding, it would mean that Defendants or some accomplice modified the hospital records for the first visit on May 10, 2015, and then waited another two days to falsify the records for the second visit. That is a terribly odd way to go about covering one's tracks. The more natural inference, of course, is that the data fields above the banner pertain to routine administrative processing, and do not constitute indicia of some sinister plot.

But the Court need not trouble itself with this issue further, for even if the records did betray some sign of tampering, that alone provides no evidence of an agreement "between a state actor and a private entity" to "act in concert to inflict an unconstitutional injury." *Pangburn*, 200 F.3d at 72. If a summary judgment motion "is supported by documentary evidence and sworn

affidavits and 'demonstrates the absence of a genuine issue of material fact,' the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or 'rely on conclusory allegations or unsubstantiated speculation.'"  *Estate of Ferrara v. United Pub. Serv. Emps. Union*, No. 18-CV-527, 2020 WL 7714542, at *5 (D. Conn. Dec. 29, 2020) (quoting *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015)) (granting summary judgment for defendants where plaintiff had presented only "diffuse and expansive allegations" of conspiracy, and where the plaintiff's testimony "simply underscore[d] the [u]nion's alleged antipathy towards him," but did not establish an agreement between the union and police to act "in concert" (citations omitted)).  Because Plaintiff has failed to raise a triable issue of fact regarding either of his two conspiracy claims, summary judgment is appropriate. *See Hardy v. Baird*, No. 13-CV-7402, 2016 WL 2745852, at *13–14 (S.D.N.Y. May 10, 2016) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff failed to provide any evidence that the defendants had reached an agreement to fabricate evidence to secure a search warrant); *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at *9 (S.D.N.Y. Apr. 11, 2014) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had failed to "cite any evidence demonstrating an agreement between [the defendants] to use excessive force"); *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 218–19 (D. Conn. 2001) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had provided no evidence that the defendants "had an understanding, either tacit or explicit, to act in concert," and had only offered "rank speculation and conjecture").  Accordingly, Police Defendants and Medical Defendants' Motions are both granted with respect to Counts 14 and 20, which are dismissed.

### III.  Conclusion

For the reasons stated above, Police Defendants' Motion is granted in part and denied in Part.  The Motion is granted with respect to Counts 1, 3–4, 7–8, 12–16, and 20.  With respect to Count Two, the Motion is granted as to Plaintiff's Handcuff Claim and Assault Claim, but denied as to Plaintiff's Search Claim.  The Motion is denied with respect to Counts Five and 10.

Medical Defendants' Motion is granted in part and denied in part.  The Motion is granted with respect to Counts 12–14 and 16–20.  The Motion is denied with respect to Count 15.

Plaintiff's Motion is granted in part and denied in part.  With respect to Count Six, the Motion is granted as to the visual body cavity search and denied as to the alleged manual body cavity search.  The Motion is denied as to Counts One, Seven, and 10.

Accordingly, Counts 1, 3–4, 7–8, 12–14, and 16–20 are dismissed.  The Handcuff Claim and Assault Claim within Count Two are also dismissed.  Count 15 is dismissed as to Police Defendants only.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 159, 173), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

Dated:   March 26, 2021
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge